**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| LUCKY JJC, INC., a California corporation, | ) ) ) ) | FILED: JULY 30, 2008<br>08CV4339<br>JUDGE DER YEGHIAYAN<br>MAGISTRATE JUDGE MASON |
| Plaintiff | ) ) | |
| v. | ) ) | Case No.:    JFB<br>Judge: |
| GURNEE MILLS OPERATING COMPANY, L.L.C., a Delaware limited liability company, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

**COMPLAINT**

Lucky JJC, Inc. ("LJJC"), by and for its Complaint against defendant Gurnee Mills

Operating Company, L.L.C. ("Gurnee Mills"), states as follows:

**NATURE OF THE CASE**

1.      This action arises from an actual controversy that has developed between LJJC

and Gurnee Mills regarding the proper procedure for determining the "appraised fair market

value" of a certain retail property located within the Gurnee Mills shopping center complex (the

"Property").  This action is necessary to determine the amount that Gurnee Mills must pay to

repurchase the Property from LJJC under a repurchase right granted in the Declaration of

Restrictions under which Gurnee Mills' predecessor sold the Property in 1990 (the

"Declaration").

2.      Gurnee Mills has taken the position that the Declaration requires the property to

be appraised based on the assumption that the Declaration precludes any use of the Property

other than for a variety or general merchandise store.  But the Declaration contains no such

restriction and does not permit the appraisal approach Gurnee Mills seeks to apply. LJJC believes, based on Gurnee Mills' preliminary estimate, that Gurnee Mills' impermissible assumption, if applied, would improperly discount the purchase price by $7 million or more.

3.     In this action, LJJC requests that the Court declare that the Declaration requires appraised fair market value to be determined *without* the use restriction Gurnee Mills seeks to impose and enter appropriate injunctive relief to ensure that the appraisals are conducted properly. LJJC also seeks specific performance and/or damages in connection with Gurnee Mills' anticipatory breach of the terms of the Declaration.

**PARTIES**

4.     Plaintiff LJJC is a California corporation with its principal place of business located in Beverly Hills, California. LJJC is the current owner of the Property and a successor in interest to PMI Associates, the buyer of the Property under the Declaration.

5.     Defendant Gurnee Mills is a Delaware limited liability company. On information and belief, its principal place of business in Indianapolis, Indiana. Gurnee Mills is the successor in interest to Gurnee Properties Associates Limited Partnership, the seller of the Property under the Declaration.

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship between LJJC and Gurnee Mills. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to LJJC's claims occurred in this district and because the Property in question is located in this district.

## BACKGROUND

### The Gurnee Mills Mall Complex

8.      Gurnee Mills' predecessor in interest, Gurnee Properties Associates Limited Partnership ("Gurnee Properties"), and certain of its affiliates were the original owners and developers of the Gurnee Mills outlet shopping mall project, located at the intersection of Interstate 94 and Grand Avenue (IL 132) in the Village of Gurnee, Illinois.  Gurnee Mills currently contains over 200 retail stores and is strategically positioned between the major markets of Chicago and Milwaukee.  The shopping mall complex attracts over 23 million shoppers per year.

9.      In addition to the principal shopping mall, the Gurnee Mills shopping mall complex includes a number of nearby "outlots," on which additional retail stores are located. The Property is one of the outlots that was originally owned by Gurnee Properties.  The Property has been improved with an 80,000 square foot retail building that has historically housed a Phar-Mor pharmacy and a Value City Department Store.

### The 1990 Transaction

10.      On August 31, 1990, Gurnee Properties sold the Property to PMI Associates.

11.      In conjunction with the sale of the Property, the parties entered into the Declaration (attached as Ex. 1) for the purpose of memorializing certain understandings regarding the use, occupancy and improvement of the Property.  The Declaration was recorded shortly following the sale.

12.      Paragraph 2(A) of the Declaration provides, in relevant part:

>        A.    Use.  … Buyer shall use and occupy the Property (and the building to be constructed thereon) only for the purposes of the operation of … a variety or general merchandise store.
>
>        …

> Notwithstanding the foregoing, after [three years] ***Buyer shall
> have the right to change the use*** *of the Property and/or the
> building from the operation of … a variety or general
> merchandise store provided that (i) the Property and/or the
> building shall be used only for a single retail use … and (iii)
> Buyer or any occupant of the Property shall have notified Seller
> of such proposed change of use at least sixty (60) days prior to
> such change and affords Seller the opportunity to repurchase the
> Property* as provided in Paragraph 2(E) of this Declaration.

(Declaration ¶ 2(A) (emphasis added).)  Other than the general requirement that the building

continue to be used for "single retail use" (and several specific prohibited uses listed in Exhibit 3

of the Declaration but not applicable here), the Declaration contains no restriction on the Buyer's

right to change the use of the Property to uses other than a variety or general merchandise store

so long as the Buyer notifies the Seller and affords an opportunity to repurchase.

13.    Paragraph 2(E) of the Declaration describes the repurchase option.  That

paragraph provides, in relevant part:

> E.    Repurchase Option (After Expiration of Operating
> Covenant).  If at any time after the expiration of Buyer's three (3)
> year covenant … Buyer or any occupant of the Property shall have
> notified Seller in accordance with Paragraph 2(A) of this
> Declaration that it wishes to change the use of the Property and/or
> building from a variety or general merchandise store as provided in
> said Paragraph 2(A), then in either such event Seller may, at its
> sole option, repurchase the Property…. *[T]he Property shall be
> repurchased by Seller for … the **appraised fair market value** of
> the Property* (as defined in Subparagraph 2(F) below….

(Declaration ¶ 2(E) (emphasis added).)

14.    Paragraph 2(F) of the Declaration describes the procedures for determining the

"appraised fair market value" of the Property in the event the Seller exercises the Repurchase

Option.  That paragraph provides, in relevant part:

> F.    Appraised Fair Market Value.  For the purposes of
> Subparagraph 2(E) above, the "Appraised Fair Market Value" of
> the Property shall be determined by the following procedure: …
> The appraisers ***shall appraise the Property solely on the basis of***

4

> *its use as a single user [sic] retail facility **and shall consider any
> encumbrances against the Property*** in making their appraisals.
> The appraisals shall be averaged to calculate the appraised fair
> market of the Property …

(Declaration ¶ 2(F) (emphasis added).)

15.    Under Paragraph 2(G) of the Declaration, "Seller is required to notify Buyer of its intent to repurchase the Property prior to the time that the Repurchase Price or the appraised fair market value of the Property (as the case may be) is determined."  (Declaration ¶ 2(G)(1).)  Even if Seller notifies Buyer of its intent to repurchase,

> Seller shall have the right, at its sole option, to rescind such notice
> and cancel such repurchase if Seller determines, after the
> Repurchase Price or the appraised fair market value of the Property
> (as the case may be) is calculated, that the amount which Seller
> would be required to expend in connection with the repurchase of
> the Property is greater than that which Seller anticipated.

(*Id.*)  To establish the amount Seller anticipated, the Declaration directs Seller to include an estimate of the Repurchase Price or appraised fair market value of the Property in Seller's notification of its intent to repurchase.  (*Id.* ¶ 2(G)(2).)

### The 1997 Lease

16.    In or around 1995, there was a change of use of the Property.  The Property ceased to be used as a Phar-Mor pharmacy and began to be used as a Value City Department Store.  The Value City Department Store was an off-price, full line department store rather than a variety or general merchandise store.

17.    On August 13, 1997, MRSLV Gurnee Mills L.L.C., then the owner of the Property and successor in interest to Gurnee Properties, entered into a Lease Agreement with Value City Department Stores, Inc.  (8/18/97 Lease Agreement (attached as Ex. 2).)  The primary term of the lease was twenty years, commencing September 3, 1997 and ending September 2, 2017.

18.    Following the Lease Agreement, Value City Department Stores, Inc. began operating a Value City Department Store on the Property.

19.    This store has now closed.  As part of the closure, Value City Department Stores, Inc. has assigned its interest under the Lease Agreement to American Signature, Inc. ("ASI"), the operator of Value City Furniture stores.  ASI desires to use the Property as a single retail use furniture store.

### Gurnee Mills' Intended Repurchase of the Property

20.    LJJC is the current owner of the Property and is a successor in interest (i) to PMI Associates as the Buyer under the Declaration and (ii) to MRSLV Gurnee Mills L.L.C. as the Landlord under the Lease Agreement.

21.    On May 28, 2008, ASI formally notified Gurnee Mills that it intends to change the use of the property to a Value City Furniture Store.  On June 20, 2008, LJJC formally joined in that notification.  (6/20/08 Rubin Letter (attached as Ex. 3).)  The proposed Value City Furniture Store would represent a "single retail use" as that term is used in the Declaration (and would not fall within any of the specific prohibited uses listed in Exhibit 3 of the Declaration) but would not be a "variety or general merchandise store."

22.    On July 18, 2008, Gurnee Mills informed LJJC that it intends to exercise the Repurchase Option contained in paragraph 2(E)(ii) of the Declaration.  (7/18/08 Goodman Letter (attached as Ex. 4).)

23.    On information and belief, Gurnee Mills is considering moving a Burlington Coat Factory store onto the Property after the intended repurchase.  Burlington Coat Factory is a discount apparel retailer and is not a "variety or general merchandise store" as that phrase is used in Paragraph 2(A) of the Declaration.  Operating a Burlington Coat Factory on the Property would constitute a change of use of the Property.

### The Current Controversy

24.    Pursuant to Paragraph 2(G)(2), Gurnee Mills estimated that the appraised fair market value of the Property is $3,500,000.

25.    On information and belief, Gurnee Mills' purported estimated appraised fair market value is based on interpreting the phrase "any encumbrances against the Property" in Paragraph 2(F) of the Declaration to include a requirement that the Property continue to be used as a "variety or general merchandise store" as that phrase is used in Paragraph 2(A) of the Declaration.

26.    There is no requirement in the Declaration that the Property continue to be used as a "variety or general merchandise store," nor does the Declaration grant Gurnee Mills any right to preclude LJJC or ASI from changing the use of the Property to a furniture store, so long as the Property continues to be used for a single retail use.  Rather, the Declaration expressly permits LJJC to change the use of the Property to a use other than a variety or general merchandise store."  Moreover, the notification requirement and repurchase option under Paragraph 2(A) of the Declaration do not constitute an "encumbrance" for purposes of applying the appraisal methodology prescribed in 2(F) of the Declaration.

27.    LJJC's counsel previously notified Gurnee Mills' counsel on May 12, 2008 that LJJC disagreed with Gurnee Mills' interpretation of "appraised fair market value" of the Property.  (5/12/08 Rubin Letter (attached as Ex. 5).)

28.    LJJC believes that the appraised fair market value of the Property will be between $10,000,000 and $15,000,000 (and, in any event, significantly higher than the Gurnee Mills estimate) if the if the appraisers conduct their appraisals in accordance with the correct interpretation of the Declaration.

29.     Permitting Gurnee Mills to repurchase the Property for $3,500,000, or for any amount determined (even in part) by an appraisal based on Gurnee Mills' misinterpretation of the Declaration, would result in a significant windfall to Gurnee Mills and a significant loss to LJJC.

30.     Gurnee Mills is the successor to the Seller under the Declaration.  If Gurnee Mills repurchases the Property, it will be able to use the Property for any purpose.  Indeed, there are no third-party beneficiaries under the Declaration, and there is no reason Gurnee Mills cannot void the declaration in its entirety.  The value of the Property to Gurnee Mills will be far greater than $3,500,000, because (among other things) it will not be subject to the use restriction (improperly) assumed in Gurnee Mills' appraisal.

31.     Likewise, LJJC would be compensated far less than the Property is worth. Paragraph 2(A) of the Declaration *expressly grants the Buyer the right to change the use of the property* to uses other than a variety or general merchandise store (after the first three years the Declaration is in place and except for the specific prohibited uses in Exhibit 3 of the Declaration).  The right to change uses is subject to Gurnee Mills' option to repurchase. However, if Gurnee Mills exercises its right, it must pay the appraised fair market value of the Property, which must include the value of LJJC's bargained-for right to change the use.  Gurnee Mills' $3,500,000 estimate, or any appraised value that misinterprets the Declaration to impose a *restriction* on changing the use of the Property, would be contrary to the terms of the Declaration and would under compensate LJJC.

32.     Moreover, Gurnee Mills is seeking to exercise its right to repurchase in bad faith. The repurchase right was intended to ensure that Gurnee Mills would have a means of repurchasing the Property if the Buyer (or any lessee) intended to use the Property for a purpose that was incompatible with or injurious to the Gurnee Mills outlet shopping mall project.  On

information and belief, Gurnee Mills is seeking to use its repurchase option to reap a windfall rather than because changing the use of the Property would be injurious or incompatible. Indeed, on information and belief, Gurnee Mills itself anticipates changing the Property's use. While LJJC does not contest Gurnee Mills' right to exercise its repurchase right, it must exercise that right in good faith and must compensate LJJC fair market value for the Property. Gurnee Mills' $3,500,000 estimate is substantially below the Property's fair market value.

**The Appraisal Procedure**

33. The Declaration provides that "Seller and Buyer shall each select an appraiser to appraise the Property, which appraisals shall be made within thirty (30) days of the date on which Seller notifies Buyer, in writing, of its intent to exercise the repurchase option." (Declaration ¶ 2(F).)

34. To calculate the appraised fair market value for purposes of determining the amount paid for the repurchase:

> The appraisals shall be averaged to calculate the appraised fair market of the Property … , unless such appraisals are more than five percent (5%) of the lower appraisal apart, in which event the two appraisers shall select a third appraiser who shall independently appraise the Property. The appraised fair market value of the Property shall then be the average of those appraisals which are less than five percent (5%) of the lower appraisal apart from the middle appraisal. If none of the appraisals are less than five percent (5%) of the lower appraisal apart from the middle appraisal, then the value of the middle appraisal shall be the appraised fair market value of the Property.

(Declaration ¶ 2(F) (emphasis added).)

35. Gurnee Mills notified LJJC in writing of its intent to exercise the repurchase option by letter (sent by registered mail) on July 18, 2008. The Declaration calls for each party's appraisal to be made within 30 days of the date on which Gurnee Mills provided notice to LJJC.

36.     To arrive at an appraised fair market value consistent with the terms of the Declaration, *both* parties' appraisers must conduct their appraisals applying the correct interpretation of the Declaration.  The correct interpretation must be determined based on the terms of the Declaration, which are ultimately a matter for the Court, not the parties' appraisers, to decide.  *See Superior Investment and Dev. Corp. v. Devine*, 614 N.E.2d 302, 308 (Ill. App. Ct. 1993).

## COUNT I
## DECLARATORY AND INJUNCTIVE RELIEF

37.     Paragraphs 1 through 36, above, are hereby incorporated by reference as if fully set forth herein.

38.     The Declaration, when properly construed, requires the parties' appraisers to appraise the Property based on the assumption that the owner (or lessee) has the right to change the use of the Property to uses other than as a variety or general merchandise store.

39.     An actual and justiciable controversy exists between LJJC and Gurnee Mills regarding the methodology the Declaration prescribes for appraising the Property.  Pursuant to 28 U.S.C. §§ 2201, 2202 this Court may declare the rights and legal relations of the parties and grant further necessary or proper relief based on its declaration.

40.     In the event Gurnee Mills seeks to exercise its repurchase right, LJJC has a clearly ascertainable right under the Declaration to have the repurchase price determined in accordance with the terms of the Declaration.

41.     Without conducting a proper appraisal procedure, the parties will not have a valid "appraised fair market value."  If Gurnee Mills' appraiser (or any other appraiser involved in the valuation process) conducts an appraisal based on impermissible assumptions, the process

prescribed by the Declaration for determining the "appraised fair market value" will be flawed and will yield a repurchase price significantly lower than the Declaration requires.

42.     If the parties do not conduct a proper appraisal procedure, LJJC will suffer irreparable harm for which it would have no adequate remedy at law.

43.     In the event that Gurnee Mills proceeds with an appraisal based on impermissible assumptions, or does not suspend the timetable for completing appraisals to permit resolution of the issues herein, LJJC will face an imminent threat of harm.

44.     For the reasons stated herein, LJJC is reasonably likely to succeed on the merits of this claim, the balance of harms would weigh in favor of granting relief, and the requested relief would not cause public harm.

WHEREFORE, LJJC requests that the Court (i) enter judgment in its favor; (ii) issue a declaration pursuant to 28 U.S.C. § 2201 that the Declaration requires the "appraised fair market value" to be determined based on the assumption that the owner (or lessee) of the Property has the right to change the use of the Property to uses other than as a variety or general merchandise store; (iii) issue appropriate injunctive relief, including (a) an injunction requiring Gurnee Mills to direct any appraiser engaged to appraise the Property in connection with the contemplated repurchase to conduct the appraisal based on the assumption that the owner (or lessee) of the Property has the right to change the use of the Property to uses other than as a variety or general merchandise store; and (b) if necessary, an injunction suspending the timetable for completing appraisals to permit resolution of the issues set forth in this Complaint; and (iv) grant whatever additional relief the Court deems just and proper.

**COUNT II**
**ANTICIPATORY BREACH OF CONTRACT**

45.     Paragraphs 1 through 44, above, are hereby incorporated by reference as if fully set forth herein.

46.     After the expiration of the original three year covenant, the Declaration grants to LJJC an express and affirmative right to change the use of the Property to uses other than as a variety or general merchandise store.

47.     The exercise of the repurchase right is uniquely within the discretion of Gurnee Mills.

48.     Gurnee Mills has an obligation to exercise its repurchase right in good faith and not in a manner that is contrary to the intent of the parties to the Declaration or in a manner that destroys the benefit of LJJC's bargain.

49.     Gurnee Mills has indicated its intent to breach the terms of the Declaration by:  (i) exercising the Repurchase Option in bad faith and in a manner contrary to the clear intent of the parties to the Declaration, destroying the benefit of LJJC's express and bargained-for right to use the Property; and (ii) estimating the appraised value of the Property with the assumption that it will be used as a variety or general merchandise store, in violation of the terms of the Declaration.

50.     The Property is uniquely valuable commercial real estate without reasonable equivalent.

51.     As a direct and proximate result of Gurnee Mills' anticipated breach, LJJC will suffer irreparable injury for which monetary damages are inadequate.

52.     In the event that Gurnee Mills repurchases the Property in breach of the Declaration, LJJC will suffer a significant monetary loss.

WHEREFORE, LJJC requests that the Court (i) enter judgment in its favor; (ii) enjoin Gurnee Mills from exercising its repurchase right; (iii) in the alternative, award LJJC monetary damages in an amount to be determined; and (iv) grant whatever additional relief the Court deems just and proper.

## JURY DEMAND

53.     LJJC demands a jury trial on all issues triable to a jury.


Dated:  July 30, 2008                                    Respectfully submitted,


                                           _____s/_Stephen J. Landes_____
                                           Stephen J. Landes
                                           W. Allen Woolley
                                           Peter N. Moore
                                           WILDMAN, HARROLD, ALLEN & DIXON
                                           225 West Wacker Drive
                                           Chicago, Illinois 60606
                                           Telephone: (312) 201-2000
                                           Facsimile:  (312) 201-2555
                                           *Attorneys for Plaintiff, Lucky JJC, Inc.*

2943172

FILED: JULY 30, 2008
08CV4339
JUDGE DER YEGHIAYAN
MAGISTRATE JUDGE MASON

JFB

## DECLARATION OF RESTRICTIONS

### BETWEEN

**GURNEE PROPERTIES ASSOCIATES LIMITED PARTNERSHIP,**
an Illinois limited partnership

- And -

**PMI ASSOCIATES, a Pennsylvania limited partnership**

**Prepared By And After
Recording Return To:**

David B. Sickle, Esq.
Rudnick & Wolfe
203 North LaSalle Street
Suite 1800
Chicago, Illinois 60601-1293

GIE0938 08/27/90 1850

CHICAGO TITLE INSURANCE CO.

# TABLE OF CONTENTS

Section                                                                          Page

1.    CONSTRUCTION BY BUYER ......................................................... 2
      A.    Approvals Required.............................................................. 2
      B.    Construction Standards ........................................................ 2
      C.    Building Schedule................................................................ 3
      D.    Safety Measures.................................................................. 4
      E.    Storage Areas ..................................................................... 4
      F.    Protection of Shopping Center Project.................................. 4
      G.    Buyer's Construction Duty .................................................. 5
      H.    Improvements To Be Constructed ....................................... 5
      I.    Liens.................................................................................. 6
      J.    Evidence of Compliance With Construction Requirements.............. 7
      K.    Alterations.......................................................................... 7

2.USE RESTRICTIONS AND OPERATING COVENANT............................... 8
      A.    Use .................................................................................... 8
      B.    Operating Covenant ........................................................... 10
      C.    Master Declaration ............................................................ 12
      D.    Repurchase Option (Prior to Expiration of
            Operating Covenant Period) ............................................... 12
      E.    Repurchase Option (After Expiration of Operating Covenant) ..... 14
      F.    Appraised Fair Market Value ............................................... 17
      G.    Refusal to Repurchase ....................................................... 17

3.    ANNUAL ASSESSMENTS ........................................................... 19

4.    SELLER'S ON-SITE AND OFF-SITE WORK...................................... 21

5.    SELLER'S CONSTRUCTION ........................................................ 22

6.    SIGN EASEMENTS.................................................................... 26

7.    COMMON UTILITIES EASEMENT ................................................ 27

8.    TRANSFER OR CONVEYANCE BY BUYER ...................................... 30

9.    TRANSFER OR CONVEYANCE BY SELLER ..................................... 33

10.   INSURANCE............................................................................. 36

11.   INDEMNIFICATION.................................................................... 40

12.   DEFAULT................................................................................. 41

13.   TERM OF DECLARATION ........................................................... 44

14.   NOTICES ................................................................................ 45

GIE0938 08/27/90 1850                    i

2943172
2

<u>Section</u>                                                                      <u>Page</u>

15.    GOVERNING LAW...............................................................46

16.    ASSIGNMENT BY SELLER ...............................................46

17.    BINDING EFFECT ...............................................................46

18.    MISCELLANEOUS ..............................................................47

2943172
*3*

GIE0938 08/27/90 1850                    ii

DECLARATION

~~DESCRIPTION~~ OF RESTRICTIONS

THIS DECLARATION OF RESTRICTIONS (the "Declaration") is made as of the 31st day of August, 1990 by and between **GURNEE PROPERTIES ASSOCIATES LIMITED PARTNERSHIP**, an Illinois limited partnership, whose address is 3000 K Street, N.W., Suite 200, Washington, D.C. 20007 (the "Seller") and **PMI ASSOCIATES**, a Pennsylvania limited partnership, whose address is 20 Federal Plaza West, Youngstown, Ohio 44501, (the "Buyer") based on the following recitals:

A.    On this date, Seller has conveyed to Buyer a certain parcel of land situated in the Village of Gurnee, Lake County, Illinois, which parcel is more particularly described on Exhibit 1 attached hereto and made a part hereof (hereinafter referred to as the "Property").

B.    The Property is a part of a larger parcel of land encompassing certain neighboring and adjacent properties which are being (or will be) developed in large part by Seller as a shopping center (hereinafter referred to as the "Shopping Center Project"), which is more particularly described on Exhibit 2 attached hereto and made a part hereof.

C.    The Shopping Center Project is a part of a larger parcel of land encompassing certain neighboring and adjacent properties which are or have been owned in large part by Seller and certain related entities (hereinafter referred to as the "Gurnee Mills Development").

D.    Seller and Buyer desire to memorialize certain understandings regarding the use, occupancy and improvement of the Property in the manner hereinafter set forth.

GIE0938 08/27/90 1850

**2943172**
4

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **CONSTRUCTION BY BUYER.**

A.    <u>Approvals Required</u>.  No buildings, structures or other improvements shall be constructed or installed on the Property unless and until all plans and specifications therefor are reviewed and approved by Seller, in accordance with the terms and conditions set forth in that certain Master Declaration of Easements, Covenants, Conditions and Restrictions executed by Seller on January 22, 1990, a memorandum of which was recorded on January 26, 1990, with the Lake County, Illinois Recorder of Deeds as document number 2873087 (hereinafter referred to as the "Master Declaration").  Buyer further agrees that it shall not submit to any governmental authority any site plans or other design plans relating to the Property of the improvements to be constructed thereon unless and until all such plans are reviewed and approved by Seller, as provided in the Master Declaration.  Buyer agrees to cause its plans and specifications to be prepared and submitted to Seller within thirty (30) days following the date of execution of this Declaration.

B.    <u>Construction Standards</u>.  Buyer hereby covenants and agrees to perform its construction (which term shall include any and all alteration or reconstruction work) of any and all buildings, structures and improvements upon the Property in accordance with the following requirements and standards:

        (i)     All buildings, structures and other improvements to the Property (and all restorations thereof and additions, alterations or changes thereto) shall be constructed or made in accordance with and in the locations shown on the plans and specifications approved by Seller (pursuant to the terms and provisions of the Master Declaration) and in accordance with Seller's Anchor Design Criteria Booklet dated June 1, 1990;

GIE0938 08/27/90 1850                         2

**2943172**
5.

(ii)    Upon commencement of any construction, Buyer shall diligently and expeditiously prosecute such construction to completion, subject to delays caused by fire, strike, or other catastrophe or contingency beyond Buyer's control;

(iii)   All construction shall be performed in a good and workmanlike manner using first quality materials and in accordance with all applicable laws, ordinances, rules and regulations of all governmental and quasi-governmental agencies and authorities having jurisdiction over such construction;

(iv)    Buyer shall perform its construction work in full cooperation with Seller, and in the event Seller performs any construction or site work on the Property or on other land adjacent to or in the vicinity of the Property at approximately the same time as Buyer performs its construction work on the Property, each party shall use its reasonable efforts to cause its architects, engineers, contractors and subcontractors to cooperate and coordinate its construction with the other party's architects, engineers, contractors and subcontractors, to the extent necessary to achieve the objectives set forth in this Declaration; and

(v)     Buyer shall perform its construction so as not to unreasonably impair, disrupt or interfere with the construction, use, occupancy or enjoyment of the Gurnee Mills Development or any part thereof.

C.    <u>Building Schedule</u>.  Prior to the commencement of construction on the Property, Buyer shall prepare and submit to Seller, for informational purposes only, a building schedule showing the date upon which Buyer anticipates (i) commencement of construction of its work, (ii) having its building enclosed, (iii) having its building substantially completed and (iv) having its building ready to open to the public.  Periodically during the course of construction, Buyer shall prepare and submit to Seller, for informational purposes only, updated building schedules showing the status of its construction and, if there shall be any changes in said dates, the revised date or dates for each phase of construction.  The submittal by Buyer of a building schedule or revised building schedule shall not in any way change the obligations of Buyer with respect to its commencement, prosecution and/or completion of construction in accordance with

2943172
6

the provisions of this Declaration, or deprive Seller of any rights which it may have because of the delays or failure of performance by Buyer.

D.  **Safety Measures.**  Buyer shall at all times take any and all safety measures reasonably required under good construction practices to protect Seller and any and all persons and entities owning, occupying, performing work on or visiting the portion of the Shopping Center Project in which Buyer is performing work from injury or damage caused by or resulting from the performance of Buyer's construction.  If any construction to be performed by Buyer shall not have been substantially completed when any other building in the Shopping Center Project shall have opened for business to the public, or if Buyer shall commence any construction at any time or times after any buildings in the Shopping Center Project shall have opened for business to the public, then Buyer shall erect or cause to be erected an adequate and attractive construction barricade or other protective device at least eight (8) feet in height, substantially enclosing the area of its construction, and shall maintain such barricade and device until removal of such barricade or device would be justified under good construction practice.

E.  **Storage Areas.**  When performing construction work, Buyer shall use the area on the Property designated (on the plans and specifications prepared by Buyer and approved by Seller) as a construction staging area (i.e., for material and equipment storage sites, construction shacks and temporary improvements incidental to construction).  Buyer shall keep all construction equipment, vehicles and materials in the designated construction staging area, and shall keep such staging area secured at all times with an adequate chain link fence or other barricade or protection device around the area.

F.  **Protection of Shopping Center Project.**  In the event that any loose dirt, trash or debris resulting from or attributable to Buyer's construction work on the

Property accumulates on any other portion of the Shopping Center Project, then Buyer shall be responsible for removing the same. Buyer shall also be responsible for repairing any damage to any other portion of the Shopping Center Project that may result from or be attributable to Buyer's construction on the Property.

  G. <u>Buyer's Construction Duty</u>. Buyer shall commence construction of its improvements upon the Property in sufficient time to open for business within the time period set forth below; provided, however, that Buyer shall not be required to commence construction prior to the later of the dates on which the following events occur: (i) Seller completes its rough grading and compaction work on the Property (pursuant to Paragraph 2(B) of that certain Supplemental Agreement [the "Supplemental Agreement"] entered into by Seller and Buyer of even date herewith), (ii) Seller approves Buyer's plans and specifications for its development of the Property (as required pursuant to the Master Declaration), or (iii) this Declaration is executed by Seller and Buyer. Buyer shall cause construction of its building on the Property to be completed and opened for business to the public no later than August 1, 1991 (subject to <u>force majeure</u>, as provided in Subparagraph 18(C) below, and to delays caused by virtue of the failure of Seller to perform its work on the Property within the time periods set forth in this Declaration and in the Supplemental Agreement); provided, however, that if the shopping center to be constructed in connection with the Shopping Center Project (the "Shopping Center") is not completed and opened for business to the public (as defined in Paragraph 5 below) on or before August 1, 1991 then Buyer may delay opening its building on the Property for business to the public until the date on which the Shopping Center is open for business to the public (as defined in Paragraph 5 below).

  H. <u>Improvements To Be Constructed</u>. Buyer shall construct or cause to be constructed on the Property the following buildings and improvements:

GIE0938 08/27/90 1850     5

2943172
5

(i)    A one (1) level building containing not less than eighty thousand (80,000) square feet of floor area, nor more than ninety thousand (90,000) square feet of floor area (measured from the exterior faces of the exterior walls and the mid-line of the interior wall of the building);

(ii)   All landscaped and planted areas in the Property (including screening and buffer);

(iii)  A complete paved parking area, at grade level (including, without limitation, concrete curbs, islands, sidewalks, bike racks, interior roads, parking area identification, traffic control and entrance and exit signs, entrances and exit driveways and parking lot striping and painting) which shall be large enough to accommodate at least five (5) cars for every one thousand (1,000) square feet of floor area in the building constructed on the Property [measured as provided in subsection (i) above] initial construction of which parking area may be completed by Seller, on Buyer's behalf, as provided in the Supplemental Agreement);

(iv)   A complete parking area lighting system, including without limitation, concrete bases, conduits, fittings and fixtures (initial construction of which lighting system may be completed by Seller, on Buyer's behalf, as provided in the Supplemental Agreement);

(v)    Any other improvements that are provided for in the site and design plans approved by the Architectural Review Committee pursuant to the Master Declaration.

I.    **Liens**.  Buyer shall indemnify, defend and save Seller harmless from all losses, damages, liabilities, expenses and/or claims whatsoever (including, without limitation, reasonable attorneys' fees, disbursements and other costs of defending against the foregoing), by reason of any lien for any work done, services performed or materials supplied at the request of or for the benefit of Buyer which shall be filed against any portion of the Shopping Center Project (other than the Property).  In the event any such lien is filed, Buyer shall discharge such lien on record as promptly as possible, but in no event later than forty-five (45) days after the filing of such lien.  Buyer shall have the right to contest the validity, amount or applicability of any lien by appropriate legal proceedings, provided Buyer shall (i) (A) furnish a bond, if bonding is necessary to

and Seller's mortgagee, and each of their respective successors and assigns

GIE0938 08/27/90 1850            6

2943172
9

secure a stay of execution and/or to induce Seller's title insurance company to insure over such lien, or (B) if bonding is not required, place in escrow with a national title company or institutional lender the amount necessary to pay such lien (with interest), and (ii) prosecute such contest to completion diligently and in good faith, in which event, the requirement contained above that Buyer pay and discharge such lien shall not be applicable. In the event such legal proceedings shall be finally concluded (so that no further appeal may be taken) adversely to Buyer, Buyer shall, within five (5) days thereafter, cause the lien to be discharged of record. In the event that Buyer is obligated to discharge any lien of record pursuant to this Subparagraph 1(I) but fails to do so within the time required, then Seller shall have the right (but not the obligation) upon ten (10) days' notice to Buyer to discharge such lien of record for the account of and at the expense of Buyer. Buyer shall promptly, upon demand, reimburse Seller for any amounts paid by it in connection with its causing such lien to be discharged of record.

J.    <u>Evidence of Compliance With Construction Requirements</u>. After Buyer has completed all of its initial construction upon the Property, Buyer shall, within sixty (60) days after request by Seller, deliver to Seller evidence that the construction has been completed in compliance with all applicable laws, ordinances, rules and regulations. A copy of the permanent certificate of occupancy (or the equivalent thereof) issued by the appropriate governmental body having jurisdiction thereover shall be deemed satisfactory evidence of compliance with the requirements of this Subparagraph 1(J).

K.    <u>Alterations</u>. Buyer shall not make any alterations, changes or additions to (i) the exterior and/or the structure of its building, (ii) the interface between Buyer's building and any other buildings on the Shopping Center Project, and/or (iii) any other

GIE0938 08/27/90 1850                  7

2943172
10

improvements (excluding Buyer's building) located (or to be located) on the Property, unless and until Buyer presents plans therefor to Seller for its review and approval, and Seller approves the same, in writing. All such plans shall be prepared, submitted and reviewed in accordance with the terms and provisions of the Master Declaration. In no event shall Buyer be permitted to make any alterations, changes or additions that would reduce the parking ratio on the Property below five (5) parking spaces for every one thousand (1,000) square feet of floor area in the building to be constructed by Buyer on the Property (measured as provided in Subparagraph 1(H) above).

2.    **USE RESTRICTIONS AND OPERATING COVENANT.**

   A.   **Use.** Subject to the provisions of this Subparagraph 2(A), Buyer shall use and occupy the Property (and the building to be constructed thereon) only for the purposes of the operation of a "Phar-Mor" store (as then being operated by Phar-Mor, Inc. in a majority of its other stores) or a variety or general merchandise store. The products and merchandise to be displayed and offered for sale in Buyer's store shall include the following:

   (i)    Health and beauty aids;

   (ii)   Pharmaceuticals, which are sold and dispensed through a pharmacy staffed by one or more registered pharmacists; and

   (iii)  Video tapes, video cassettes, video discs, and other such pre-recorded video products, which may be offered for sale or rental to Buyer's customer (provided, however, that in keeping with the legitimate expectations of a family oriented Shopping Center, Buyer shall not allow any movies, posters or other items showing graphic violence or nudity to be or to become visible from outside of Buyer's building).

   Furthermore, the products and merchandise which shall initially be displayed and offered for sale in Buyer's store shall include the following:

   (1)    Housewares;

GIE0938 08/27/90 1850                    8.                **2943172**
                                                            //

(2)    Pre-packaged food items (which are neither prepared on-premises nor intended for on-premises consumption);

(3)    Greeting cards;

(4)    Automotive supplies;

(5)    Books, magazines and records; and

(6)    School supplies and stationery.

In addition, Buyer shall be permitted to sell and display such other products and merchandise as may generally be found in a variety or general merchandise retail store, provided that Buyer shall not devote more than five thousand (5,000) square feet of floor area in its building to the sale or display of any particular product or merchandise type other than those product or merchandise types which are specifically described in sections (i) through (iii) above.

Notwithstanding the foregoing, Buyer may devote up to ten thousand (10,000) square feet of floor area in its building to the sale and display of the products or merchandise specifically described in sections (1) through (6) above. Seller hereby acknowledges that Buyer shall be permitted to sell and display packaged liquor, beer and/or wine for off-premises consumption, if and to the extent permitted by all applicable laws, provided that Buyer does not devote more than five thousand (5,000) square feet of floor area to the sale or display of all such types of alcoholic beverages.

Notwithstanding the foregoing, after the expiration of Buyer's operating covenant period (as provided in Subparagraph 2(B) below), Buyer shall have the right to change the use of the Property and/or the building from the operation of a "Phar-Mor" store (as then being operated by Phar-Mor, Inc. in a majority of its other stores) or a variety or general merchandise store provided that (i) the Property and/or the building shall be used only for a single retail use which is (1) permitted under all applicable laws, ordinances, orders, rules, regulations and requirements of all governmental authorities

2943172
/2

having jurisdiction over the Shopping Center Project, and (2) consistent with and permitted under the Master Declaration; (ii) so long as Seller is operating a shopping center within the Shopping Center Project in no event shall Buyer use the Property and/or the building for any of the purposes listed on Exhibit 3, attached hereto and (iii) Buyer or any occupant of the Property shall have notified Seller of such proposed change of use at least sixty (60) days prior to such change and affords Seller the opportunity to repurchase the Property as provided in Paragraph 2(E) of this Declaration. In no event shall the Property be used or occupied for any purposes or in any manner other than as set forth in this Subparagraph 2(A). With respect to the foregoing restrictions on the use of the Property, Buyer hereby acknowledges and agrees that the Property is a part of the larger Shopping Center Project, and that Seller has a substantial interest in the ownership and operation of the Shopping Center Project. Accordingly, Seller desires to insure that the Property being conveyed to Buyer will be used in a manner consistent with the plans and designs of Seller (for both the appearance and the operation of the Shopping Center Project) and not in a manner that would injure or adversely affect the remaining portions of the Shopping Center Project and/or the operation thereof. Buyer hereby further acknowledges the legitimacy of these objectives, and acknowledges and agrees that its acceptance of the use restrictions set forth in this Subparagraph 2(A) is a material inducement to Seller to convey the Property to Buyer, by virtue of its need to protect the legitimate objectives more particularly described above.

B.    **Operating Covenant**.  Buyer hereby covenants and agrees that it shall open its building for business to the public no later than the time provided in Subparagraph 1(G) above. Provided Seller is operating a shopping center with the Shopping Center Project, Buyer shall, for a period of not less than three (3) years after opening, continuously operate (or cause to be operated) such building as a "Phar-Mor"

GIE0938 08/27/90 1850                    10

2943172
13

variety or general merchandise retail store, as described in Subparagraph 2(A) above. During such three (3) year period, Buyer shall operate such store (or cause such store to be operated) under the trade name "Phar-Mor," or under any other trade name used by Phar-Mor, Inc., a Pennsylvania corporation, for a majority of its variety or general merchandise stores in the State of Illinois. In connection with its operation during such three (3) year period of the store described in the preceding sentences of this Subparagraph 2(B), Buyer hereby covenants and agrees that it will devote at least seventy-five percent (75%) of the floor area in its building on the Property (measured as provided in Subparagraph 2(H) above) to retail sales, with the balance of the floor area of its building being devoted to storage and/or office space for use by Buyer in connection with the operation of its retail sales area. For the purposes of this Paragraph 2, Buyer shall be deemed to be "continuously operating" its store if the same is open for business to the public and operating during the hours from 10:00 a.m. until 9:30 p.m., Monday through Saturday, and from 12:00 noon until 6:00 p.m. on Sunday (excluding legal holidays, as designated by the State of Illinois and/or the United States of America). Buyer's covenant to operate is subject to interruptions that are (i) incidental to the reasonable conduct of Buyer's business on the Property (e.g., in order to take stock of current inventory), provided that such interruptions do not result in Buyer's business being closed to the public for more than ten (10) consecutive business days or for more than twenty (20) business days in any consecutive twelve (12) month period, or (ii) necessary in connection with the performance of any construction, alteration, repair or restoration work on the Property, provided that the same is diligently pursued by Buyer and does not result in Buyer's business being closed to the public for more than one hundred eighty (180) days in any consecutive twelve (12) month period.

2943172
14

C.   _Master Declaration_.   Buyer on behalf of itself and its successors and assigns, hereby (i) agrees and acknowledges that its ownership of the Property is subject to and benefited by the Master Declaration, (ii) consents to the terms and conditions of the Master Declaration, the restrictions contained therein and the liens created thereby, (iii) acknowledges that under the Master Declaration Seller has reserved certain rights for itself and its successors and assigns and has granted certain rights to other property owners within the Gurnee Mills Development and hereby accepts same, (iv) confirms that the easements, covenants, conditions and restrictions set forth in the Master Declaration are binding upon and enforceable against Buyer, its successors and assigns, and any subsequent owners of the Property, and (v) agrees to comply with all of the terms and conditions contained in the Master Declaration (including, without limitation, all terms and conditions relating to the approval of plans and the construction of buildings and other improvements located or to be located on the subject land). Seller agrees that it will not modify, amend, delete from or add to any of the list of restricted or prohibited uses and operations set forth in Section 5.1 of the Master Declaration without the consent or approval of Buyer, which consent or approval Buyer agrees will not be unreasonably withheld.

D.   _Repurchase Option (Prior to Expiration of Operating Covenant Period)_.   In the event that (i) Buyer has not completed construction of its improvements on the Property within one hundred twenty (120) days following the time periods specified in Subparagraph I(G) above, or (ii) Buyer, or any subsequent owner or occupant of the Property, fails to operate the building on the Property in the manner required in Subparagraph 2(B) above, then Seller may, at its sole option, repurchase the Property for a sum of money equal to the Repurchase Price (as hereinafter defined). This option, which is hereby granted to Seller and its successors and assigns by Buyer for itself, its

2943172

/5

successors and assigns and any subsequent owners of the Property, may be exercised by Seller at any time prior to the date on which Buyer commences or completes construction of its improvements or cures the breach of its operating covenant (as the case may be), by giving written notice thereof to Buyer by registered mail (return receipt requested), postage prepaid, and addressed to Buyer. In the event that Seller exercises its right to repurchase the Property as provided above, then Buyer shall pay the real estate taxes and special assessments on the Property payable in the year that the notice of exercise of said option to purchase is given and the years prior thereto, and upon receipt of the Repurchase Price from Seller (which amount shall be paid within sixty (60) days after the notice of exercise of the option is given), Buyer shall convey to Seller, by Special Warranty Deed, good and marketable title to the Property and all improvements thereon and appurtenances thereto, free and clear of any liens or encumbrances placed or suffered thereon by Buyer, and/or Buyer's successors or assigns. Real estate taxes and special assessments payable in the year in which the closing of the repurchase occurs shall be prorated between Buyer and Seller in the same manner that taxes and assessments were prorated in conjunction with the purchase of the Property by Buyer from Seller. Buyer shall be responsible for paying the costs of all documentary stamps, transfer taxes, recording fees, and other closing costs associated with the reconveyance of the Property to Seller pursuant to the option granted hereunder. For the purposes of this Subparagraph 2(D), the "Repurchase Price" shall be equal to (a) the original amount paid by Buyer to Seller for the Property, as shown on the closing statement executed by Buyer and Seller at closing (including, without limitation, the actual amount Buyer has reimbursed Seller for Buyer's share of all costs and expenses incurred in connection with the performance of the On-Site and Off-Site Work as provided in Paragraph 4 of this Declaration), plus (b) the remaining unamortized value of

2943172

/6

the then existing improvements constructed upon the Property, where "value" shall be equivalent to the costs incurred by Buyer for its initial construction upon the Property (i.e., Buyer's original construction costs, including its labor and material expenses, and the costs of equipment and machinery attached to and forming a part of the building, but excluding any development, leasing and/or financing fees or costs incurred by Buyer), as shown on Buyer's paid invoices for such initial construction costs. Copies of all such paid invoices shall be presented to Seller by Buyer within ninety (90) days of the date on which construction of Buyer's improvements on the Property is completed. In order to compute unamortized value, the subject costs shall be amortized on a straight-line basis over the shorter of (i) the useful life of the subject improvements calculated under generally accepted accounting principles, or (ii) thirty-one and a half (31.5) years. The amount of the unamortized value, calculated in accordance with the foregoing, shall be set forth in a statement, certified to Seller by an independent certified public accounting firm, which statement shall be delivered to Seller within thirty (30) days of the date on which Seller gives notice of exercise of the option pursuant to this Subparagraph 2(D). The Repurchase Price shall be reduced by the amount of any sums then due from Buyer to Seller pursuant to this Declaration and/or the Supplemental Agreement as of the date of closing of the repurchase of the Property by Seller. Buyer and Seller expressly acknowledge and agree that the purchase rights granted to Seller under this Subparagraph 2(D) shall be in addition to, and not in lieu of, any other rights and remedies that are available to Seller by virtue of any default under or breach of the terms and provisions of this Declaration by Buyer.

E.    <u>Repurchase Option (After Expiration of Operating Covenant)</u>. If at any time after the expiration of Buyer's three (3) year covenant to operate its building as provided in Subparagraph 2(B) above, (i) Buyer or any occupant of the Property desires

GiE0938 08/27/90 1850                    14              2943172

/7

to cease conducting business to the public in its building on the Property or (ii) Buyer or any occupant of the Property shall have notified Seller in accordance with Paragraph 2(A) of this Declaration that it wishes to change the use of the Property and/or building from a variety or general merchandise store as provided in said Paragraph 2(A), then in either such event Seller may, at its sole option, repurchase the Property in the same manner as indicated in Subparagraph 2(D) above (and all of the provisions of Subparagraph 2(D) above shall apply with respect to the repurchase option granted under this Subparagraph 2(E)), with the sole exception that the Property shall be repurchased by Seller for a sum equal to the greater of (a) the appraised fair market value of the Property (as defined in Subparagraph 2(F) below) or (b) the sum of (x) the original amount paid by Buyer to Seller for the Property, as shown on the closing statement (including, without limitation, the actual amount Buyer has reimbursed Seller for Buyer's share of all costs and expenses incurred in connection with the performance of the On-Site and Off-Site Work as provided in Paragraph 4 of this Declaration) plus (y) the remaining unamortized value (as such term is defined in Paragraph 2(D) hereof) of the then existing improvements constructed on the Property by Buyer. The procedures to be followed in connection with the repurchase option granted under this Subparagraph 2(E) shall be as follows: Buyer shall notify Seller, in writing, of its intent to cease conducting business to the public in its building on the Property, or change the use of the Property and/or building, as the case may be, which notice shall be delivered at least sixty (60) days prior to the effective date of any such cessation of operations. Such notification shall include all information reasonably required by Seller in order for it to review the proposed cessation or new use, as the case may be. Seller shall then have sixty (60) days from the date on which it receives such notice to decide whether or not to exercise the repurchase option granted to it under this Subparagraph 2(E). If

GIE0938 08/27/90 1850                    15

2943172

/8

Seller does not send written notification to Buyer of its intent to exercise the repurchase option granted hereunder within such sixty (60) day period, then Seller shall be deemed to have waived the repurchase option with respect to the particular cessation of business which had given rise to such repurchase option, and Buyer shall then have the right to cease conducting business to the public in its building in the manner and for the time specified in the notice to Seller or change the use of the Property and/or building to the use set forth in Buyer's notice. Failure of Seller to exercise its right to repurchase the Property pursuant to this Subparagraph 2(E) in connection with notice of any particular cessation of business or change in use as the case may be or change in use of the Property and/or building as set forth in Buyer's notice shall not extinguish or be deemed to constitute a waiver of the repurchase option granted hereunder in connection with any subsequent cessation(s) of business in the building by Buyer or change in use of the Property and/or building (or its successors or assigns). Seller hereby acknowledges and agrees that Buyer shall not be deemed to have ceased conducting business to the public in its building if it closes its building for business (i) in order to take stock of current inventory, provided that the same does not result in Buyer's business being closed to the public for more than ten (10) consecutive business days or for more than twenty (20) business days in any consecutive twelve (12) month period, (ii) in connection with the performance of any construction, alteration, repair or restoration work on the Property, provided that the same is diligently pursued by Buyer and does not result in Buyer's business being closed to the public for more than one hundred eighty (180) days in any consecutive twelve (12) month period, or (iii) to accommodate a transition of ownership of the Property or the business being conducted on the Property, provided that the same does not result in Buyer's business being closed to the public for more than ninety (90) days in any consecutive twelve (12) month period.

F.    <u>Appraised Fair Market Value</u>. For the purposes of Subparagraph 2(E) above, the "Appraised Fair Market Value" of the Property shall be determined by the following procedure: Seller and Buyer shall each select an appraiser to appraise the Property, which appraisals shall be made within thirty (30) days of the date on which Seller notifies Buyer, in writing, of its intent to exercise the repurchase option granted in Subparagraph 2(E) above. The appraisers shall appraise the Property solely on the basis of its use as a single user retail facility and shall consider any encumbrances against the Property in making their appraisals. The appraisals shall be averaged to calculate the appraised fair market of the Property, unless such appraisals are more than five percent (5%) of the lower appraisal apart, in which event the two appraisers shall select a third appraiser who shall independently appraise the Property. The appraised fair market value of the Property shall then be the average of those appraisals which are less than five percent (5%) of the lower appraisal apart from the middle appraisal. If none of the appraisals are less than five percent (5%) of the lower appraisal apart from the middle appraisal, then the value of the middle appraisal shall be the appraised fair market value of the Property. Buyer and Seller shall each be responsible for the cost of its own appraisal, and shall share equally the cost of the third appraisal (if any).

G.    <u>Refusal to Repurchase</u>.

(1)    Buyer and Seller hereby acknowledge that, pursuant to Subparagraph 2(D) and Subparagraph 2(E) above, Seller is required to notify Buyer of its intent to repurchase the Property prior to the time that the Repurchase Price or the appraised fair market value of the Property (as the case may be) is determined, in accordance with the procedures set forth in the foregoing Subparagraphs. Therefore, even if Seller notifies Buyer of its intent to

2943172

repurchase the Property, Seller shall have the right, at its sole option, to rescind such notice and cancel such repurchase if Seller determines, after the Repurchase Price or the appraised fair market value of the Property (as the case may be) is calculated, that the amount which Seller would be required to expend in connection with the repurchase of the Property is greater than that which Seller anticipated (determined as provided below). If Seller makes such determination and elects to cancel such repurchase, then it shall notify Buyer, in writing, within thirty (30) days following the date on which the Repurchase Price or the appraised fair market value of the Property (as the case may be) is calculated and Seller is advised of the same, that Seller intends to not repurchase the Property, in which event Seller's original notice to Buyer of its intent to repurchase the Property shall be null and void ab initio and neither party shall be obligated to proceed with the repurchase transaction contemplated under such rescinded notice.

(2)    In order to establish the amount that Seller anticipated expending in connection with the repurchase of the Property, Seller agrees that any notice which Seller sends to Buyer evidencing Seller's intent to exercise its option to repurchase the Property shall include Seller's estimate of the Repurchase Price or appraised fair market value of the Property (as the case may be). In the event that the Repurchase Price or the appraised fair market value of the Property (as the case may be), as finally calculated, is less than or equal to the estimate of the same established by Seller, the Seller shall not have the right to cancel the repurchase of the Property (notwithstanding the provisions of Paragraph 2(G)(1) above). The estimate of the Repurchase Price or the appraised fair market value of the Property established by Seller shall not be binding upon or have any

2943172

significance whatsoever to Seller and/or Buyer, except as specifically provided above.  Failure of Seller to include the estimate of the Repurchase Price or the appraised fair market value of the Property in Seller's notice of its intent to repurchase the Property shall not nullify or otherwise affect Seller's repurchase right; however, if Seller provides such notice without the required estimate, and fails to provide such estimate within five (5) business  days following Buyer's written request therefor, then Seller shall not have the right to cancel the proposed repurchase after Repurchase Price or the appraised fair market value of the Property is calculated (regardless of the provisions of Section 2(G)(1) above).

   (3) Neither the failure of Seller to exercise the options to repurchase the Property granted under this Paragraph 2(G) nor Seller's election to rescind the exercise of either option as provided herein shall extinguish, nor be deemed to constitute a waiver of the option rights granted to Seller under this Paragraph 2(G) in connection with either any subsequent proposed cessation of operations or any subsequent proposed change of use of the Property by Buyer or its successors and assigns.

3. **ANNUAL ASSESSMENTS.**

  Seller hereby acknowledges and agrees that it is responsible for creating and administering a Promotional Fund for the purpose of advertising and promoting the businesses to be conducted in the Shopping Center Project and elsewhere in the Gurnee Mills Development, and maintaining certain Common Areas (as defined in the Master Declaration) that are located in the Shopping Center Project and elsewhere in the Gurnee Mills Development, all as such obligations are set forth in the Master Declaration. Buyer hereby covenants and agrees to pay the Seller, its successors and assigns, annual assessments for the purpose of contributing to the (i) funding of the Promotional Fund

2943172
22

(hereinafter referred to as the "Promotion Assessment"), and (ii) cost of maintaining the Common Areas (hereinafter referred to as the "Maintenance Assessment"). (The Promotion Assessment and the Maintenance Assessment are sometimes collectively referred to as the "Assessments"). The Assessments shall be established and collected in accordance with the following:

(a)    The annual Promotion Assessment shall be equal to the amount set forth in the Supplemental Agreement. The Promotion Assessment shall be due and payable in monthly installments, upon the first day of each month, commencing with the first day of the first month following the date of execution of this Declaration. The Promotion Assessment, together with interest thereon and costs of collection thereof, shall be a continuing lien on the Property, as well as the personal obligation of the owner of the Property at the time when the same becomes due, in the same manner (and to the same extent) as is provided for in the Master Declaration with respect to the Maintenance Assessment. All of the provisions of the Master Declaration regarding the establishment of the liens for the Maintenance Assessment and the rights and remedies of Seller in the event of non-payment of the Maintenance Assessment (which provisions are hereby incorporated into this Declaration by reference) shall also apply with respect to the Promotion Assessment, as if the same had been set forth in their entirety (but with regard to the Promotion Assessment) in this Subparagraph (a).

(b)    The annual Maintenance Assessment shall be calculated and paid as provided in the Master Declaration. Notwithstanding anything contained in the Master Declaration to the contrary, however, Buyer and

GIE0938 08/27/90 1850                    20                    2943172

23

Seller acknowledge and agree that the amount of Buyer's Assessments shall be calculated as set forth in the Supplemental Agreement.

(c)    Seller shall upon demand therefor furnish a certificate setting forth the status of the payments of the Annual Assessments on the Property. The certificates shall be conclusive evidence of the payment of any Annual Assessments stated to have been paid therewith.

4.    <u>SELLER'S ON-SITE AND OFF-SITE WORK</u>.

Buyer and Seller acknowledge and agree that Seller shall be responsible for performing (or causing to be performed) all of the work specified in Paragraph 2 of the Supplemental Agreement (which work is referred to herein and therein as the "On-Site and Off-Site Work"). In consideration for the same, Buyer covenants and agrees to reimburse Seller for Buyer's share of all costs and expenses incurred in connection with the performance of such On-Site and Off-Site Work, in the manner, at the times and in the amounts specified in the Supplemental Agreement. The obligations of Buyer under this Paragraph 4 and in the Supplemental Agreement shall be personal obligations of Buyer, and shall also be a charge and continuing lien against the Property until Seller has been paid for all amounts due from Buyer in connection with the On-Site and Off-Site Work. Such lien shall be binding upon Buyer and all successors in title to the Property and subject to the any action at law or proceedings to foreclose the same, in the same manner and upon the same terms and conditions (including, without limitation, the provisions regarding interest, costs and fees) as set forth in the Master Declaration with respect to the Maintenance Assessments. With respect to those aspects of the On-Site and Off-Site Work to be performed by (or on behalf of) Seller on the Property, Buyer hereby grants to Seller a non-exclusive easement in, on, over, under and across the Property for purposes of performing the On-Site and Off-Site

Work.  The easement granted hereunder shall include the right of ingress to and egress from the Property, as well as the right to place and store any and all tools and equipment necessary for the performance of such work on or about the Property.  The easement granted hereunder shall be for the benefit of Seller and its independent contractors, employees, agents, licensees, and any or all other persons or entities performing or assisting in the performance of the On-Site and Off-Site Work.

5.     **SELLER'S CONSTRUCTION.**

    A.     Seller agrees that it shall, as soon as may reasonably be practicable after all necessary construction and occupancy permits and approvals are obtained from the appropriate governmental authorities and adequate and suitable financing is arranged, commence construction (or cause such construction to be commenced) of a regional Shopping Center in the Shopping Center Project.  Seller agrees that all buildings, structures and other improvements to the Shopping Center Project (and all restorations thereof and additions, alterations or changes thereto) shall be constructed or made in accordance with the terms and provisions of the Master Declaration.  All construction by Seller shall be performed in a good and workmanlike manner using first quality materials and in accordance with all applicable laws, ordinances, rules and regulations of all governmental and quasi-governmental agencies and authorities having jurisdiction over such construction and shall be architecturally harmonious so as to provide the appearance of a unified, integrated development.  Seller shall diligently pursue construction of such Shopping Center to completion, and shall cause the Shopping Center to be completed and open for business to the public no later than August 1, 1991 (subject to force majeure, as provided in Subparagraph 18(C) below).  For the purposes of this Declaration, the Shopping Center shall be deemed to be open for business to the public at such time that (1) the shell of Seller's building to be constructed in the

25

construction phase which includes Buyer's building is completed and ready for tenants to make improvements, but not necessarily leased and occupied with tenants' spaces in finished form, (2) each of Sears, Roebuck and Co. ("Sears"), Waccamaw Corporation ("Waccamaw"), Bed, Bath and Beyond of Gurnee, Inc. ("Bed and Bath") and Marshalls of Gurnee, Inc. ("Marshalls") has opened its store on the Shopping Center Project for business to the public, (3) at least two (2) of the following eight (8) entities: Nordstrom, Inc. ("Nordstrom"), Saks Fifth Avenue ("Saks"), The 49th Street Galleria, Inc. ("49th Street"), Polk Brothers ("Polk"), VF Corporation ("VF"), J.C. Penney Company, Inc. ("Penney"), Spiegel ("Spiegel") or Filene's Basement ("Filene's") have opened their stores in the Shopping Center Project for business to the public, and (4) tenants that are occupying fifty percent (50%) or more (in the aggregate) of the gross leaseable area in the construction phase of the Shopping Center Project in which the Property is located (other

than that, which is occupied by anchors) are open for business to the public. (For the purposes of this Declaration, an "anchor" shall be deemed to be any person or entity that occupies at least fifty thousand (50,000) square feet of floor area in a single unit within the building(s) in the Shopping Center Project.) Seller hereby acknowledges and agrees that Seller's building to be constructed in the Shopping Center Project shall contain not less than one million (1,000,000) square feet of floor area in the aggregate, and the parking areas to be constructed in the Shopping Center Project shall contain no less than five (5) parking spaces for every one thousand (1,000) square feet of leaseable floor area within the buildings to be located in the Shopping Center Project. Seller shall take any and all safety measures reasonably required in order to protect Buyer and any and all persons and entities performing work on or visiting the Property from injury or damage caused by or resulting from the performance of Seller's construction in the Shopping Center Project. In the event that any loose dirt, trash or debris resulting from or

GIE0938 08/27/90 1850                 23

2943172

26

attributable to Seller's construction work on the Shopping Center Project accumulates on the Property, then Seller shall be responsible for removing the same. Seller shall also be responsible for repairing any damage to any other portion of the Property that may result from or be attributable to Seller's construction on the Property. Seller shall indemnify, defend and save Buyer harmless from all losses, damages, liabilities, expenses and/or claims whatsoever (including, without limitation, reasonable attorneys' fees, disbursements and other costs of defending against the foregoing), by reason of any liens for work or services performed or material supplied at the request or for the benefit of Seller which shall be filed against the Property. Seller shall have the right to contest the validity, amount or applicability of any lien, provided that it complied with the obligations imposed upon Buyer pursuant to Subparagraph 2(I) above.

B.     In the event that the Shopping Center is not open for business to the public (as defined in Subparagraph 5(A) above) on or before August 1, 1991 (i.e., the date on which Buyer is required to open its building for business to the public pursuant to Subparagraph 2(B) above), then Buyer shall have the right, at its sole option, to delay the date on which it is required to open its building for business to the public until the date on which the Shopping Center is open for business to the public. If Buyer elects to open its building for business to the public prior to the date on which the Shopping Center is open for business to the public, and any construction work in or about the Shopping Center Project must still be performed by (or on behalf of) Seller or any other occupant of the Shopping Center Project, then such construction work may be continued to completion, and neither Seller nor any other person or entity performing construction work in or about the Shopping Center Project shall be required to take any additional measures by virtue of Buyer's opening for business to the public prior to the date on which the Shopping Center is open for business to the public; provided,

2943172

27

however, that Seller (and any other persons and entities performing construction work on behalf of the Seller) shall use its reasonable efforts to perform such construction work in such a manner so as to minimize any interference with the operation of Buyer's business (it being understood that "reasonable efforts" shall not include any efforts requiring the expenditure of additional costs or expenses).  Notwithstanding anything set forth in this Paragraph 5 to the contrary, in the event Buyer elects to open its building for business to the public prior to the date on which each of Sears, Waccamaw, Bed and Bath, Marshalls, and at least two (2) of the following eight (8) entities: Nordstrom, Saks, Spiegel, 49th Street, Polk, Filene's, VF or Penney, have opened their stores on the Shopping Center Project for business to the public (each such event here-inafter referred to as an "Opening Requirement"), Seller agrees to pay to Buyer liqui-dated damages in the amount of Eight Hundred Thirty-Three and 33/100 Dollars ($833.33) for each day from and after August 1, 1991 that either Opening Requirement is not satisfied (provided, however, that such liquidated damages shall not exceed, in any event, Two Hundred Thousand and 00/100ths Dollars ($200,000.00) in the aggregate). The liquidated damage payments required of Seller under this Paragraph 5(B) shall be paid to the Tenant ~Buyer no less frequently than monthly, at the end of each calendar month. The Seller shall be deemed to be in default of its obligation to pay the same if any pay-ment is not made within ten (10) business days after the due date thereof.  If the Seller defaults in making a payment, then the delinquent amount shall accrue interest (at the rate set forth in Paragraph 11(D) of this Declaration) from the date of default until the date of payment.  In the event Seller fails to make any such payment when due, Buyer shall have, in addition to any and all other remedies provided in this Declaration, the right to offset such payments against any and all Assessments payable to Seller then or in the future.

GIE0938 08/27/90 1850                25

2943172
28

3.   **SIGN EASEMENTS.**

Buyer hereby grants to Seller a non-exclusive perpetual easement in, on, over and across those portions of the Property designated on Exhibit 4, attached hereto and made a part hereof, for the purpose of constructing, installing, maintaining and replacing directional signs (which may, at Seller's sole option, include the trade names of other occupants of the Gurnee Mills Development). (Buyer shall have the right to approve, in advance, the specific location, content [subject to the foregoing provisions of this Paragraph 6] and the size of each sign to be located within the easement area on the Property, and any changes or modifications to any signs previously installed by Seller, provided that Buyer does not unreasonably withhold, delay or condition its approval, and provided that Buyer shall not withhold its approval of any sign that any municipal authority requires or determines to be reasonably necessary to promote traffic control within the Shopping Center Project. In connection therewith, Buyer hereby approves a sign constructed and placed on the Property substantially in accordance with the drawing attached hereto as Exhibit 4.) The easement granted hereunder shall include the right of ingress to and egress from the subject easement areas, as well as the right to construct, install, maintain, repair and replace any utility lines that may be necessary or desirable to service the sign(s). The easement granted hereunder shall be for the benefit of Seller and its heirs, representatives, successors, assigns, employees, independent contractors and agents.

In the event that Seller constructs or installs any pylon signs within the Shopping Center Project, and grants to any other occupant of the Shopping Center Project the right to install and attach a sign identifying such occupant upon Seller's pylon signs (if any), then Seller shall also grant a similar right to Buyer to install and attach a sign identifying Buyer's business in the Shopping Center Project to Seller's pylon signs.

2943172

29

Buyer shall be responsible for all costs and expenses associated with the installation and attachment of its signs onto Seller's pylon signs.

7.    **COMMON UTILITIES EASEMENT.**

Buyer hereby acknowledges and agrees that pursuant to Section 2.5 of the Master Declaration, Seller has created and reserved unto itself a non-exclusive perpetual easement (the "Common Utilities Easement") in, on, over, under, through and across the surface of those portions of the Property as substantially depicted on the Site Development Criteria Plan (the "Site Development Plan") dated August 13, 1990 (as last revised August 23, 1990) by National Survey and Engineering attached hereto as Exhibit 5 and hereby made a part hereof on which are located or shall or may be located certain storm drainage facilities, sanitary sewer systems, natural gas systems, water lines and systems, fire protection installations, electrical power systems, television cable systems and telecommunication systems (collectively hereinafter referred to as the "Common Utility Facilities") which serve or may hereafter serve the Property and/or all or any other portion of the Gurnee Mills Development. Buyer further acknowledges and agrees that Seller shall have the right to use said Common Utilities Easement for the purposes of (i) constructing, installing, using, maintaining, replacing, repairing, operating, enlarging, relocating and removing any Common Utility Facilities located within the Property, and (ii) connecting to, tapping into and using any and all Common Utility Facilities that may be constructed or installed in, on, over, under, through and across or adjacent to the Property or all or any other portion of the Gurnee Mills Development. The Common Utilities Easement shall include the right of ingress to and egress from the Common Utility Facilities in order for Seller to achieve the purposes of said easement. Buyer and Seller hereby acknowledge and agree that the

GIE0938 08/27/90 1850                    27            **2943172**
                                                          *30*

Common Utilities Easement shall inure to the benefit of Seller and its heirs, representatives, successors, assigns, employees, independent contractors and agents and shall be construed in accordance with the applicable terms and provisions of the Master Declaration.

Seller hereby acknowledges and agrees that pursuant to Section 2.5(b) of the Master Declaration, Buyer may relocate any Common Utility Facilities installed on the Property provided that Buyer shall comply with the following conditions: (i) Buyer shall obtain the prior written approval of Seller (or any successor thereof) to such proposed relocation of Common Utility Facilities which approval must be requested by Buyer no later than sixty (60) days prior to undertaking such activity, (ii) Buyer must give thirty (30) days prior written notice of the proposed relocation of the Common Area Facilities to each other occupant of the Gurnee Mills Development that has tapped into and is using such Common Area Facilities, or would otherwise be affected by said relocation, and (iii) Buyer shall undertake the relocation of and shall relocate the Common Area Facilities in accordance with all other requirements of Subsection 2.5 of the Master Declaration. Buyer hereby acknowledges and agrees that Seller's rights under the Common Utilities Easement shall extend to and shall apply to such Common Area Facilities as may be relocated by Buyer pursuant to this Paragraph 7 of the Declaration and Subsection 2.5(b) of the Master Declaration and Buyer hereby agrees to execute, upon the request of Seller, any and all documents evidencing the relocation of the Common Area Facilities as undertaken by Buyer, and Seller's rights thereto, pursuant to the Common Utilities Easement as described in this Declaration and the Master Declaration.

Buyer hereby acknowledges and agrees that pursuant to Section 2.12 of the Master Declaration, Seller has reserved unto itself the right to dedicate and/or to convey to

GIE0938 08/27/90 1850              28

2943172
31

the Village of Gurnee, Illinois or any other governmental entity or to any public utility company providing utility service to the Gurnee Mills Development, all or any portion of the Common Utility Facilities. Buyer further acknowledges and agrees that, at the request of Seller, Buyer shall join in and/or consent, as required, in the execution of any applications, deeds, plans or other documents as may be necessary in order to effectuate the dedication or conveyance of the Common Area Facilities (or any portion thereof) and the dedication, conveyance or assignment of Seller's rights, title and interest to said facilities as provided pursuant to the Common Utilities Easement. In the event Buyer shall fail to execute any document required in connection with the dedication and/or conveyance of all or any portion of the Common Utility Facilities within ten (10) days of Seller's request with respect thereto, Buyer hereby acknowledges and agrees that pursuant to Subsection 2.12(d) of the Master Declaration, Seller shall be authorized to execute said document or documents as Buyer's attorney in fact for and in the name and stead of Buyer and that the power of attorney granted hereby shall be irrevocable and coupled with an interest. Notwithstanding anything contained in this Declaration or the Master Declaration to the contrary, Buyer shall not dedicate or convey any Common Utilities Facilities to any person or entity without the prior written consent of Seller. Buyer and Seller further acknowledge and agree that upon the dedication and/or conveyance of all or any portion of the Common Utility Facilities, and the proper acceptance thereof, the Common Utilities Easement (to the extent of the Common Utility Facilities so dedicated or conveyed) shall terminate; provided, however, that in the event any such dedication or conveyance of the Common Utility Facilities (or any portion thereof) is reversed or abandoned, the Common Utilities Easement to the extent of such Common Utility Facilities shall automatically revive.

8.    TRANSFER OR CONVEYANCE BY BUYER.

A.    In no event shall the rights, powers and obligations conferred upon Buyer pursuant to this Declaration be at any time transferred by Buyer except through a transfer of its interest in the Property, and then only to the extent and in the manner provided in this Paragraph.

B.    Prior to the expiration of Buyer's covenant to operate its building on the Property as provided in Paragraph 2 above, Buyer shall not sell, transfer or convey all or any part of the Property or any interest therein (and any such sale, transfer or conveyance shall be void) except (a) by the way of a sale and leaseback as collateral security for, or any other bona fide financing arrangement with, an institutional lender, (b) a transfer of all or any part of the Property upon foreclosure of a mortgage to an institutional lender or deed in lieu of foreclosure or to any person or entity thereafter succeeding to such interest, (c) to the condemning party pursuant to a condemnation or under a threat of a condemnation, or (d) pursuant to the Lease described in Subparagraph 8(D) below.  Notwithstanding the foregoing, after Buyer enters into the Lease described in Subparagraph 8(D) below, but prior to the expiration of Buyer's covenant to operate its building on the Property as provided in Paragraph 2 above, Buyer shall have the right to sell, transfer or convey all of the Property (as well as its interest in the Lease described in Subparagraph 8(D) below) to another person or entity, provided that:

(i)    The transferee assumes the obligation and responsibility for all of the terms, conditions, covenants and agreements in this Declaration to be kept, observed and performed by Buyer, and a duly executed and acknowledged copy, in recordable form, of the instrument by which the transferee shall have become liable for the obligations of Buyer shall be delivered to Seller (which instrument shall be reasonably satisfactory to Seller's counsel);

(ii)    At the time of the sale, transfer or conveyance, any and all amounts which shall then be due and payable by Buyer to

2943172
33

Seller shall be paid to Seller or adequate provision therefor (reasonably satisfactory to Seller) shall be made;

(iii)    At the time of any such sale, transfer or conveyance, Buyer is not in default under this Declaration; and

(iv)    The transferee has a net worth (according to its published, audited financial statement, or according to a statement certified to Seller by an independent certified public accountant) of at least Twenty Million Dollars ($20,000,000.00) for its most recently completed fiscal year, and is reasonably experienced in the operation of a retail store similar to that which Buyer is required to operate (or cause to be operated) pursuant to Paragraph 2 above.

C.    Except as provided in this Subparagraph 8(C), no sale, transfer or conveyance by Buyer of all or any part of the Property (or any interest therein and/or improvements thereon) shall be deemed to release Buyer from any of its obligations under this Declaration. If, after the expiration of Buyer's covenant to operate its building as provided in Paragraph 2 above, Buyer sells, transfers or conveys the Property in its entirety (together with all improvements thereon any easements and appurtenances thereto), Buyer shall be released from all liability under this Declaration and cease to be a party hereto from and after the date upon which the transferee shall become liable for the terms, conditions, covenants and agreements in this Declaration thereafter to be kept, observed and performed by Buyer, but only on the condition that:

(i)    all of the provisions of Subsections (i) through (iii) of Subparagraph 8(B) above are complied with by Buyer and the transferee; and

(ii)    the transferee, any general partner of the transferee (if the transferee is a partnership) or any guarantor of the transferee (which guarantor executes a guaranty in favor of Seller that is reasonably satisfactory, in form and substance, to Seller) has a net worth (according to its published, audited financial statement, or according to a statement certified to Seller by an independent certified public accountant) of at least Five Million Dollars ($5,000,000.00) for its most recently completed fiscal year, and is reasonably experienced in the operation of a retail store similar to that which Buyer is required to operate (or cause to be operated) pursuant to Paragraph 2 above.

2943172
34

D.    Notwithstanding anything contained in this Paragraph 8 to the contrary, Buyer shall have the right, at its sole option, to enter into a lease (the "Lease") with Phar-Mor, Inc., a Pennsylvania corporation (the "Tenant"), (or any subsidiary or affiliate of Phar-Mor, Inc. provided the obligations of the Tenant under the Lease are guaran-teed by said Phar-Mor, Inc.) covering all of the Property.  The Lease, if entered into by Buyer and Tenant, shall be consistent in all respects with this Declaration and the Supplemental Agreement, and shall contain the following limitations and provisions:

(collectively, the "Tenant")

    (i)    The use restrictions and the operating covenant set forth in the Lease shall be identical to, or more stringent than (but not, in any event, in conflict with), the use restrictions and operating covenant set forth in Paragraph 2 of this Declaration;

    (ii)    Tenant shall be prohibited from assigning, transferring or conveying all or any part of its interest in the Lease or sub-letting all or any portion of the Property prior to the expiration of the operating covenant period set forth in Paragraph 2 of this Declaration (provided, however, that Tenant shall have the right to encumber its leasehold inter-est with a leasehold mortgage to an institutional lender or investor [as defined in Paragraph 9 below], provided that the terms and provisions of such leasehold mortgage are consistent in all respects with the terms and provisions of this Declaration, and that the enforcement of the rights of the leasehold mortgagee do not interfere with or inhibit the enforcement of Seller's rights hereunder);

    (iii)    Tenant shall covenant and agree to abide by and comply with the terms and provisions of this Declaration and the Supplemental Agreement (and all of Buyer's obligations under the same), and Seller shall be deemed to be a third-party beneficiary of such covenant and agreement; and

    (iv)    Neither Buyer nor Tenant shall enter into any amendment or modification of the Lease that would alter or affect the pro-visions of the Lease described above. Buyer hereby agrees to provide written notice to Seller when and if it enters into a Lease with Tenant, which notice shall contain a fully exe-cuted copy of the Lease for Seller's records (although Buyer may, at its option, cause the financial obligations of Tenant to Buyer to be deleted from the copy of the Lease to be delivered to Seller).  Seller hereby acknowledges and agrees that from and after the date on which it receives such writ-ten notice and the Lease from Buyer, Seller shall accept the

(i.e., the payment terms of the Lease)

2943172
35

performance by Tenant of any obligations of Buyer under this Declaration and/or the Supplemental Agreement, and the performance of such obligations by Tenant shall satisfy Buyer's obligations under this Declaration and/or the Supplemental Agreement to the extent of such performance by Tenant. Buyer hereby acknowledges and agrees that from and after the date on which it enters into the Lease, any breach of the terms and provisions of this Declaration and/or the Supplemental Agreement by Tenant shall also constitute a breach of the same by Buyer, whereupon Seller shall have the right to exercise any of the rights and remedies available to it by virtue of a default by Buyer pursuant to the terms of this Declaration and/or the Supplemental Agreement.

E.    Notwithstanding anything contained in this Paragraph 8 to the contrary, Buyer shall have the right, without the requirement of the prior consent of the Seller to transfer the Property and the rights, powers and obligations conferred upon Buyer pursuant to this Declaration to Phar-Mor, Inc., a Pennsylvania corporation, or any subsidiary or affiliate of Phar-Mor, Inc. Notwithstanding the foregoing, any subsequent transfer of the Property and/or the rights, power and obligations of Buyer under this Declaration, or any cessation of the relationship of the transferee as a subsidiary or affiliate of Phar-Mor, Inc., shall be deemed to be a sale, transfer and conveyance subject to the restrictions set forth in this Paragraph 8.

9.    **TRANSFER OR CONVEYANCE BY SELLER.**

Seller hereby agrees that it shall not sell, transfer or convey its fee simple title to the Shopping Center Project to any other person or entity prior to the date on which the shell of Seller's building to be constructed in the construction phase which includes the Property is completed and ready for tenants to make improvements (but not necessarily leased and occupied with tenants' spaces in finished form). Notwithstanding the foregoing, Seller shall have the unrestricted right to sell, transfer or convey all or any

part of the Shopping Center Project and/or any interest which it may have in the same (including, without limitation, its fee simple title) to:

    (i)    One (1) or more anchors;

    (ii)    Any other entity in which Seller (and/or the direct or indirect owners of the interests in Seller) has an ownership interest, or with which Seller has an employer/employee, agency or contractor relationship, so that Seller (and/or the direct or indirect owners of the interests in Seller) maintains continuing involvement with the development of the Shopping Center Project;

    (iii)    Any institutional lender or investor (which shall be defined to mean any bank, savings and loan association, trust company, insurance company, pension fund, or retirement fund);

    (iv)    Any person or entity having either (a) a net worth (according to its published, audited financial statement, or according to a statement certified to Buyer by an independent certified public accountant) of at least Five Million Dollars ($5,000,000.00) for its most recently completed fiscal year, or (b) reasonable experience in the development of Shopping Centers; and/or

    (v)    Any lender in connection with any bona fide financing arrangement, including (without limitation) a sale and leaseback arrangement, or a financing arrangement with equity participation by the lender.

In the event that Seller sells, transfers or conveys its fee simple title to the Shopping Center Project prior to the date on which it is permitted to do so pursuant to this Paragraph 9 to any person or entity other than those which are permitted transferees (as provided above), then Buyer may, at its sole option, require Seller to repurchase the Property for a sum of money equal to the Put Price (as hereinafter defined). Buyer shall exercise such option within sixty (60) days following the date on which Buyer receives notice or obtains actual knowledge of such a sale, transfer or conveyance of Seller's fee simple interest in the Shopping Center Project, by giving written notice thereof to Seller by registered mail (return receipt requested), postage prepaid, and

2943172
37

addressed to Seller. In the event that Buyer exercises its right to require Seller to repurchase the Property as provided above, then Buyer shall pay the real estate taxes and special assessments on the Property payable in the year that the notice of exercise of said option to require repurchase is given and the years prior thereto, and, upon receipt of the Put Price from Seller (which amount shall be paid within sixty (60) days after the notice of exercise of the option is given), Buyer shall convey to Seller, by Special Warranty Deed, good and marketable title to the Property and all improvements thereon and appurtenances thereto, free and clear of any liens or encumbrances placed or suffered thereon by Buyer, and/or Buyer's successors or assigns. Real estate taxes and special assessments payable in the year in which the closing of the repurchase occurs shall be prorated between Buyer and Seller in the same manner that taxes and assessments were prorated in conjunction with the purchase of the Property by Buyer from Seller. Buyer shall be responsible for paying the costs of all documentary stamps, transfer taxes, recording fees, and other closing costs associated with the reconveyance of the Property to Seller pursuant to the option granted hereunder. For the purposes of this Paragraph 9, the "Put Price" shall be equal to (a) the original amount paid by Buyer to Seller for the Property, as shown on the closing statement executed by Buyer and Seller at closing, plus (b) all costs incurred by Buyer (through the date on which Buyer exercises its option to require Seller to repurchase the Property) for its initial construction upon the Property (i.e., Buyer's original construction costs, including its labor and material expenses, and the costs of equipment and machinery attached to and forming a part of the building), as shown on Buyer's paid invoices for such initial construction costs. Copies of all such paid invoices shall be presented to Seller by Buyer within ninety (90) days of the date on which construction of Buyer's improvements on the Property is completed. The Put Price shall be reduced by the

GIE0938 08/27/90 1850                    35

2943172
38

amount of any sums then due from Buyer to Seller pursuant to this Declaration and/or the Supplemental Agreement as of the date of closing of the repurchase of the Property by Seller. Buyer and Seller expressly acknowledge and agree that the "put" rights granted to Buyer under this Paragraph 9 shall be Buyer's sole remedy in the event that Seller sells, transfers or conveys its fee simple interest in the Shopping Center Project other than as permitted in this Paragraph 9.

10.    **INSURANCE.**

A.    Buyer and Seller shall each carry (or cause to be carried) comprehensive general liability insurance covering its (respective) legal liability in connection with claims for personal injury, death, and property damage incurred upon or about the Property, the Shopping Center Project and the easement areas being used by Buyer and/or Seller on any other parcel of land within the Gurnee Mills Development. Such insurance shall have minimum limits of Three Million Dollars ($3,000,000.00) per occurrence. Such insurance coverage shall be in comprehensive general liability form with at least the following endorsements: (i) providing for blanket contractual liability coverage (including, without limitation, for the indemnity obligations contained in Paragraph 11), broad form property damage coverage, products completed operations, owner's protective and personal injury coverage; (ii) deleting any liquor liability exclusions; and (iii) providing for coverage of employers automobile non-ownership liability. The policy of insurance which is to be maintained by Buyer under this Declaration shall name Seller, or its successors and assigns, as an additional insured. The policy of insurance liability which is to be maintained by Seller under this Declaration shall name Buyer as an additional insured, at least with respect to the coverage pertaining to the Common Areas (as defined in the Master Declaration) covered by Seller's insurance policy. In addition, all such insurance shall (1) be primary and noncontributory; (2) provide for

GIE0938 08/27/90 1850                36

severability of interest: (3) provide that an act or omission of one of the insureds or the additional named insured which would void or otherwise reduce coverages shall not void or otherwise reduce coverages to the insured or additional named insured, as the case may be: and (4) afford coverage for all claims based on acts, omissions, injury and damage which occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period.

B. (1) Buyer and Seller shall each obtain and maintain, at their sole cost and expense, all-risk or fire and extended coverage insurance against fire, casualty and other perils as now are or hereafter may be included in the standard extended coverage endorsement from time to time in general use in the State of Illinois, insuring their respective building and improvements in an amount equal to not less than the full replacement value thereof (exclusive of the cost of excavations, foundations and footings), with a deductible not greater than Five Hundred Thousand Dollars ($500,000.00). In the event that all or any portion of either party's respective building or improvements are damaged by fire or other casualty during the period in which Buyer's operating covenant is in effect, then all proceeds from the insurance policy required to be covered under this Subparagraph 10(B), however recovered, shall be used for payment of the cost of repairing, replacing or rebuilding the damaged building and/or improvements , subject to the rights of Seller's mortgage lenders. In the event that the proceeds of any such insurance are not sufficient to cover the cost of any such reconstruction, and except as provided in Subparagraph 10(B)(2) below, then the responsible party shall be obligated to pay the shortage, so that the building and improvements are reconstructed to the same condition that they were in immediately prior to any such fire or other casualty. In the event that any such fire or casualty damages or destroys either party's building or improvements after the expiration of Buyer's operating covenant period, then such party shall not be obligated to repair, replace or rebuild the damaged building and/or

GIE0938 08/27/90 1850                37

2943172
40

improvements; provided, however, that if the responsible party elects not to repair, replace, or rebuild the damaged building and/or improvements, then such party shall be obligated to raze the same, clear away all debris and take all other action (including landscaping) required by good construction practice so that the area which had been occupied by the razed building or portion thereof will be attractive, and usable as parking area for the balance of the Shopping Center Project. Any and all work performed in connection with reconstruction or repairing the building or improvements, or razing the same, shall be diligently commenced and completed, and shall be performed in accordance with the provisions of Paragraph 1 above.

8(2)  See page 38A attached hereto and incorporated herein.

C.    Neither party shall be liable to the other party, or to any insurance company insuring such other party, for any loss or damage to any building or improvements on the Property which was or could have been covered by the insurance described in this Paragraph 10 even though such loss or damage might have been occasioned by the negligence of a party, its agents, employees and/or contractors, and each party hereby releases all of its rights to recover from the other party for such loss or damage.  Without in any manner limiting or conditioning the effectiveness of the foregoing waiver and release, each party covenants that it will obtain for the benefit of the other party a waiver of any rights of the insurer as such party may require against the other by virtue of the payment of any such loss covered by such insurance.  In the event that either party is required to pay an additional premium for the foregoing waiver of subrogation, then the beneficiary of the waiver shall be responsible for the payment of such additional premium (unless it elects to waive the requirement that the other party's insurance policy contain such waiver of subrogation).

D.    The insurance required to be maintained under this Paragraph 10 may be maintained under a "blanket policy" covering other property of Buyer or Seller (as the

2943172
41

## DECLARATION OF RESTRICTIONS

10(B)(2)     Notwithstanding anything to the contrary contained in clause 10(B)(1) above or otherwise, in the event that all or any portion of Seller's building and improvements are damaged or destroyed by fire or other casualty during the period in which Buyer's operating covenant is in effect and Seller's mortgage lender does not make the insurance proceeds available for the reconstruction or repair of the affected buildings and improvements, and as a result Seller is unable to effect such reconstruction or repair, then (i) Seller shall so notify Buyer within thirty· (30) days of Seller's becoming aware of the disposition of insurance proceeds, (ii) Seller shall be relieved of its obligation to effect such reconstruction and repair and, (iii) provided Buyer is not then in default under this Declaration or the Supplemental Agreement, Buyer may, at its sole option, require Seller to repurchase the Property (and all improvements constructed thereon) in the manner provided in Paragraph 9 above for a sum of money equal to the Casualty Put Price (hereinafter defined).  Buyer shall exercise such option, if at all, by written notice thereof to Seller within thirty (30) days after receipt of Seller's notice regarding the disposition of the insurance proceeds.  As used herein, the "Casualty Put Price" shall mean the Repurchase Price (as defined in Paragraph 2(D) above); provided that at Seller's election either (i) the Casualty Put Price shall be reduced by the amount of insurance proceeds (plus deductibles, if any) paid or payable with respect to damages to Buyer's building which are not repaired, or (ii) the Casualty Put Price shall be reduced by the amount of any deductibles applicable to such insurance proceeds and Buyer shall assign such proceeds to Seller.  Seller shall pay for and maintain insurance with respect to its repurchase obligations under this subparagraph 10(B)(2), with respect to which Buyer shall be the loss payee.  Seller shall provide a certificate of insurance or other evidence that such insurance is in full force and effect.

case may be) or of their respective principals or affiliates, so long as the amount of insurance required to be provided under this Paragraph 10 is not thereby diminished. All insurance policies required under this Paragraph 10 is not thereby diminished. All insurance policies required under this Paragraph 10 shall be issued through financially responsible insurance companies licensed to do business in the State of Illinois.

E.     Each party shall promptly furnish the other, upon request therefor, a certificate evidencing such party's compliance with the insurance coverage requirement of this Paragraph 10. Each certificate of insurance shall stipulate therein that the insurance evidenced thereby shall not be reduced, cancelled or not renewed unless ten (10) days' prior written notice shall have been given by the insurer to the other party. Neither party shall be required during any given three hundred sixty-five (365) day period to honor more than one such request from the other party.

F.     Buyer and Seller shall each require all contractors and subcontractors employed by it in connection with its construction on the Property or in the Shopping Center Project (as the case may be) to maintain public liability insurance and broad form property damage insurance, including completed operations and contractual coverage to include the indemnity set forth in this Subparagraph 10(F), with limits of coverage to be not less than Two Million Dollars ($2,000,000.00) for all perils. Completed operations coverage shall be continued for not less than twelve (12) months after the date of acceptance of and full payment for completion of the work. Broad form property damage insurance shall specifically include demolition and excavating, including blasting, shall include automobile bodily injury and personal property insurance covering all vehicles moving under their own power and engaged in work pursuant to this Declaration. All such policies shall name both Buyer and Seller as additional insured parties. Buyer's policies shall provide that they may not be cancelled, altered or

GIE0938 08/27/90 1850                    39              2943172
                                                          43

amended without thirty (30) days' prior written notice to Seller.  Buyer and Seller shall each also require its contractors and subcontractors to carry workmen's compensation and employer's liability insurance affording a protection under the Workmen's Compensation Law of the State of Illinois and the employer's liability protection subject to a limit of not less than Five Hundred Thousand Dollars ($500,000.00).

11.   **INDEMNIFICATION.**                                      mortgagees.

A.    Buyer shall defend, indemnify and save Seller, its partners, employees, agents, contractors, licensees and all tenants or occupants of the Shopping Center Project harmless against and from all claims, losses, injuries, damages, costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, arising by reason of personal injury to or death of any persons or damage or destruction of property resulting from or arising out of or in any manner connected with Buyer's construction on the Property and/or its use, occupancy or possession of the Property and/or any other portion of the Gurnee Mills Development.

B.    Seller shall defend, indemnify and save Buyer, its partners, employees, agents, contractors, and licensees harmless against and from all claims, losses, injuries, damages, costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, arising by reason of personal injury to or death of any persons or damage or destruction of properties resulting from or arising out of or in any manner connected with Seller's construction in the Shopping Center Project and/or its use, occupancy or possession of the Shopping Center Project.

2943172
44

12.    DEFAULT.

A.    If Seller or Buyer (or any person or entity occupying the Property by or through Buyer) (hereinafter referred to as the "Defaulting Party") violates or attempts to violate or default under any of the terms or provisions contained in this Declaration, the Supplemental Agreement and/or the Master Declaration, then the other party shall have the right to prosecute any proceedings at law or in equity against the Defaulting Party in order to prevent it or them from doing so, and to recover damages for any such violation or default, and/or to avail itself of any or all rights or remedies provided for in this Declaration. The remedies available under this Paragraph 12 shall include, without limitation. ex parte applications for temporary restraining orders, preliminary injunctions and permanent injunctions enjoining any such violation or attempted violation or default. and actions for specific performance of the terms and provisions of this Declaration, the Supplemental Agreement and/or the Master Declaration. Except as otherwise provided in this Declaration, neither Seller nor Buyer shall have the right to terminate this Declaration for any reason whatsoever. Except as otherwise provided above, the rights and remedies provided under this Declaration shall be deemed to be cumulative and no one of such rights and remedies shall be exclusive of any of the others, or of any other right or remedy at law or in equity which a party might otherwise have by virtue of a default by the Defaulting Party, and the exercise of one such right or remedy by a party shall not impair its standing to exercise any other right or remedy.

B.    (1) If Seller shall fail to perform any covenant, term or condition of this Declaration upon Seller's part to be performed, and if as a consequence of such default Buyer shall recover a money judgment against Seller, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied

GIE0938 08/27/90 1850                    41

2943172

thereon against the right, title and interest of Seller in the Shopping Center Project and/or the Gurnee Mills Development and out of rents or other income from the Shopping Center Project and/or the Gurnee Mills Development receivable by Seller, or out of the consideration received by Seller from the sale or other disposition of all or any part of Seller's right, title and interest in any property owned by Seller in the Shopping Center Project and/or the Gurnee Mills Development, subject, nevertheless, to the rights of any mortgagee of Seller (who has a mortgage or leasehold lien on any property owned by Seller in the Shopping Center Project and/or the Gurnee Mills Development), and neither Seller nor any of the partners comprising the limited partnership which is Seller herein shall be liable for any deficiency. The foregoing limitation of liability shall be noted in any judgment secured against Seller and in the judgment index.

B(2)    See page 42A attached hereto and incorporated herein.

C.    A waiver of any default by a party must be in writing, and no such waiver shall be implied from any omission by the other party to take any action in respect to such default. One or more written waivers of any default in the performance of any provision shall not be deemed to be a waiver of any subsequent default in the performance of the same provision or any other term or provision contained in this Declaration, the Supplemental Agreement and/or the Master Declaration.

D.    Except as otherwise provided in this Declaration, in the event that either party fails to make any payments due the other party pursuant to this Declaration and/or the Supplemental Agreement on a timely basis, then the amount due shall bear interest from the tenth (10th) day following the date on which the party owed the payment sends written notice of the delinquency to the other party until the date paid at the lesser of (i) that rate of interest that is three percent (3%) above the then-current published prime or corporate base rate charged by Citicorp Bank, N.A. or (ii) the highest rate permitted by law.

2943172

46

## DECLARATION OF RESTRICTIONS

12(B)(2)    Notwithstanding anything to the contrary contained herein, in the Supplemental Agreement or otherwise, in the event that Citicorp Real Estate, Inc., individually in its own capacity and/or acting as agent for one or more co-lenders and participants ("CREI") or any successor or assign of CREI, succeeds to the interest of Seller in the Shopping Center Project or any portion thereof, then the maximum liability of CREI, its successors and assigns for the performance of Seller's obligations under Paragraph 5(B) above (with respect to the Opening Requirement) and Paragraph 7 of the Supplemental Agreement (with respect to the Opening Date and the Satisfaction Date) shall not exceed Three Hundred Thousand Dollars ($300,000.00) in the aggregate.    The foregoing limitation of liability shall be noted in any judgment secured against Seller and in the judgment index.

2943172

47

E.    In the event Buyer defaults in the performance of any of its obligations under this Declaration, the Supplemental Agreement and/or the Master Declaration, Seller shall have the right, but not the obligation, after giving ten (10) days' written notice to Buyer, to cure such default for the account of and at the expense of Buyer; provided, however, that in the event that emergency conditions arise because of a default, Seller acting in good faith shall have the right to cure such default upon such advance notice as is reasonably possible under the circumstances or, if necessary, without advance notice, so long as notice is given as soon as possible thereafter. Any notice hereunder shall specify with particularity the nature of the default claimed and shall set forth in detail the action which Seller proposes to take in order to cure the claimed default.  To effectuate any such cure, Seller shall have the right to enter upon the Property (but not any buildings located thereon) to perform any necessary work or furnish any necessary materials or services to cure the default of Buyer.

F.    Any party serving a notice of default or any other notice of an event or act which if taken or not taken may become a default (any of the foregoing hereinafter referred to as a "notice of default") under this Declaration, the Supplemental Agreement and/or the Master Declaration shall send by registered or certified United States Mail, postage prepaid, a copy of such notice to any holder of a mortgage on the Property, any leasehold interest pertaining to the Property and/or improvements of the party so served, provided such holder shall have sent the party serving the notice of default a notice in the manner required under this Declaration informing it of the existence of such mortgage and the name of the person or officer and the address to which copies of such notices of default are to be sent.  Such holder shall be permitted to cure any such default within the time periods allowed the defaulting party hereunder.  The mortgagee shall advise each party as to what actions, if any, it shall elect to

take in order to remedy any such default, which notice shall be without obligation on the part of the mortgagee to perform, failing of which, however, the non-defaulting party shall have the right to proceed to enforce the terms and the conditions of this Declaration. In the case of an emergency, the above required notice shall not be required but such notice shall be given as may be reasonably practicable under the circumstances.

13.   **TERM OF DECLARATION.**

Except as otherwise expressly provided herein, this Declaration and the Supplemental Agreement (and the obligations set forth under this Declaration and/or the Supplemental Agreement) shall remain binding from the date of this Declaration and shall continue for a period of fifty (50) years hereafter; provided, however, that those easements and rights created hereunder which are to continue in perpetuity shall not terminate upon the termination of this Declaration. If and to the extent that any of the covenants or other provisions herein would otherwise be unlawful or void for violation of (a) the rule against perpetuities, (b) the rule restricting restraints on alienation, or (c) any other applicable statute or common law rule analogous thereto or otherwise imposing limitations upon the time for which such covenants may be valid, then the provisions concerned shall continue and endure only until the expiration of a period of twenty-one (21) years after the death of the last to survive the class of persons consisting of all of the lawful descendants of George Bush, living at the date of this Declaration.

2943172

49

14.    **NOTICES**.

All notices, consents or other instruments or communications provided for under this Declaration shall be in writing, signed by the party giving the same and shall be deemed properly given and received when (i) actually delivered and received, if personally delivered, or (ii) three (3) business days after mailed, if sent by registered or certified mail, postage prepaid, return receipt requested, or (iii) one (1) business day after being sent by overnight delivery service, all to the following addresses:

If to Seller:

Gurnee Properties Associates Limited Partnership
c/o Western Development Corporation
3000 K Street, N.W., Suite 200
Washington, D.C.  20007
Attention:  General Counsel

With Copy to:

Rudnick & Wolfe
Suite 1800
203 North LaSalle Street
Chicago, Illinois 60601-1293
Attention:  Robert H. Goldman, Esq.

If to Buyer:

PMI Associates
20 Federal Plaza West
Youngstown, Ohio  44501
Attention:  Michael I. Monus

With Copy to:

Phar-Mor, Inc.
101 Kappa Drive
R.I.D.C. Park
Pittsburgh, PA  15235
Attention:  Director of Real Estate

Each party shall have the right to designate other or additional addresses for the delivery of notices, by giving notice thereof similarly given (such other or additional addresses being effective from and after the date of receipt of notice thereof by the other party).

GIE0938 08/27/90 1850                    45                    **2943172**

*50*

15.   <u>GOVERNING LAW.</u>

This Declaration shall be governed by, and enforced in accordance with, the laws of the State of Illinois.

16.   **ASSIGNMENT BY SELLER.**

Buyer hereby acknowledges and agrees that Seller may, at any time hereafter, assign and convey some or all of the rights or benefits reserved by or granted to Seller hereunder, and/or under the Supplemental Agreement, and/or under any other document or instrument of record pertaining to the Property, to any other person or entity (subject, however, to the provisions of Paragraph 9 above). Buyer hereby further acknowledges and agrees that from and after the date on which it receives written notice of any such assignment, Buyer shall deliver all plans, pay all Assessments and other sums and submit all other items required or permitted to be submitted to Seller to Seller's assignee instead, and that Seller's assignee shall be entitled to exercise all rights and receive all benefits reserved by or granted to Seller as if such assignee had been the owner of the Property and the Seller hereunder, and all such rights and benefits had been reserved by or granted to Seller's assignee directly.

17. . **BINDING EFFECT.**

All of the foregoing covenants, conditions, restrictions and easements shall be covenants running with the land, and shall be binding upon the parties hereto and their

~~, subject to Subparagraph 12(B)(2) above,~~

respective representatives, successors and assigns, and all subsequent owners and occupants of the Property and the Shopping Center Project (as the case may be). All of Buyer's covenants, conditions, restrictions and easements shall be enforceable against Buyer as the owner of the Property, and its successors in title to the Property, and shall inure to the benefit of and be enforceable by Seller, its personal successors or assigns.

All of Seller's covenants, conditions and restrictions shall be enforceable against Seller as the owner of the Shopping Center Project, and its successors in title to the Shopping Center Project (except for those portions thereof which are now or hereafter sold, transferred or conveyed to any other anchor of the Shopping Center Project), and shall inure to the benefit of and be enforceable by Buyer, its successors or assigns. (For the purposes of the foregoing sentence, an "anchor" shall be defined as provided in Paragraph 5 above.)  With respect to those portions of the Shopping Center Project which are hereafter sold, transferred or conveyed to any other anchor of the Shopping Center Project, the sale, transfer or conveyance of such portion(s) of the Shopping Center Project to such other anchor(s) shall automatically result in the complete release of such portion(s) of the Shopping Center Project from the covenants, conditions and restrictions created by this Declaration and/or the Supplemental Agreement, and Buyer shall promptly execute any documentation requested by Seller to the extent required in order to confirm such release.  The invalidation of any one or more of the covenants, conditions, restrictions, or easements contained in this Declaration shall in no event affect any of the other covenants, conditions, restrictions or easements contained herein.

18.    **MISCELLANEOUS.**

A.    The captions of this Declaration are inserted only as a matter of convenience and for reference.  They do not define, limit or describe the scope or intent of this Declaration, and they shall not affect the interpretation of this Declaration.  All Exhibits which are mentioned in this Declaration are made a part hereof.

B.    The provisions of this Declaration are for the exclusive benefit of the parties and, except as otherwise provided in this Declaration, not for the benefit of any other person or entity.  Except as otherwise provided in this Declaration, this

their respective successors and assigns

GIE0938 08/27/90 1850                    47

2943172
52

Declaration shall not be deemed to have conferred any rights, express or implied, upon any third person. Nothing in this Agreement shall be construed to create any rights in or for the benefit of any space lessee of any part of the Shopping Center Project.

C.    Notwithstanding anything to the contrary contained in this Declaration, Buyer and Seller shall each be excused from performing any obligation under this Declaration, and any delay in the performance of any obligation under this Declaration shall be excused, if and so long as the performance of the obligation is prevented, delayed or otherwise hindered by acts of God, fire, earthquake, floods, explosion, actions of the elements, war riots, mob violence, inability to procure or a general shortage of labor, equipment, facilities, materials or supplies on the open market, failure of transportation, strikes, lockouts, actions of labor unions, condemnation, court orders, laws, regulations or orders of governmental or military authorities or any other cause, whether similar or dissimilar to the foregoing, not within the control of the affected parties (other than lack of or inability to procure funds or financing to fulfill its commitments and obligations under this Declaration).

D.    Neither anything contained in this Declaration nor any acts of the parties performed pursuant to this Declaration shall be deemed or construed to create the relationship of principal and agent, or of partnership, or of joint venture, or of any association among the parties to this Declaration.

E.    As an inducement by Buyer to Seller to enter into this Declaration, Buyer represents, covenants and agrees that Buyer has full power and authority to execute, acknowledge, deliver and record this Declaration and to grant all the interest, rights and privileges granted to Seller under this Declaration.

F.    The operating covenants of Buyer contained in Paragraph 2 shall run to and for the benefit of the holder of any mortgage on Seller's property within the

Shopping Center Project who has served notice on Buyer of the existence of said mortgage and the address to which notices are to be sent to it under this Declaration. Buyer hereby acknowledges that Citicorp Real Estate, Inc. ("Citicorp") is the holder of certain mortgages which encumber the Shopping Center Project, and that Citicorp's address for the notices hereunder is:

Citicorp Real Estate, Inc.
1001 G Street, N.W.
Suite 800
Washington, D.C.  20001
Attention: Ms. Jennifer Howell

~~Citicorp Real Estate, Inc.~~
~~919 18th Street, N.W.~~
~~Suite 502~~
~~Washington, D.C.  20006~~
~~Attention:  Ms. Jennifer Howell~~

With a Copy to:

Jones, Day, Reavis and Pogue
1450 G Street, N.W.
Washington, D.C. 20005
Attention:  James P. Carroll, Esq.

The provisions hereof shall constitute service of notice on Buyer of the existence of Citicorp's mortgages, as required in the first sentence of this Subparagraph 18(F). The rights granted to the holder of a mortgage under this Subparagraph 18(F) are valid and enforceable, notwithstanding that such holder is not a party to this Declaration. Such holder shall have the right to seek and obtain against Buyer any and all remedies or relief available to such holder at law or in equity; provided, however, that such holder is then in possession of Seller's property in the Shopping Center Project or is in the process of enforcing its rights to obtain possession of the same.

G.    Seller hereby acknowledges that, pursuant to the terms of the Master Declaration, it is currently responsible for maintaining certain parking areas and roads within the Property. In the event that Seller shall fail to maintain the parking areas and roads within the Property as provided in the Master Declaration, and such failure is not corrected within thirty (30) days of the date on which Seller receives written notice of such failure from Buyer (except in the case of an emergency, in which event buyer shall only be required to provide Seller with twenty-four (24) hours' prior notice, and

2943172
54

except in the case where such failure requires more than thirty (30) days to correct, in which event Seller shall have such additional time as may reasonably be required to correct the failure, provided that Seller is diligently prosecuting the correction to completion), then Buyer shall have the right, but not the obligation, to perform the needed maintenance work on the parking areas and roads within the Property and to obtain reimbursement from Seller of its reasonable costs and expenses incurred in connection therewith (with interest thereon, as provided in Subparagraph 12(D) above). Seller shall reimburse Buyer for such costs and expenses within fifteen (15) business days of its receipt of Buyer's invoice therefor (which shall be accompanied by reasonably sufficient supporting documentation evidencing the costs and expenses incurred). If Seller fails to reimburse Buyer for such costs and expenses within the aforementioned fifteen (15) business day period, Buyer shall have in addition to any and all other remedies provided in this Declaration, the right to offset such costs and expenses against any and all Assessments payable to Seller then or in the future. In the event that Buyer desires to have the maintenance work completed prior to the expiration of the notice and cure periods provided to Seller as provided above, then Buyer shall have the right to do such work, obtaining reimbursement from Seller of its reasonable costs and expenses, but without any interest thereon. In no event shall Buyer, in the performance of any work by it pursuant to this Subparagraph 18(G), interfere with any work being performed by or on behalf of Seller in the Gurnee Mills Development.

H.    Notwithstanding anything contained in this Declaration to the contrary, Seller shall have the right, at any time and from time to time, without the consent of or notice to Buyer, to enlarge or contract the Shopping Center or any other portion of the Gurnee Mills Development, to construct, remove, relocate or reconfigure any and all buildings or improvements within the Shopping Center or any other portion of the

Gurnee Mills Development, or otherwise change or modify the Shopping Center or any other portion of the Gurnee Mills Development, in any manner whatsoever, except that Seller shall not, without Buyer's prior consent (which shall not be unreasonably withheld), (i) make any alterations or changes in the Property, (ii) construct or install nor permit the construction or installation of any structures or improvements within the area shown and identified on the Site Plan as the "Area of Critical Concern," or (iii) change those portions of the parking areas, entrances or exits within the "Area of Critical Concern". The depiction of the Shopping Center and the rest of the Gurnee Mills Development in any exhibit attached hereto shall in no way limit Seller from proceeding with any of the foregoing. Seller does not represent or warrant that the Shopping Center or the remainder of the Gurnee Mills Development will be constructed exactly as shown on any such exhibit. After the Shopping Center is constructed, however, Seller agrees that it shall not make any changes in the Mall Ring Road or Project Roads (as defined in the Master Declaration) providing access unless Seller complies with the provisions of the Master Declaration in connection therewith.

I.    Provided Buyer is not in default (beyond any applicable cure period) in the terms, provisions and obligations of this Declaration of Restrictions, the Supplemental Agreement or any other instrument of record which encumbers the Property, Seller agrees that it will not lease or sell any premises in the Shopping Center Project containing more than fifteen thousand (15,000) square feet of gross floor area (as the term is defined in the Master Declaration as amended) for the purpose of developing or operating as its principal use, a deep discount drugstore. Seller and Buyer acknowledge and agree that, notwithstanding the foregoing, the restriction contained in this Subparagraph 18(I) shall not apply:  (1) with respect to any land or gross floor area leased or sold to Sears signed leases or Wal-Mart Stores, Inc. and their respective

GIE0938 08/27/90 1850          51          2943172
                                              56

affiliates, successors and assigns; (2) as of one year after the date on which Buyer ceases to use and occupy the Property (and the building to be constructed thereon) for the purposes set forth in Paragraph 2(A) hereof; and/or (3) with respect to any lease or sale of premises in the Shopping Center Project containing less than fifteen thousand (15,000) square feet of Gross Floor Area. Seller agrees that it shall not amend or modify any lease agreement with any of the entities set forth in Subparagraph (1) of this Subparagraph 18(I) that will broaden the rights of such entity with respect to the exclusive use granted herein.

J.    Seller agrees that notwithstanding anything set forth in Section 5.2 of the Master Declaration to the contrary, Seller shall not charge Buyer's customers, patrons, invitees or employees for the right to use the areas of the Shopping Center Project used or designated from time to time for automobile parking except for fees or fines imposed in connection with enforcement of parking regulations promulgated pursuant to the Master Declaration. Buyer agrees that it shall not charge customers, patrons or invitees of the Shopping Center Project for the right to use the areas of Buyer's Property used or designated from time to time for automobile parking.

K.    Either party may, at any time and from time to time, but not more than twice in any calendar year, deliver written notice to the other party requesting such other party without charge to certify in writing that, to the best knowledge of the certifying party, (i) this Declaration is in effect and a binding obligation of such certifying party; (ii) this Declaration has not been amended and/or supplemented or, if so amended and/or supplemented, identifying the amendments and/or supplements; (iii) the requesting party is not in default in the performance of its obligations under this Declaration, or, if in default, describing the nature of any default(s); each party receiving such request shall execute and return such certificate within ten (10) days following the

request thereof; and (iv) certifying that all conditions and agreements under this Declaration to be satisfied and performed have been satisfied and performed except as shall be stated.

L.    Notwithstanding the provisions set forth in Section 5.1(l) of the Master Declaration, nothing herein shall prevent Phar-Mor, Inc. from keeping, storing, using or distributing hazardous materials in quantities consistent with reasonable standards of a business of the type and size operated by Phar-Mor, Inc. on the Premises.

M.    This Dearation may be executed in several counterparts and each executed counterpart shall be considered an original of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Declaration of Restrictions as of the day and year first above written.

SELLER:

GURNEE PROPERTIES ASSOCIATES LIMITED PARTNERSHIP, an Illinois Limited Partnership

By:    GRAND AVENUE PROPERTIES, INC., an Illinois corporation, its general partner

By: _____
Vice Its: President

By: _____
Its: Assistant Secretary

2943172

58

BUYER:

PMI ASSOCIATES, a Pennsylvania
limited partnership

By:     DAVMIC CORP., a Pennsylvania
        corporation, its general partner

By: _____    RICHARD H. NIMTZ
Its: _____         VICE PRESIDENT

By: _____    CHARITY J. IMBRIE
Its: _____         SECRETARY

2943172

2943172

RECORDER
LAKE COUNTY, ILL.

1990 SEP 11  AM 10: 30

59

STATE OF ~~OF~~ District of

COUNTY OF ~~COUNTY OF~~ Columbia    ) SS.

I, Walter A. Hines, Jr, a Notary Public in and for said County in the State aforesaid, do hereby certify that Harry H Nick, Vice President of Grand Avenue Properties, Inc., an Illinois corporation, the general partner of Gurnee Properties Associates Limited Partnership, an Illinois limited partnership, and Victoria Stoll, Assistant Secretary of said corporation, both personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such respective officers, appeared before me this day in person and acknowledged that they signed and delivered such instrument as their own free and voluntary acts and as the free and voluntary act of said corporation and of said partnership, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal this 30th day of August, 1990.

_____
Notary Public

My Commission expires:

My Commission Expires July 14, 1993

_____
60

GIE0938 08/27/90 1850

STATE OF <u>Pennsylvania</u> )
                      )   SS.
COUNTY OF <u>Allegheny</u> )

I, <u>Pamela M. Carter</u>, a Notary Public in and for said County in the State aforesaid, do hereby certify that <u>Richard H. Nimtz</u>, <u>Vice</u> President of DAVMIC, Inc., a Pennsylvania corporation, the general partner of PMI Associates, a Pennsylvania limited partnership, and <u>Charity J. Imbrie</u>, <u>       </u> Secretary of said corporation, both personally known to me to be the same persons whose names are sub-scribed to the foregoing instrument as such respective officers, appeared before me this day in person and acknowledged that they signed and delivered such instrument as their own free and voluntary acts and as the free and voluntary act of said corporation and said partnership, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal this <u>29th</u> day of <u>August</u>, 19<u>90</u>.

_Pamela H. Carter_
**Notary Public**

> Notarial Seal
> Pamela McCarter, Notary Public
> Pittsburgh, Allegheny County
> My Commission Expires July 11, 1994
> Member, Pennsylvania Association of Notaries

My Commission expires:

**2943172**

*61*

GIE0938 08/27/90 1850

EXHIBIT "1"

Legal Description of Premises

## PARCEL 1:

THAT PART OF LOT 1 OF BLOCK "M" OF GURNEE MILLS, BEING A SUBDIVISION OF PARTS OF SECTIONS 8, 9 AND 16, TOWNSHIP 45 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, AND RECORDED ON JULY 25, 1990 AS DOCUMENT NO. 2928223, DESCRIBED AS FOLLOWS:  BEGINNING AT THE POINT OF INTERSECTION OF THE NORTH LINE OF COMMONWEALTH EDISON COMPANY RIGHT-OF-WAY BEING A LINE 150.00 FEET NORTH OF AND PARALLEL TO THE SOUTH LINE OF SECTION 9 AND THE NORTHWESTERLY LINE OF LOT 2 IN BLOCK "M" OF GURNEE MILLS; THENCE NORTH 44°30'00" EAST ALONG SAID NORTHWESTERLY LINE FOR A DISTANCE OF 133.58 FEET TO A POINT CURVATURE; THENCE NORTH ALONG A CURVED LINE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 398.50 FEET, AN ARC LENGTH OF 309.97 FEET, AND A CHORD LENGTH OF 302.21 FEET BEARING NORTH 22°13'00" EAST TO A POINT OF TANGENCY; THENCE CONTINUING ALONG THE WEST LINE OF LOT 2 IN BLOCK "M" NORTH 00°04'00" WEST FOR A DISTANCE OF 289.76 FEET; THENCE NORTH 90°00'00" WEST FOR A DISTANCE OF 480.19 FEET; THENCE NORTH 45°00'00" WEST FOR A DISTANCE OF 81.58 FEET; THENCE SOUTH 45°00'00" WEST FOR A DISTANCE OF 0.50 FEET; THENCE NORTH 45°00'00" WEST FOR A DISTANCE OF 40.00 FEET; THENCE SOUTH 45°00'00" WEST FOR A DISTANCE OF 60.00 FEET; THENCE SOUTH 45°00'00" EAST FOR A DISTANCE OF 40.00 FEET; THENCE SOUTH 45°00'00" WEST FOR A DISTANCE OF 255.50 FEET; THENCE SOUTH 45°00'00" EAST FOR A DISTANCE OF 705.65 FEET TO A POINT ON THE NORTH LINE OF COMMONWEALTH EDISON COMPANY RIGHT-OF-WAY; THENCE SOUTH 89°54'49" EAST ALONG SAID NORTH LINE FOR A DISTANCE OF 54.80 FEET TO THE POINT OF BEGINNING, IN THE VILLAGE OF GURNEE, LAKE COUNTY, ILLINOIS. (CONTAINING 8.00 ACRES)

## PARCEL 2:

EASEMENT FOR INGRESS AND EGRESS AS CONTAINED IN "GURNEE MILLS MASTER DECLARATION OF EASEMENTS, COVENANTS, CONDITIONS AND RESTRICTIONS" DATED JANUARY 22, 1990 AND RECORDED JANUARY 26, 1990 AS DOCUMENT NO. 2873087, IN LAKE COUNTY, ILLINOIS.

[ALTERNATE DESCRIPTION: PARCEL 1 OF THE FIRST RESUBDIVISION OF LOT 1 IN BLOCK "M" OF GURNEE MILLS, RECORDED ON AUGUST 28, 1990 AS DOCUMENT NO. 2938772, BEING A RESUBDIVISION OF GURNEE MILLS, A SUBDIVISION OF PARTS OF SECTIONS 8, 9 AND 16, TOWNSHIP 45 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN AND RECORDED ON JULY 25, 1990 AS DOCUMENT NO. 2928223, IN THE VILLAGE OF GURNEE, LAKE COUNTY, ILLINOIS.]


Property Address:   Gurnee Mills
                    Gurnee, Illinois

Permanent Index
   Numbers:         07-09-300-005 (affects premises and other land)
                    07-09-400-006 (affects premises and other land)

2943172
62

<u>EXHIBIT "2"</u>

GURNEE MILLS SUBDIVISION, A SUBDIVISION OF PARTS OF SECTIONS 8, 9 AND 16, TOWNSHIP 45 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN IN LAKE COUNTY, ILLINOIS, ACCORDING TO THE PLAT THEREOF RECORDED JULY 25, 1990 AS DOCUMENT NO. 2928223.

2943172

GIE0938 08/27/90 1850                E2-1                63

## EXHIBIT "3"

### PROHIBITED USES

As provided in Paragraph 2 of this Declaration, the Property shall not be used for any of the following uses or purposes:

1. Supermarket (i.e., a store used primarily for the sale and display of food, produce, household paper products, kitchen accessories [e.g., aluminum foil, trash bags, etc.], and other such similar items).

2. Toy store (i.e., a store used primarily for the sale and display of toys, games, and other such entertainment items).

3. Linen store (i.e., a store used primarily for the sale and display of sheets, blankets, towels, curtains, drapes, window treatments, and other such similar items).

4. Store used primarily for the sale and display of men's clothing and/or accessories.

5. Bowling alley.

6. Ice skating or roller skating rink.

7. Video, pinball and/or amusement arcade, or other such entertainment facility.

8. Electronics store (i.e., a store used primarily for the sale and display of audio equipment [e.g., stereos, compact disc players, radios, etc.], video equipment [e.g., televisions, video cassettes recorders, video cameras, etc.], computers, computer games, and/or other such similar items).

9. Home improvement store (i.e., a store used primarily for the sale and display of home improvement items such as paint, wallpaper, lumber, kitchen cabinets, bathrooms cabinets, plumbing fixtures and materials, garden tools, and/or other such similar items).

10. Nursery.

11. Hardware store.

12. Motion picture theater(s).

**2943172**

*64*









### LEGEND

#### PROPOSED SITE UTILITIES

| | |
|---|---|
| ———— | SANITARY SEWER |
| ———— | STORM SEWER |
| ———— | WATERMAIN |
| ———— | ELECTRIC |
| ———— | TELEPHONE |
| ———— | GAS |
| ———— | CABLE T.V. |

#### MISCELLANEOUS

| | |
|---|---|
| ■ | INLET |
| ● | MH |
| ◄ | HYDRANT |
| ⊣ | WATER VALVE |
| ⚡ | LIGHT POLE |
| ○ | POWER POLE |
| ⊠ | COM-ED TOWER |

NOTES:

1. SELLER RESERVES THE ABSOLUTE RIGHT TO CONSTRUCT, REMOVE, RELOCATE OR RECONFIGURE ANY AND ALL BUILDINGS, PARKING AREAS, AND OTHER IMPROVEMENTS WITHIN THE GURNEE MILLS DEVELOPMENT, EXCEPT AS MAY BE OTHERWISE PROVIDED, UNDER THE TERMS OF THE MASTER DECLARATION AND THE PURCHASE AND SALE AGREEMENT.

2. ALL UTILITIES SHOWN WITHIN PARCEL WITHIN PARCEL WILL BE CENTERED IN EASEMENTS OF THE FOLLOWING APPROXIMATE WIDTHS:

   SANITARY SEWER    10'
   STORM SEWER       15'
   WATERMAIN         10'
   ELECTRIC          15'
   GAS               10'

3. LOCATIONS AND INVERTS OF UTILITY LATERALS AS SHOWN ON THE PLANS ARE APPROXIMATE. BUYER IS RESPONSIBLE FOR FIELD VERIFICATION.

EXHIBITS - DECLARATION OF RESTRICTIONS

2943172

| PLAN TITLE: EXHIBIT A | PLAN DATE 6-13-90 |
|---|---|
| ANCHOR E SITE DEVELOPMENT CRITERIA PLAN | SCALE 1" = 550' |

PROJECT: GURNEE MILLS



FILED: JULY 30, 2008
08CV4339
JUDGE DER YEGHIAYAN
MAGISTRATE JUDGE MASON

JFB

# LEASE AGREEMENT

## BETWEEN

## MRSLV GURNEE MILLS L.L.C. (LANDLORD)

## AND

## VALUE CITY DEPARTMENT STORES, INC. (TENANT)

## DATED AUGUST 13, 1997

# TABLE OF CONTENTS

Page

1. Certain Definitions. ........................................................................................... 1

2. Demise of Premises. .......................................................................................... 9

3. Term. ................................................................................................................ 10

4. Rent. ................................................................................................................. 10

5. Net Lease; True Lease. .................................................................................... 11

6. Title and Condition. ......................................................................................... 12

7. Taxes; Insurance and Legal Requirements. .................................................... 13

8. Use. .................................................................................................................. 14

9. Maintenance and Repair. ................................................................................ 15

10. Liens. .............................................................................................................. 16

11. Alterations. .................................................................................................... 16

12. Condemnation. ............................................................................................... 17

13. Insurance. ....................................................................................................... 20

14. Damage, Destruction. .................................................................................... 22

15. Restoration. .................................................................................................... 23

16. Subordination to Financing ........................................................................... 24

17. Assignment, Subleasing. ................................................................................ 26

18. Permitted Contests. ........................................................................................ 27

19. Default. ........................................................................................................... 28

20. Landlord's Remedies. ..................................................................................... 29

21. Notices. ........................................................................................................... 31

22. Memorandum of Lease; Estoppel Certificates. ............................................. 33

23. Surrender and Holding Over. ......................................................................... 33

24. No Merger of Title. ......................................................................................... 34

25. Landlord Exculpation. .................................................................................... 34

26. Hazardous Materials. ...................................................................................... 35

27. Entry by Landlord. .......................................................................................... 35

28. Financial Statements; Additional Information. .............................................. 36

29. No Usury. ........................................................................................................ 38

30. Broker. ............................................................................................ 38

31. Waiver of Landlord's Lien. .......................................................... 38

32. No Waiver. ................................................................................... 39

33. Separability. ................................................................................. 39

34. Indemnification. ........................................................................... 39

35. Tenant to Comply With Reciprocal Easement Agreement. ........... 40

36. Headings. ...................................................................................... 41

37. Modifications. ............................................................................... 41

38. Successors, Assigns. ..................................................................... 41

39. Counterparts. ................................................................................ 42

40. Governing Law. ............................................................................ 42

41. Lender as Third Party Beneficiary. .............................................. 42

42. Exculpation of Trustee. ................................................................ 42

43. Substitution of Premises. .............................................................. 42

44. Event Purchase Offer. ................................................................... 45

45. Warranties. ................................................................................... 46

## LIST OF EXHIBITS

Exhibit 1            Permitted Encumbrances

Exhibit 2            Leased Premises

Exhibit 3            Basic Rent

Exhibit 9            Repair Obligations

Exhibit 12-1         Purchase Price

Exhibit 12-2         Determination of Remainder Value and Leasehold Value

Exhibit 26           Environmental Obligations

Exhibit 43           Substitution Closing Requirements

Exhibit 45           Tenant's Warranties

THIS LEASE AGREEMENT is made as of the 13th day of August, 1997, by and between MRSLV Gurnee Mills L.L.C., a Delaware limited liability company, having an office at 350 North Clark Street, Chicago, Illinois 60610 ("Landlord"), and Value City Department Stores, Inc., an Ohio corporation, having its principal office at 1800 Moler Road, Columbus, Ohio 43207 ("Original Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant hereby covenant and agree as follows:

1.    Certain Definitions.

(a)    "Additional Rent" shall mean all sums required to be paid by Tenant hereunder other than Basic Rent, which sums shall constitute rental hereunder.

(b)    "Additions to Purchase Price" shall mean Additions to Purchase Price as defined in Paragraph 12(b).

(c)    "Adjoining Property" shall mean all real estate adjoining the Leased Premises, including without limitation all sidewalks, curbs, gores and vault spaces.

(d)    "Affiliate" means, with respect to any person or entity, a person or entity directly or indirectly controlling, controlled by, or under common control with, such person or entity.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession directly or indirectly of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities or by contract or otherwise.

(e)    "Alteration" or "Alterations" shall mean any or all changes, additions, improvements, reconstructions or replacements of any of the Improvements, both interior or exterior, and ordinary and extraordinary.

(f)    "Assignee Tenant" shall mean any Qualified Entity to which the Original Tenant's interest in this Lease has been assigned pursuant to Paragraph 17 hereof.

(g)    "Basic Rent" shall mean Basic Rent as defined in Paragraph 4.

(h)    "Basic Rent Payment Date" shall mean Basic Rent Payment Date as defined in Paragraph 4.

(i)    "Closing Date" shall mean Closing Date as defined in Paragraph 12(b).

(j)    "Commencement Date" shall mean August 13, 1997.

(k)    "Condemnation" shall mean a Taking and/or a Requisition.

(l)    "Corporate Creditworthiness Rating" shall mean a Corporate Creditworthiness Rating issued by Standard & Poors Rating Services pursuant to a Private Letter Rating which may be relied on by Landlord and Lender, or a comparable private letter credit rating issued by Moody's Investors Services, Inc., Duff & Phelps Credit Co., NAIC or Fitch Investors Service, which may be relied on by Landlord and Lender.

(m)    "Default Purchase Offer" shall mean Default Purchase Offer as defined in Paragraph 20(d).

(n)    "Default Rate" shall mean an annual rate of interest equal to the greater of (i) two (2%) percent per annum above the therein current Prime Rate and (ii) the rate of interest chargeable under any Note following the occurrence of an event of default thereunder or under the Mortgage securing such Note, provided that in no event shall the Default Rate exceed the rate of interest chargeable under such Note prior to an event of default thereunder plus five percent (5%) per annum.

(o)    "Discount Rate" shall mean as of the date of determination the then yields (which shall be converted to monthly yields) on U.S. Treasury securities maturing nearest the end of the Term (without regard to any Executory Renewal Terms.)

(p)    "Easements" shall mean Easements as defined in Paragraph 35(a).

(q)    "Environmental Laws" shall mean all federal and state statutes regulating dangerous, hazardous and toxic substances, including, without limitation, the federal and state statutes referred to in the definition of Hazardous Materials and all rules and regulations promulgated pursuant thereto, as the same may be from time to time amended.

(r)    "Event of Default" shall mean an Event of Default as defined in Paragraph 19.

(s)    "Event Purchase Offer" shall mean an Event Purchase Offer as defined in Paragraph 44.

(t)    "Event Purchase Offer Date" shall mean the Event Purchase Offer Date as defined in Paragraph 44.

(u)    "Executory Renewal Term" shall mean any potential Renewal Term as to which Tenant has not waived its right to cancel pursuant to Paragraph 3.

(v)    "Expiration Date" shall mean the last day of the Term as the same may be extended pursuant to this Lease.

(w)    "Financial Event" shall mean a Financial Event as defined in Paragraph 44.

(x)    "Guaranties" shall mean Guaranties as defined in Paragraph 6(c).

(y)     "Hazardous Materials" shall mean and include, without limitation, all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended 42 U.S.C. § 7401, *et seq.*, any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq.*, any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, *et seq.*, any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above-listed statutes or any modifications thereof or successor statutes thereto; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

(z)     "Improvements" shall mean the Improvements as defined in Paragraph 2.

(aa)     "Indemnified Parties" shall mean Indemnified Parties as defined in Paragraph 26(b).

(bb)     "Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant pursuant to this Lease, including without limitation insurance policies required to be maintained by Tenant or Tenant's contractor while Tenant is engaged in making any Alteration, Restoration, repairs or construction work of any kind (collectively, "Work").

(cc)     "Insured Improvements" shall mean Insured Improvements as defined in Paragraph 13(a).

(dd)     "Interim Term" shall mean the Interim Term as defined in Paragraph 4.

(ee)     "Land" shall mean the Land as defined in Paragraph 2.

(ff)     "Landlord" shall mean the entity identified as such in the first sentence of this Lease and any and all successors in interest thereto with respect to any or all of the rights or interests of Landlord under this Lease.

(gg)     "Landlord's Interest" shall mean Landlord's Interest as defined in Paragraph 42.

(hh)     "Late Charge" shall mean the Late Charge as defined in Paragraph 4(b).

(ii)    "Law" shall mean any constitution, statute, ordinance, regulation or rule of law.

(jj)    "Leased Premises" shall mean the Leased Premises as defined in Paragraph 2.

(kk)    "Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of (i) all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those which by their terms are not applicable to and do not impose any obligation on any of Tenant, Landlord or the Leased Premises), including, without limitation, all zoning and building ordinances, and (ii) all covenants, restrictions and conditions now or hereafter of record which may be applicable to any of Tenant, Landlord or the Leased Premises, or to the use, manner of use, occupancy, possession, operation or maintenance of the Leased Premises even if any such matter (A) necessitates structural changes or improvements (including changes required to comply with the "Americans with Disabilities Act" as from time to time amended) or results in interference with the use or enjoyment of any part or all of the Leased Premises, or (B) requires Tenant to carry insurance other than as otherwise required by the provisions of this Lease.

(ll)    "Lender" shall mean the entity identified to Tenant as such in writing, which makes a Loan to Landlord, secured in whole or in part by a Mortgage and evidenced by a Note, or which is the holder of a Mortgage and Note as a result of an assignment thereof, or which is a trustee in any securitization in which the Mortgage is included and, when a Mortgage secures multiple Notes held by one or more noteholders, the trustee acting on behalf of such holders, provided any such trustee has been identified as such in writing to Tenant.

(mm)    "Loan" shall mean a loan made by a Lender to Landlord secured in whole or in part by a Mortgage and evidenced by a Note or Notes.

(nn)    "Modifications" shall mean Modifications as defined in Paragraph 35(a).

(oo)    "Monthly Fair Market Rent" shall mean the Monthly Fair Market Rent as defined in Paragraph 12(b).

(pp)    "Mortgage" shall mean a first priority mortgage, deed of trust or similar security instrument now or hereafter encumbering the Leased Premises executed by Landlord in favor of Lender and, if delivered as additional security for the Note secured by a Mortgage, any assignment of leases, rents, profits or the like.

Requirements as the same shall apply to Tenant, Landlord and/or the Leased Premises, subject to the provisions of Paragraph 18 hereof.

        8.    <u>Use.</u>

        (a)    Tenant may use the Leased Premises for any lawful purpose other than any use that will (i) have a material adverse effect on the value of the Leased Premises, (ii) materially increase the likelihood that Tenant, Landlord or Lender would incur liability under any provisions of Environmental Laws, or (iii) result or give rise to any material environmental deterioration or degradation of the Leased Premises; provided, however, no sublessee or assignee shall use the Leased Premises for a use other than retail or office use without the prior written consent of Landlord and Lender, which consent shall not be unreasonably withheld or delayed. In no event shall the Leased Premises be used for heavy manufacturing. In no event shall the Leased Premises be used for any purpose which shall violate any Legal Requirement. Tenant agrees that with respect to any recorded covenants, restrictions or agreements, Tenant shall observe, perform and comply with and carry out the provisions thereof required therein to be observed and performed by or imposed upon Landlord.

        (b)    Subject to Tenant's rights of contest under Paragraph 18 hereof, Tenant shall not permit any unlawful occupation, business or trade to be conducted on any part or all of the Leased Premises or any use to be made thereof contrary to applicable Legal Requirements or Insurance Requirements. Subject to Tenant's rights of contest under Paragraph 18 hereof, Tenant shall not use, occupy or permit any part or all of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any part or all of the Leased Premises, in a manner which would (i) violate any certificate of occupancy or equivalent certificate affecting any part or all of the Leased Premises, (ii) make void or voidable any insurance which Tenant is required hereunder to maintain with respect to any part or all of the Leased Premises, (iii) affect in any manner the ability of Tenant to obtain any insurance which Tenant is required to furnish hereunder, (iv) cause any injury or damage to any of the Improvements unless pursuant to Alterations permitted under Paragraph 11 hereof, other than ordinary wear and tear, or (v) constitute a public or private nuisance or waste.

        (c)    Subject to all of the provisions of this Lease, so long as no Event of Default exists hereunder, Landlord covenants that neither it nor any party claiming by, through or under it, shall do any act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant. Landlord may enter upon and examine any part or all of the Leased Premises at reasonable times after reasonable notice and during business hours and exercise any rights and privileges granted to Landlord under the provisions of this Lease.

9.    <u>Maintenance and Repair</u>.

(a)    Except for any Alterations that Tenant is permitted to make hereunder, Tenant shall at all times, including any Requisition period, put, keep and maintain the Leased Premises, including, without limitation, the roof, landscaping, parking areas, sidewalks, driveways, walls (interior and exterior), footings, foundations and structural components of the Leased Premises and the Adjoining Property, in good and safe repair and appearance and in conformity with all Legal Requirements and Insurance Requirements, and shall promptly make all repairs and replacements (substantially equivalent in quality and workmanship to the original work) of every kind and nature, whether foreseen or unforeseen, which may be required to be made upon or in connection with any part or all of the Leased Premises in order to keep and maintain the Leased Premises in good and safe repair and appearance and in conformity with all Legal Requirements and Insurance Requirements. Tenant shall do or cause others to do all shoring of the Leased Premises or Adjoining Property or of foundations and walls of Improvements and every other act necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon any part or all of the Leased Premises or Adjoining Property, whether or not Landlord shall, by reason of any Legal Requirements or Insurance Requirements, be required to take such action or be liable for failure to do so. Landlord shall not be required to make any repair, whether foreseen or unforeseen, or to maintain any part or all of the Leased Premises or Adjoining Property in any way, and Tenant hereby expressly waives the right to make repairs at the expense of the Landlord, which right may otherwise be provided for in any Law now or hereafter in effect. Nothing in the preceding sentence shall be deemed to preclude Tenant from being entitled to the use for Restoration of insurance proceeds or condemnation awards pursuant to the terms of the Lease. Tenant shall, in all events, promptly make, and pay the cost of as due, all repairs and replacements for which it is responsible hereunder promptly, and all repairs and replacements shall be done in a good, proper and workmanlike manner.

(b)    If Tenant shall be in default under any of the provisions of this Paragraph 9, Landlord may (but shall have no obligation to), after thirty (30) days notice to Tenant and failure of Tenant to commence to cure during said period or to diligently prosecute such cure to completion once begun, but immediately upon notice in the event of an emergency (that is, imminent danger of injury to persons or property), do whatever is necessary to cure such default as may be reasonable under the circumstances for the account of and at the expense of Tenant. In the event of an emergency, before Landlord may avail itself of its rights under this Paragraph 9(b), Landlord shall send notice to Tenant of the situation by phone or other available communication. All actual or reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred by Landlord, together with interest thereon at the Default Rate from the date of payment or incurring the expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand. Landlord and Tenant agree that, in the event of an emergency, expenditures which might otherwise be unreasonable (such as overtime) may nevertheless be reasonable under the circumstances.

-15-

(c)    Tenant shall from time to time replace with other operational equipment or parts (in good and safe operating condition) any of the mechanical systems or other equipment included in the Improvements which shall have become worn out, obsolete or unusable for the purpose for which it is intended, been taken by a Condemnation, or been lost, stolen, damaged or destroyed. Tenant shall repair at its sole cost and expense all damage to the Leased Premises caused by the removal of equipment or any other personal property of Tenant at any time, including upon expiration or termination of the Lease.

(d)    Tenant shall comply with the requirements set forth in Exhibit 9 attached hereto.

10.    Liens.

Tenant shall not, directly or indirectly, create or permit to be created or to remain, and shall promptly discharge, any lien on any part or all of the Leased Premises, Basic Rent, Additional Rent or any other sums payable by Tenant under this Lease, other than the Mortgage, the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting from any affirmative act by Landlord or those claiming by, through or under Landlord (except Tenant and its sublessees and assignees).

11.    Alterations.

Tenant shall not make any Alterations which would result, after giving consideration to the completed alteration, in a diminution in the value of the Leased Premises, without Landlord's prior written consent; provided, however, no sublessee or assignee may make any Alterations which would change the use of the Leased Premises from retail or office use without the prior written consent of Landlord and Lender, which consent shall not be unreasonably withheld. Tenant may make any other Alterations without the prior written consent of the Landlord provided such Alterations comply with all of the provisions of the following sentence. In the event that Landlord gives its prior written consent to any Alterations, or if such consent is not required, Tenant agrees that in connection with any Alteration (i) all such Alterations shall be performed in a good and workmanlike manner, and shall be safely and expeditiously completed in compliance with all Legal Requirements and shall be done only within the Land, (ii) all work done in connection with any such Alterations shall comply with all Insurance Requirements, (iii) Tenant shall promptly pay all costs and expenses of any such Alteration, and shall discharge all liens filed against any part or all of the Leased Premises arising out of the same, (iv) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, (v) all such Alterations shall be the property of Landlord and shall be subject to this Lease, and (vi) any Alteration the estimated cost of which in any one instance or series of related instances exceeds Three Hundred Thousand Dollars ($300,000) shall be made under the supervision of a licensed architect or engineer in accordance with detailed plans and specifications which shall be submitted to Landlord at least ten (10) days prior to the commencement of the Alterations. Submission of the plans

and specifications to Landlord shall be for Landlord's information only and Landlord shall not have the right to approve the same except that Landlord may use the plans and specifications to determine whether Tenant has complied with this Paragraph 11 in going forward with such Alterations. Upon completion of any Alteration or series of related Alterations in excess of Three Hundred Thousand Dollars ($300,000). Tenant will provide to Landlord and Lender as-built plans and specifications or final working plans and specifications with the general contractor's field notes of changes made thereto. Upon completion of any Alteration which alters the footprint of any building, alters any driveway, parking area or other exterior improvement or adds any physical structure to the Land, Tenant shall provide to Landlord a revised Survey showing all such matters.

12.    Condemnation.

(a)    Immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, Tenant shall notify Landlord and Lender thereof and Landlord or Lender or both shall be entitled to participate in any Condemnation proceeding at Tenant's expense. Landlord, immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Tenant thereof and Tenant shall have the right to participate in such proceedings at its own expense. Subject to the provisions of this Paragraph 12 and Paragraph 15, Tenant hereby irrevocably assigns to Lender or to Landlord, in that order, any award or payment in respect of any Condemnation of the Leased Premises, except that nothing in this Lease shall be deemed to require the assignment to Landlord or Lender of any award or payment on account of Tenant's Trade Fixtures or other tangible personal property, and moving expenses, if available, to the extent Tenant shall have a right to make a separate claim therefor against the condemnor or have the same included in a single award to be separately allocated between Landlord and Tenant, and such claim or allocation does not reduce the award to which Landlord is or would be entitled for Condemnation of the Leased Premises.

(b)    If (i) the entire Leased Premises or (ii) at least ten percent (10%) of the Land or the Improvements, the loss of which even after Restoration of the remainder of the Leased Premises would, in Tenant's reasonable business judgment, be substantially and materially adverse to the business operations of Tenant, shall be subject of a Taking by a duly constituted authority or agency having jurisdiction, then Tenant shall, not later than sixty (60) days after such Taking has occurred, serve notice upon Landlord ("Tenant's Termination Notice") of its intention to terminate this Lease on any Basic Rent Payment Date specified in such notice, which date (the "Termination Date") shall be no sooner than the first Basic Rent Payment Date occurring at least ninety (90) days after the date of Tenant's Termination Notice. In the event that the Termination Date is on or prior to the Expiration Date of the Primary Term, Tenant shall, as part of such notice, offer (which offer may be rejected by Landlord as set forth below) to purchase the Leased Premises and the award, or if no part of the Leased Premises shall remain, the entire award ("Tenant's Offer to Purchase") for the applicable price computed in accordance with the schedule annexed hereto and marked Exhibit 12-1 (the "Purchase Price") plus all other amounts which may be or become due and

-17-

owing to the Lender or Landlord by reason of any default by Tenant in complying with its obligations under this Lease (the "Additions to Purchase Price").  If Landlord and Lender shall not elect to accept Tenant's Offer to Purchase, Landlord and Lender shall give written notice rejecting such offer to Tenant within thirty (30) days after the giving of Tenant's Termination Notice, in which case this Lease shall be terminated as above provided.  If this Lease shall be terminated during the Primary Term and Landlord and Lender do not elect to accept Tenant's Offer to Purchase or if this Lease is terminated pursuant to this paragraph 12(b) during a Renewal Term, the entire award made in the Condemnation proceeding for the Leased Premises shall be paid as follows:

> (1)    First to Lender, or if there is no Lender, to Landlord, an amount equal to the Purchase Price;

> (2)    Then, to Landlord and Tenant in the proportion as the Remainder Value bears to the Leasehold Value.

For purposes of the foregoing, (A) Remainder Value shall mean the fair market value of the Leased Premises on the day preceding the Condemnation unencumbered by this Lease, and (B) the Leasehold Value shall mean the excess, if any, of (I) the Monthly Fair Market Rent of the Leased Premises for each month remaining in the Term (excluding any Executory Renewal Terms) discounted to present value at a discount rate equal to the Discount Rate over (II) the monthly Basic Rent for each such month discounted to present value at a discount rate equal to the Discount Rate.  As used herein, "Monthly Fair Market Rent" shall mean an amount of monthly rent for the Leased Premises equal to the then current fair market rate of monthly net rentals received in the general market area in which the Leased Premises are located pursuant to lease provisions comparable to this Lease for a similar lease term with respect to buildings having similar characteristics, including but not limited to age, condition and classification and for tenants having financial condition similar to the then financial condition of Original Tenant.  The rental rate or other terms of any then existing subleases of the Premises shall not be considered in establishing Monthly Fair Market Rent.  Unless the parties otherwise agree, Remainder Value and Leasehold Value shall be determined pursuant to Exhibit 12-2.  Landlord's notice to reject Tenant's Offer to Purchase shall be void and of no effect unless accompanied by the written notice of Lender to the effect that Lender also rejects Tenant's Offer to Purchase.  Should said notices of Landlord and Lender rejecting Tenant's Offer to Purchase not be served within said period of thirty (30) days, then and in that event, the said offer shall be deemed accepted.  In the event that Landlord and Lender shall accept or be deemed to have accepted Tenant's Offer to Purchase, transfer of title shall close and the Purchase Price and Additions to Purchase Price shall be paid as hereinafter provided and in such event Tenant shall be entitled to and shall receive any and all awards then or thereafter made in the Condemnation proceeding and Landlord shall assign or, in case of any award previously made, deliver to Tenant on the Closing Date such award as may have been received and retained by Landlord in respect of such proceedings.

In the event Landlord and Lender shall accept or be deemed to have accepted Tenant's Offer to Purchase, payment of the purchase price and transfer of title shall close on the Termination Date hereinbefore defined (the "Closing Date"), at noon at the office of Landlord's counsel in the State, or at such other time and place as the parties hereto may agree upon, the Term shall be automatically extended to and including the Closing Date (or, if applicable, the extended Closing Date hereinafter described) and Tenant shall pay the Purchase Price and Additions to Purchase Price by transferring immediately available federal funds to such account or accounts and in such bank or banks as Lender or Landlord, in that order, shall designate, upon delivery of a special warranty deed conveying the Leased Premises and all other required documents including an assignment of any award in connection with such Taking. The deed shall convey marketable fee title, including all of Landlord's right, title and interest in the Leased Premises, free from encumbrances (including free and clear of the Mortgage), other than (i) Permitted Encumbrances (other than the Mortgage), (ii) liens or encumbrances created or suffered through or by Tenant (or its sublessees or assignees) or by Landlord at the request or with the consent of Tenant, (iii) any Taxes not theretofore paid, (iv) this Lease, and (v) all Legal Requirements. Landlord may by written notice to Tenant extend the Closing Date for a period of up to thirty-five (35) days. Such deed shall contain an agreement by grantee to observe and perform all of the covenants, conditions and restrictions contained in any instruments of record which were assumed by Landlord or deemed to have been assumed by Landlord on its acquisition of title or subsequently entered into by Landlord at the request or with the consent of Tenant. The acceptance of a deed by Tenant shall be deemed to be the full performance and discharge of every agreement and obligation on the part of Landlord to be performed pursuant to the provisions of this Lease. Tenant shall pay all conveyance, transfer, sales and like taxes, recording charges and fees, escrow charges and title charges for any policy of title insurance required by Tenant, required in connection with the purchase. If on the Closing Date, there may be any liens or encumbrances which Landlord is obligated to remove, the Closing Date shall be extended for a reasonable period to permit Landlord to discharge such liens or encumbrances. Landlord shall not be obligated to discharge any such lien or encumbrance if Tenant's title insurance company shall issue, at no cost to Tenant, affirmative insurance (including a commitment to issue future policies including such affirmative insurance) to the effect that the same shall not be collected from or enforced against the Leased Premises. If there be any liens or encumbrances against the Leased Premises which Landlord is obligated to remove, upon request made a reasonable time before the Closing Date, Landlord shall provide at the closing separate funds for the foregoing, payable to the holder of such lien or encumbrances or Landlord may use the funds payable at Closing by Tenant to remove the same. If the Closing Date is extended pursuant to this grammatical paragraph, the Termination Date shall be likewise extended.

(c)    In the event of any other Condemnation of part of the Leased Premises which does not result in a Termination of this Lease, subject to the requirements of Paragraph 15, the Net Award of such Condemnation shall be delivered to Lender or Landlord, in that order, and, promptly after such Condemnation, Tenant shall commence and diligently

continue to perform the Restoration (whether or not the Net Award shall be sufficient to pay the entire cost thereof). Landlord and Lender shall, to the extent received, make the Net Award available to Tenant for such purpose subject to conditions to disbursement comparable to disbursement of Net Proceeds pursuant to Paragraph 15 below, and all Rent shall continue unabated. Any balance of the Net Award remaining after completion of the Restoration shall be retained by Landlord. In the event of a Requisition of any part or all of the Leased Premises, the Net Award of such Requisition shall be retained by Tenant and all Rent shall continue unabated, provided that if the Requisition affects the Leased Premises for any period after the Term, the Net Award shall be equitably divided between Landlord and Tenant.

(d)    Except with respect to an award or payment to which Tenant is entitled pursuant to the foregoing provisions of this Paragraph 12, no agreement with any condemnor in settlement of or under threat of any Condemnation shall be made by either Landlord or Tenant without the written consent of the other, and of Lender, if the Leased Premises are then subject to a Mortgage, which consent of Landlord, Tenant and Lender shall not be unreasonably withheld or delayed provided such award or payment is applied in accordance with this Lease.

(e)    In the event of a Condemnation of any part or all of the Leased Premises, Tenant shall continue to pay Base Rent and Additional Rent without abatement, reduction or offset by reason of such Condemnation or otherwise through and including the last day of the Term provided that, if this Lease is terminated pursuant to Paragraph 12(a) above and whether or not Landlord and Lender shall accept or be deemed to have accepted any Tenant's Offer to Purchase, Tenant shall continue to pay Base Rent and Additional Rent through and including the Termination Date.

13.    Insurance.

(a)    Tenant shall maintain or cause to be maintained at its sole cost and expense the following insurance on the Leased Premises:

(i)    Insurance against loss or damage to the Improvements under an All Risk Policy, which shall include flood insurance (federal flood program may be used when necessary) and earthquake insurance, each to the extent applicable and obtainable and which may contain such exclusions as are standard in the industry. Such insurance shall be written on a replacement cost basis with an agreed upon value equal to the full insurable replacement values of the Improvements excluding footings and foundations and areas not within any structure (the portion of the Improvements not so excluded being referred to as the "Insured Improvements"), with a deductible not to exceed Two Hundred Fifty Thousand Dollars ($250,000) and in all events in amounts sufficient to

-20-

prevent Landlord or Tenant from becoming a co-insurer under the applicable policies.

(ii)    Contractual and commercial general liability insurance against claims for bodily injury, death or property damage occurring on, in or about any part or all of the Leased Premises, which insurance shall be written on a so-called "occurrence basis," and shall provide minimum protection with a combined single limit in an amount not less than One Million Dollars ($1,000,000) (or in such increased limits from time to time to reflect declines in the purchasing power of the dollar as Landlord may reasonably request) with umbrella coverage of not less than Five Million Dollars ($5,000,000).

(iii)    Worker's compensation insurance covering all persons employed by Tenant on the Leased Premises in connection with any Work done on or about any part or all of the Leased Premises.

(iv)    When the completed estimated cost of any Work exceeds Five Hundred Thousand Dollars ($500,000), a completed value Builder's Risk policy, with a deductible not to exceed Two Hundred Fifty Thousand Dollars ($250,000).

(b)    The insurance required by Paragraph 13(a) shall be written by companies having either (i) an insurance company claims paying rating equal to or greater than A as ascribed by Standard & Poor's Rating Services. All companies providing insurance required by Paragraph 13(a) shall be authorized to engage in the insurance business in the State. The insurance policies shall be for a term of not less than one year. Property damage policies shall name Tenant as named insured and Landlord and Lender as loss payees. Liability policies shall name Tenant as named insured and Landlord and Lender as additional insureds as their interests may appear. If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and Lender.

(c)    Each insurance policy referred to above shall, to the extent applicable, contain standard non-contributory mortgagee clauses in favor of any Lender. Each policy required to be carried by Tenant shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any part or all of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Lender pursuant to any provision of the Mortgage upon the happening of an event of default therein, or (iv) any change in title or ownership of any part or all of the Leased Premises.

(d)     Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 13, shall renew or replace each policy, and shall deliver to Landlord and Lender, a certificate or other evidence (reasonably satisfactory to Lender and Landlord) of the existing policy and such renewal or replacement policy no later than ten (10) days prior to such renewal or replacement.  In the event of Tenant's failure to comply with any of the foregoing requirements of this Paragraph 13 within five (5) days of written notice from Landlord, Landlord shall be entitled to procure such insurance.  Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant upon written demand by Landlord, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(e)     Anything in this Paragraph 13 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 13(a)(i) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 13.  In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender a certified copy of those provisions of the blanket policy that pertain to the Leased Premises, if any, to evidence the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 13.

14.     <u>Damage. Destruction.</u>

(a)     In the event of any casualty loss exceeding Two Hundred Fifty Thousand Dollars ($250,000), Tenant shall give Landlord and Lender immediate notice thereof.  Tenant shall adjust, collect and compromise any and all such claims, with the consent of Lender and Landlord, not to be unreasonably withheld or delayed, and Landlord and Lender shall have the right to join with Tenant therein.  If the estimated cost of Restoration or repair shall be  Two Hundred Fifty Thousand Dollars ($250,000) or less, all proceeds of any insurance required under Paragraph 13(a) shall be payable to Tenant, provided that Original Tenant and any Assignee Tenant at such time shall each have a Tangible Net Worth of not less than Two Hundred Million Dollars ($200,000,000), and in all other events to a Trustee which shall be a federally insured bank or other financial institution, selected by Landlord and approved by Tenant and Lender, such approval by Tenant and Lender not to be unreasonably withheld (the "Trustee"); provided, however, if the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee.  Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant hereby irrevocably appoints such Trustee as Tenant's attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease after approval by Tenant of such Trustee, if Trustee is other than Lender.

(b)    In the event of any casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder.  Promptly after such casualty, Tenant shall commence and diligently continue to perform the Restoration to the Leased Premises.  Upon payment to the Trustee of the Net Proceeds, the Trustee shall make the Net Proceeds available to Tenant for Restoration, in accordance with the provisions of Paragraph 15.  Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly commence the Restoration and diligently continue the same until final completion in accordance with all Insurance Requirements and Legal Requirements and the provisions of this Lease (including Tenant's making any desired Alterations allowed hereunder).

(c)    Tenant shall pay to the Trustee within fifteen (15) days following any damage or destruction, the amount of any deductible applicable to the Insured Improvements (the amount payable by Tenant pursuant to this Paragraph 14(c) being referred to as "Tenant's Insurance Payment").

15.    <u>Restoration</u>.

The Net Proceeds and the Tenant Insurance Payment (together being herein defined as the "Restoration Fund") held by the Trustee shall be disbursed by the Trustee to pay the cost of Restoration subject to satisfaction of the following conditions:

(a)    At the time of any disbursement, Tenant shall have deposited with the Trustee all amounts which the Tenant is required to deposit pursuant to this Lease, no Event of Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged and unbonded.

(b)    If the estimated cost of Restoration exceeds Two Hundred Fifty Thousand Dollars ($250,000), prior to commencement of the Restoration, the architects, contracts, contractors, plans and specifications for the Restoration shall have been approved by Landlord and Lender, which approval shall not be unreasonably withheld or delayed.

(c)    Each request for disbursement shall be accompanied by a certificate of the Tenant in Possession, signed by the President, Treasurer or any Vice President of the Tenant in Possession, describing the completed work for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work; and the certificate to be delivered by the Tenant in Possession upon completion of the work shall, in addition, state that the work has been completed and complies with the applicable requirements of this Lease and all Legal Requirements and Insurance Requirements.

(d)    Disbursements shall be made from time to time in an amount not exceeding the cost of the work completed since the last disbursement less customary retentions upon receipt of (1) satisfactory evidence, including architects' and general

contractors' certificates, of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications approved by Landlord, (2) waivers of liens from the general contractor and such other waivers of lien as are required by the title insurer, (3) a satisfactory bring down of title insurance, and (4) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed in place and free and clear of mechanics' lien claims.

(e)    At the direction of Landlord or Lender, the Trustee shall retain ten percent from each disbursement of the Restoration Fund until the Restoration is fully completed and the Leased Premises are available for their intended use, in the reasonable judgment of the Landlord and Lender, including the issuance of any necessary certificate of occupancy.

(f)    The Restoration Fund shall be kept by the Trustee in a separate interest-bearing account or investment issued, guaranteed or insured by the United States of America.

Prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord or Lender, exceeds the amount of the Restoration Fund, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund prior to any further disbursement or Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration. Provided no Event of Default then exists, any sum in the Restoration Fund which remains in the Restoration Fund upon the final completion of Restoration shall be paid to Tenant.

16.    Subordination to Financing

(a)    Subject to the following provisions of this Paragraph 16(a), Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage. So long as no Event of Default shall be outstanding, Tenant's tenancy and right of possession shall not be disturbed by Landlord or Lender or any party claiming by, through or under Landlord or Lender, nor shall this Lease be affected by any default under such Mortgage, and in the event of a foreclosure or other enforcement of any such Mortgage, or sale or deed in lieu thereof, the purchaser at such foreclosure sale or by any person claiming by, through or under Lender shall be bound to Tenant for the Term of this Lease and any extensions thereof, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default by Tenant has occurred and is continuing. So long as no Event of Default by Tenant has occurred and is continuing, Tenant shall not be named as a party defendant in any such foreclosure suit or other suit brought by Lender seeking to realize upon its collateral, except as may be required by law, but, so long as no Event of Default by Tenant has occurred and is continuing, in no event shall any such foreclosure or other suit seek or result in termination of Tenant's tenancy or rights of possession under this Lease. Any Mortgage to which this Lease is now or

hereafter subordinate shall provide, in effect, that during the time this Lease is in force all Net Proceeds, Tenant's Insurance Payments and Net Awards shall be permitted to be used for Restoration in accordance with the provisions of this Lease. Upon any foreclosure, or the delivery of a deed in lieu thereof or any other enforcement of the Mortgage, neither Lender, its successor nor any purchaser at foreclosure or otherwise shall disturb the tenancy or possession of any Qualified Entity referred to in Paragraph 17(c) below that is entitled to nondisturbance as set forth in such Paragraph (and for whom nondisturbance has been requested at any time before the occurrence of an Event of Default); provided, however, that the nondisturbance of such Qualified Entity shall be subject in all cases to the conditions and limitations set forth in Paragraph 17(c) below.

(b)    Notwithstanding the provisions of Paragraph 16(a) above, the holder of the Mortgage to which this Lease is subject and subordinate, as provided in said Paragraph, shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to this Lease by recording a unilateral declaration to such effect.

(c)    At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16(a) above, to attorn, from time to time, to any such owner or Lender, upon the then executory terms and conditions of this Lease, for the remainder of the Term originally demised in this Lease and for any Renewal Terms, provided that such owner or Lender shall then be entitled to possession of the Leased Premises subject to the provisions of this Lease. The provisions of this Paragraph 16(c) shall inure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of Law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

(d)    Each of Tenant, Landlord and Lender agrees that, if requested by any of the others, each shall, without charge, enter into a Subordination, Non-Disturbance and Attornment Agreement reasonably acceptable to Tenant, Landlord and Lender, provided such agreement contains provisions relating to non-disturbance and attornment in accordance with the provisions of this Paragraph 16. Tenant hereby agrees for the benefit of Lender that Tenant will not, without in each case the prior written consent of Lender, in its sole discretion, (a) amend or modify the Lease, or enter into any agreement with Landlord so to do, (b) cancel or surrender or seek to cancel or surrender the Term hereof, or enter into any agreement with Landlord to do so (the parties agreeing that the foregoing shall not be construed to affect the rights or obligations of Tenant, Landlord or Lender with respect to any termination pursuant to the express terms hereof in connection with an offer to purchase the Leased Premises following certain events as provided in Paragraphs 12, 20 and 44 hereof), or (c) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

17.    Assignment, Subleasing.

(a)    Tenant is currently in occupancy and is operating its business at the Leased Premises.  Landlord acknowledges that the cessation of business operations at the Leased Premises by Original Tenant or any permitted sublessee or assignee shall not, in and of itself, constitute an Event of Default under this Lease.  Tenant may assign its interest in this Lease or sublease the Leased Premises without the prior written consent of Landlord provided Tenant complies with all applicable provisions of this Paragraph 17.  Tenant shall, however, give Landlord and Lender prior written notice of Tenant's intent to assign its interest in this Lease or sublease any portion of the Leased Premises promptly upon electing to do so.  No sublease under, or assignment of, this Lease (or any rejection in bankruptcy or other default by any assignee or sublessee hereunder) shall relieve the Original Tenant hereunder of any of its obligations hereunder, for which it shall remain primarily liable, and upon any assignment or sublease hereunder, the Original Tenant shall acknowledge in writing in favor of Landlord and Lender that such obligations are not affected by such assignment, sublease or rejection.

(b)    Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease.  No sublease term shall extend beyond the Term of this Lease (excluding Executory Renewal Terms).  Tenant agrees that in the case of an assignment or sublease, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment or sublease, deliver to Landlord and Lender a duplicate original of such assignment or sublease wherein the assignee or sublessee agrees to observe and perform the provisions of Paragraph 13(a)(ii) and related provisions of Paragraph 13(c), (d) and (e) insofar as Paragraph 13(a)(ii), (c), (d) and (e) relate to the use and occupancy by the assignee of the entire Leased Premises in the case of any assignment and by the sublessee of the subleased premises in the case of a sublease. In the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord and Lender a duplicate original of such sublease.

(c)    Upon written request of Tenant, Landlord and Lender will enter into a Non-Disturbance and Attornment Agreement with any proposed assignee or sublessee, provided:

(i)    the Non-Disturbance and Attornment Agreement is in a form reasonably acceptable to Landlord and Lender;

(ii)    Landlord is not required to assume any additional operating, financing or other obligations in respect of the Leased Premises beyond Landlord's obligations contained in this Lease;

(iii)    The proposed assignee or sublessee is a Qualified Entity;

(iv)    In the case of an assignment, the assignee assumes all of the obligations of the Original Tenant under this Lease and in the case

-26-

of a sublease, the sublessee assumes all of the obligations of the Original Tenant under this Lease to the extent applicable to the subleased space; and

      (v)    The per square foot net rent payable by the assignee or sublessee is not less than the per square foot rent payable by the Original Tenant as Basic Rent under this Lease or, if such net rent is less, Tenant has provided Landlord with security in a form and issued by an entity acceptable to Landlord and Lender securing Tenant's obligation to pay such deficiency throughout the full remaining potential Term of this Lease, including any Executory Renewal Terms.

      (d)    Upon the occurrence of an Event of Default under this Lease, Landlord shall have the right to collect and enjoy all rents and other sums of money payable under any sublease of any part or all of the Leased Premises, and Tenant hereby irrevocably and unconditionally assigns, and grants a security interest in, such rents and money to Landlord, which assignment may be exercised, and security interest enforced, upon and after (but not before) the occurrence of an Event of Default. Tenant shall execute such financing statements as Landlord may reasonably request to perfect the foregoing assignment as a security interest. Upon Landlord's written request, from time to time, Tenant shall provide to Landlord and Lender copies of all subleases then in effect and a schedule of subleases showing, with respect to each sublease, name of subtenant, size of subleased space, term of sublease and net subrent.

      18.    <u>Permitted Contests</u>.

      Notwithstanding any provision of this Lease to the contrary, after prior written notice to Landlord and Lender, Tenant shall not be required to (i) pay any Tax, (ii) comply with any Legal Requirement, or (iii) discharge or remove any lien, so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (u) the collection of, or other realization upon, the Tax or lien so contested, (v) the collection of any penalty for failure to comply with the Legal Requirement being contested, (w) the sale, forfeiture or loss of any part or all of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of the same, (x) any interference with the use of, occupancy, sale or financing of any part or all of the Leased Premises, (y) any interference with the payment of any Basic Rent or any Additional Rent, and (z) the cancellation of any fire or other insurance policy or violation of any Insurance Requirement. In no event shall Tenant pursue a contest with respect to any Tax, Legal Requirement, or lien referred to above in such manner that exposes Landlord to any criminal or civil liability, penalty or sanction for which Tenant has not made provisions reasonably acceptable to Landlord and Lender. Tenant shall be deemed to have made provisions reasonably acceptable to Landlord and

-27-

Lender (except with respect to exposure for criminal liability) if Tenant shall have provided Lender or Landlord in that order as security for such contest, an amount of cash or bond equal to, if Original Tenant or a Qualified Entity is the Tenant in Possession, 100%, and otherwise 125%, of the amount being contested, or other security satisfactory in the reasonable opinion of Lender or Landlord in that order, in assuring the payment, compliance, discharge, removal or other action, including all costs, attorneys' fees, interest and penalties, in the event that the contest is unsuccessful. No such security shall be required if the amount involved in the contest shall not exceed one tenth (1/10th) of one percent (1%) of the Tangible Net Worth of the Tenant in Possession as reasonably evidenced to Landlord. While any such proceedings are pending and the required security is held by Lender or Landlord, in that order, Lender or Landlord, as the case may be, shall not have the right to pay, remove or cause to be discharged the Tax, Legal Requirement or lien thereby being contested unless Landlord or Lender reasonably believes that any one or more of the conditions in clauses (v) through (z) above shall not be prevented during the pendency of the contest. Tenant further agrees that such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as all of the conditions of the first sentence of this Paragraph 18 are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay any and all judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed to be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts of the performance of which shall be ordered or decreed as a result thereof.

19.    Default.

The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Lease:

(a)    Tenant's failure to make any payment of Basic Rent when due which continues unremedied for a period of three (3) business days after notice thereof from Landlord or Lender.

(b)    Tenant's failure to make payment of Additional Rent or other sum herein required to be paid by Tenant and such default shall continue for a period of fifteen (15) days after notice by Landlord or Lender to Tenant.

(c)    Tenant's failure to duly perform and observe, or Tenant's violation or breach of, any other provision hereof if such failure shall continue for a period of thirty (30) days after notice thereof from Landlord to Lender, or if such failure cannot be cured within such period of thirty (30) days, such period shall be extended for such longer time. not exceeding an additional ninety (90) days, as reasonably necessary provided that Tenant has

commenced to cure such default within said period of thirty (30) days and is actively, diligently and in good faith proceeding with continuity to remedy such failure.

(d)     Original Tenant shall (i) voluntarily be adjudicated a bankrupt or insolvent, or (ii) consent to the appointment of a receiver or trustee for itself or for any part or all of the Leased Premises, (iii) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (iv) make a general assignment for the benefit of creditors.

(e)     By the order of a court of competent jurisdiction, a receiver or liquidator of (i) Original Tenant, (ii) all or substantially all of the assets of Original Tenant or (iii) the interest of Original Tenant in the Leased Premises shall be appointed and not be dismissed as to the Leased Premises within sixty (60) days after such appointment, or if by decree of such court, Original Tenant shall be adjudicated a debtor or insolvent or the Leased Premises or any of Original Tenant's property shall have been sequestered, and such decree shall have continued undischarged and unstayed for sixty (60) consecutive days after such filing, or if Original Tenant shall institute any such proceeding or shall consent to the institution of any such proceeding against it under any such law.

(f)     Original Tenant shall in any insolvency proceedings be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution.

(g)     The estate or interest of Original Tenant in any part or all of the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within sixty (60) days after such levy or attachment.

20.     <u>Landlord's Remedies</u>.

After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)     Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Leased Premises, in which event Landlord shall have the right to collect Basic Rent and all Additional Rent and other charges when due.  In the alternative, Landlord shall have the right to peaceably re-enter the Leased Premises on the terms set forth in subparagraph (b) below, but without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Leased Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant, upon such terms and conditions as Landlord may deem advisable (which terms may be materially different from the terms of this Lease), in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Leased Premises, reasonable and actual attorneys' fees and any

reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency on demand as the same shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Leased Premises in excess of the rent provided in this Lease, but such excess shall, notwithstanding the provisions of Paragraph 5, reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Leased Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b)     Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than twenty (20) days following notice to Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Tenant shall pay the following to Landlord on such date:

(i)     Any obligation which has accrued prior to the date of termination.

(ii)     The amount by which the unpaid Basic Rent and all other charges which would have accrued for the balance of the Term (excluding any Executory Renewal Terms or portions thereof) exceeds the amount of the fair and reasonable rental value of the Leased Premises in respect of such period, in each case, after discounting same to present value at a discount rate equal to the Discount Rate.

Except to the extent required by Law, Landlord shall not have any duty to mitigate its damages hereunder (including, but not limited to, any duty to relet or re-lease the Leased Premises). The amount of rent reserved by Landlord in any reletting of the Leased Premises, or any portion thereof, shall be considered in ascertaining the "fair and reasonable rental value" of the Leased Premises, or such portion thereof, as the case may be. Following the date of termination, interest shall accrue on the sums payable by Tenant at the Default Rate.

In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Leased Premises and remove all persons and property therefrom, by summary dispossession proceedings.

(c)     Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, as Additional Rent such reasonable and actual expenses as Landlord may incur in recovering possession of the Leases Premises, placing the same in good order and condition and preparing the same for reletting, and all other reasonable and actual expenses,

commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative damages caused by Tenant's failure to perform its obligations under this Lease.

       (d)    Landlord may accept Tenant's irrevocable purchase offer which Tenant shall be conclusively presumed to have made at the applicable price specified in Exhibit 12-1 attached hereto plus Yield Maintenance and any Additions to the Purchase Price (the "Default Purchase Offer"), upon the occurrence of an Event of Default. Landlord shall be deemed to have accepted the Default Purchase Offer unless Landlord and Lender shall have delivered a joint rejection thereof within sixty (60) days after the occurrence of the Event of Default. If Landlord accepts or is deemed to have accepted the Default Purchase Offer, (i) payment of the purchase price and transfer of title to the Leased Premises shall occur on a date specified by Lender which is no more than thirty-five (35) days following the next Base Rent Payment Date which occurs no less than one hundred twenty (120) days after the Event of Default and otherwise in compliance with the terms and conditions set forth in Paragraph 12 above (as though the Leased Premises were being sold to Tenant thereunder), (ii) Tenant shall pay to Landlord Yield Maintenance, if any, and (iii) this Lease shall continue in full force and effect without any abatement of Rent until such transfer of title, provided that if such Base Rent Payment Date will occur prior to the third anniversary of the Commencement Date, Landlord may, prior to the expiration of such one hundred twenty (120) days, upon written notice to Tenant, defer such closing until a date which is no later than such third anniversary. If Landlord rejects the Default Purchase Offer, this Lease shall continue in full force and effect without any abatement of Rent unless and until terminated by Landlord pursuant to Paragraph 20(b) or otherwise as permitted by Law.

       (e)    The various rights and remedies reserved to Landlord herein are cumulative. The rights and remedies described in Paragraphs 20(a)-(c) shall survive termination of this Lease and Landlord may pursue any and all such rights and remedies and any others available to Landlord under applicable law or equity, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease); provided that no remedy of termination of this Lease shall be available until after the occurrence of an Event of Default. Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Leased Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

      21.   Notices.

       All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be

deemed to have been given for all purposes upon receipt or refusal after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or upon receipt or refusal after having been sent by FedEx or other nationally recognized air courier service, to the addresses stated below or upon receipt by telephonic facsimile transmission (fax) at the telephone numbers specified below:

       (a)   If to Landlord, at the address set forth on the first page of this Lease (Fax No. (312) 595-6141), with a copy to:

> Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd.
> 55 East Monroe Street
> Suite 3700
> Chicago, Illinois  60603
> Attention:    Stephen B. Bell
> Fax No.:  (312) 332-2196

       (b)   If to Tenant, at the address set forth on the first page of this Lease (Fax No. (614) 443-0972), with a copy to:

> Value City Department Stores, Inc.
> 3241 Westerville Road
> Columbus, Ohio  43224
> Attention:    Vice President, Finance
> Fax No.:  (614) 337-4681

> and to:

> Schottenstein Stores Corporation
> 1800 Moler Road
> Columbus, Ohio  43207
> Attention:    Legal Department
> Fax No.:  (614) 443-0972

In the case of fax notice, a hard copy of the faxed notice shall be promptly given by registered or certified mail or air courier service as herein provided but, as to notices given by fax, the date of receipt of the fax notice shall control.  If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and stating in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall serve a copy of such Notice upon Lender in the manner aforesaid.  For the purposes of this Paragraph, any party may substitute its address or designate up to two additional addressees for copies of notices by giving fifteen days' notice to the other party in the manner provided above.

22.  <u>Memorandum of Lease; Estoppel Certificates</u>.

(a)  Tenant shall execute, deliver and record, file or register at Tenant's expense from time to time all such instruments as may be required by any present or future law in order to evidence the respective interests of Landlord and Tenant in any part or all of the Leased Premises, and Tenant and Landlord shall cause a memorandum of this Lease, and any supplement hereto or to such other instrument, if any, as may be appropriate, to be recorded, filed or registered and re-recorded, refiled or re-registered at Tenant's expense in such manner and in such places as may be required by any present or future law in order to give public notice and protect the validity of the Lease.  In the event of any discrepancy between the provisions of said recorded memorandum of this Lease or any other recorded instrument referring to this Lease and the provisions of this Lease, the provisions of this Lease shall prevail.  Upon or following the expiration or earlier termination of this Lease, Tenant shall, promptly following the request of Landlord or Lender, execute and deliver to Landlord in recordable form a memorandum or other document in form reasonably acceptable to Tenant and Landlord evidencing the termination of this Lease.

(b)  Landlord and Tenant shall, at any time and from time to time, upon not less than ten days prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, executed by Landlord or Tenant or, if other than an individual, by a President, Vice President or authorized general partner, managing member, principal officer or agent certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent payable hereunder has been paid, (iii) that to the knowledge of the party executing such certificate no default by either Landlord or Tenant exists hereunder or specifying each such default of which such party may have knowledge; (iv) the remaining Term hereof; and (v) with respect to a certificate signed by Tenant, (A) that to the knowledge of the party executing such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if such proceedings are pending or threatened to said party's knowledge, specifying and describing the same, and (B) certifying such additional factually correct statements as may be reasonably requested.  It is intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective mortgagee, purchaser, assignee or subtenant of the Leased Premises.

23.  <u>Surrender and Holding Over</u>.

Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises to Landlord in the same condition in which the Leased Premises were originally received from Landlord at the commencement of this Lease, except as to any repair or Alteration as permitted or required by any provision of this Lease, and except for ordinary wear and tear and damage by casualty or Condemnation which Tenant is not required to repair or restore hereunder.  Tenant may

remove at Tenant's sole cost and expense from the Leased Premises on or prior to such expiration or earlier termination Tenant's Trade Fixtures and personal property which are owned by Tenant or third parties other than Landlord, and Tenant at is expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal. Tenant's Trade Fixtures and personal property not so removed at the expiration of the Term or within thirty days after the earlier termination of the Term for any reason whatsoever shall become the property of the Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises at Tenant's expense.  Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the Term of this Lease, including extensions thereof, with the consent of Landlord, shall operate and be construed as a tenancy from month to month only, at one hundred fifty percent (150%) of the Basic Rent reserved herein and otherwise upon the same terms and conditions as contained in this Lease.  Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred fifty percent (150%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 20.

24.  No Merger of Title.

There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any part or all of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease of the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (ii) the fee estate or ownership of any part or all of the Leased Premises or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (x) this Lease or the leasehold estate created by this Lease and (y) the fee estate in or ownership of the Leased Premises including, without limitation, Lender's interest therein, or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

25.  Landlord Exculpation.

Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in Leased Premises and shall not be enforced against the Landlord individually personally or against any shareholder, member, partner or beneficiary of Landlord, or against any of their respective directors, officers, employees or agents.

26.    <u>Hazardous Materials</u>.

(a)    Tenant represents, warrants and covenants that it has not and will not, and that it has not permitted and will not permit any person or entity to make, store, release, treat or dispose of any Hazardous Materials from, on, about or under the Leased Premises, but the foregoing shall not prevent the use to the extent necessary and customary in connection with any use permitted under this Lease of any such substances in accordance with applicable Laws and regulations.  Tenant represents, warrants and covenants that it will at all times comply (and prohibit non-compliance by others) with all Environmental Laws.

(b)    To the extent required by the Environmental Laws, Tenant shall remove any Hazardous Materials whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the Term, and repair all damage to the Leased Premises caused thereby.  Tenant shall and hereby does agree to defend (with counsel satisfactory to Lender and Landlord), indemnify and hold Lender and Landlord, their respective successors, assigns, heirs, members, beneficiaries, shareholders and partners, and all of their respective directors, officers, agents and employees (collectively, the "Indemnified Parties") harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of any Environmental Law with respect to the Leased Premises; (ii) the "release" or "threatened release" of, presence of or failure to remove, as required by this Paragraph 26, Hazardous Materials onto, on, under or from the Leased Premises or any portion or portions thereof, now or hereafter existing whether or not arising out of or in any manner connected with Tenants' occupancy of the Leased Premises during the Term.  All obligations of Tenant under this Paragraph 26 shall survive expiration or earlier termination of this Lease.

(c)    The Tenant represents, warrants and covenants that it will not install any underground storage tank without specific, prior written approval from the Landlord and Lender, which may be withheld in the sole discretion of either.  The Tenant will not store combustible or flammable materials on the Leased Premises in violation of Environmental Laws.

(d)    Tenant shall comply with the requirements set forth in Exhibit 26 attached hereto.

27.    <u>Entry by Landlord</u>.

Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than forty eight (48) hours except in the case of emergency) to enter the Leased Premises at all reasonable business hours (and at all other times in the event of any emergency), for (i) the purpose of inspecting the same or for the

purpose of doing any work under Paragraph 9, and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), provided further that if an Event of Default has occurred and is continuing, such inspections and work shall be at Tenant's sole cost and expense, and (ii) the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within twelve (12) months prior to the expiration of the Term for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

28.    Financial Statements; Additional Information.

(a)    Tenant will deliver to Landlord and Lender copies of all financial statements and any documents filed with the Securities and Exchange Commission ("SEC") (including without limitation all 8-K, 10-K and 10-Q reports, and notices and proxy statements sent by Tenant and its stockholders) in each case within fifteen (15) days following delivery to the SEC or its stockholders, as the case may be; provided, however, that if Tenant does not file such statements and reports with the SEC, Tenant will deliver to Landlord and each Lender the following:

(i)    Quarterly Statements.  Within sixty (60) days after the end of each quarterly fiscal period (except the last) in each fiscal year of Tenant, duplicate copies of:

(A)    a consolidated balance sheet of Tenant and its consolidated subsidiaries as at the end of such quarter,

(B)    a consolidated statement of profits and losses of Tenant and its consolidated subsidiaries for the current quarter and the portion of the fiscal year ending with such quarter, and

(C)    a consolidated statement of cash flows of Tenant and its consolidated subsidiaries for the portion of the fiscal year ending with the current quarter;

setting forth in each case in comparative form the figures for the corresponding periods a year earlier, all in reasonable detail and certified as having been prepared in accordance with generally accepted accounting principles consistently applied and certified as complete and correct by a senior financial officer of Tenant;

(ii)    Annual Statements.  Within ninety (90) days after the end of each fiscal year of Tenant, duplicate copies of:

-36-

(A)    a consolidated balance sheet of Tenant and its consolidated subsidiaries as at the end of such year,

(B)    consolidated statements of profits and losses and cash flows of Tenant and its consolidated subsidiaries for such year, and

(C)    a consolidated statement of cash flows of Tenant and its consolidated subsidiaries for such year;

setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and accompanied by the report thereon, containing an opinion unqualified as to limitations imposed by Tenant on the scope of the audit, of a firm of independent certified public accountants of recognized national standing selected by Tenant which opinion shall state that the consolidated financial statements of Tenant and its consolidated subsidiaries fairly present the financial condition of the companies (including the results of their operations and changes in financial position) being reported upon, have been prepared in accordance with generally accepted accounting principles consistently applied and that the examination of such accounts in connection with such financial statements has been made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as were considered necessary in the circumstances.

(b)    Each set of annual and quarterly financial statements delivered to Landlord pursuant to Paragraph 28(a) shall be accompanied by a certificate of a senior financial officer of Tenant stating whether or not a Financial Event has occurred since the later of the date of this Lease or the date of the last such statement submitted to Landlord pursuant to this sentence. With reasonable promptness, Tenant shall deliver to Landlord and Lender such additional financial statements and information regarding the business affairs and financial condition of Tenant as Landlord and any Lender may reasonably request. In addition, Tenant shall submit to Landlord and Lender copies of all financial information submitted by Tenant to its institutional lenders, bondholders and other institutional investors as and when such information is delivered to such other parties. Upon the prior written request of Landlord or Lender, Tenant shall cause a senior financial officer of Tenant to meet with representatives of Landlord and/or Lender to discuss the business and financial affairs of Tenant and the financial statements and other information submitted by Tenant to Landlord pursuant to this Lease. Tenant shall also supply to Landlord no later than ninety (90) days after each fiscal year, a statement certified by a senior financial officer of Tenant, of the amount of gross sales from the Leased Premises for the preceding fiscal year.

(c)     Original Tenant shall obtain and maintain a Corporate Creditworthiness Rating during all periods of time when it does not have at least one issue of Rated Debt outstanding.

(d)     In the event that Tenant fails to provide to Landlord or its designee any of the financial statements, certificates, reports or information ( the "Required Records") required by this Paragraph 28 within thirty (30) days after the date upon which such Required Record is due, Tenant shall pay to Landlord, at Landlord's option and in its sole discretion, an amount equal to $5,000 for each Required Record that is not delivered; provided that Landlord has given at least ten (10) days prior written notice to Tenant of such failure by Tenant to timely submit the applicable Required Record and provided that Lender has imposed such cost on Landlord pursuant to the Mortgage by reason of Landlord's failure to deliver such Required Record to Lender.

29.    No Usury.

The intention of the parties being to conform strictly to the usury laws now in force in the State, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

30.    Broker.

Landlord and Tenant represent and warrant to each other that, except for W. Lyman Case & Co. (whose fee shall be paid by Tenant), neither party negotiated with any broker in connection with this Lease and that this Lease was negotiated directly by Landlord and Tenant. Each party hereby agrees to indemnify the other against all claims, damages, costs and expenses incurred by the indemnified party as a result of the breach of the foregoing representation or warranty by the indemnifying party.

31.    Waiver of Landlord's Lien.

Landlord hereby waives any right to distrain Tenant's Trade Fixtures or any personal property of Tenant and any Landlord's lien or similar lien upon Tenant's Trade Fixtures and any other personal property of Tenant regardless of whether such lien is created or otherwise. Landlord agrees, at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Tenant's Trade Fixtures or any other personal property of Tenant. Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that Tenant's Trade Fixtures are Tenant's personal property and not part of the Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

32.   <u>No Waiver</u>.

No delay or failure by either party to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.

33.   <u>Separability</u>.

If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by Law.

34.   <u>Indemnification</u>.

Tenant agrees to defend (with counsel acceptable to Landlord and Lender), pay, protect, indemnify, save and hold harmless Landlord, Lender and each of the other Indemnified Parties, from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising (a) from a default by Tenant under this Lease, (b) under any REA or any Legal Requirements pertaining to this Lease or the Leased Premises, or (c) from any part or all of the Leased Premises or Adjoining Property or the existence, use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of any of or otherwise relating to, the Leased Premises or Adjoining Property, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon, whether or not Landlord has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said Loss. In case any action or proceeding is brought against Landlord, Lender or any of the other Indemnified Parties by reason of any such Loss, Tenant covenants upon notice from Landlord or Lender to defend (with counsel acceptable to Landlord and Lender) Landlord or Lender and such other Indemnified Parties in such action, with the expenses of such defense paid by Tenant, and Landlord or Lender will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant. All obligations of Tenant under this Paragraph 34 shall survive the expiration or any termination of this Lease. All indemnities and obligations of Tenant to defend contained in this Paragraph 34 and elsewhere in this Lease (including without limitation, Paragraph 26) shall continue to run in favor of and be enforceable by, each person or entity that shall be a Landlord, Lender or any other Indemnified Party from time to time notwithstanding the assignment of this Lease by any such Landlord and the release of such Landlord hereunder or the assignment or release of any Mortgage or the payment of any debt owed to a Lender.

35. <u>Tenant to Comply With Reciprocal Easement Agreement</u>.

(a)    Landlord agrees to enter into with Tenant, at Tenant's expense, such easements, covenants, waivers, approvals or restrictions for utilities, parking or other matters as desirable for operation of the Leased Premises or Adjoining Property (collectively, "Easements") and any amendment or modification (collectively, "Modifications") to any REA (as defined below), each as requested by Tenant, subject to Lender's and Landlord's approval of the form and substance thereof which shall not be unreasonably withheld or delayed; provided (i) that such Easement or Modification shall not result in any diminution in the value or utility of the Leased Premises for use as a retail or office facility and further provided that Tenant reasonably believes that it is in the best interests of the operator(s) of the Leased Premises that such Easement be granted or Modification be entered into, as the case may be; (ii) Tenant provides Landlord and Lender with a Survey and title endorsement evidencing that no violation or encroachments will exist as a result of the establishment of any Easement or REA (and, with respect to any Modification pursuant to which any easements are created or relocated, any such Modification); (iii) Tenant assumes all obligations under such Easement or Modification during the Term (to the extent obligations are imposed upon the owner of the Leased Premises); (iv) no such Easement or Modification shall render the use of the Leased Premises dependent upon any other property or condition the use of the Leased Premises upon the use of any other property, each of which Tenant shall certify to Landlord and Lender in writing delivered with Tenant's request with respect to such Easement or Modification, as the case may be; and (v) Tenant shall pay the reasonable costs and expenses, including attorneys' fees, and expenses, incurred by Lender and Landlord in connection with the review of the Modifications. Tenant's request shall also include Tenant's written undertaking acknowledging that Tenant shall remain liable hereunder as a principal and not merely as a surety or guarantor notwithstanding the establishment of any Easement or entering into of any Modification. If either Landlord or Lender shall fail to approve or disapprove the form and substance of any such Easement or Modification within a period of thirty (30) days from their respective receipt of same, which disapproval shall be in writing delivered to both Tenant and any single third party that is a prospective party to such Easement and whose name and address have been delivered to Landlord and Lender, then either or both of Landlord or Lender, as the case may be, shall be deemed to have approved the form, scope and substance of any such Easement or Modification.

(b)    Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any Easements, Modifications or other reciprocal easement agreement or any other agreement or document of record now affecting the Leased Premises or hereafter becoming effective pursuant to Paragraph 35(a) or otherwise (such Easements, Modifications, other reciprocal easements and other agreements and documents being referred to collectively as "REA"), and that Tenant shall comply with all of the terms and conditions of the REA during the term of this Lease. Tenant shall be deemed the "Owner" of the Leased Premises for purposes of granting consents and approvals

-40-

under the REA and Tenant shall have the right to grant consents and approval under the REA as from time to time it deems necessary, subject in each case to the prior written approval of Landlord and Lender which shall not be unreasonably withheld or delayed. Landlord and Lender shall be deemed to have approved any action proposed by Tenant under this Paragraph 35(b) in a written notice to Landlord and Lender if both Lender and Landlord shall have failed to object in writing, specifying the nature of their objections, within ten (10) days following receipt of such notice. Tenant further covenants and agrees to indemnify, defend (with counsel acceptable to Landlord and Lender) and hold harmless Landlord and Lender against any claim, loss or damage suffered by Landlord or Lender by reason of (i) any action under this Paragraph 35(b) which results in a diminution in value of Landlord's reversionary interest in the Leased Premises or (ii) Tenant's failure to perform any obligations or pay any expenses as required hereunder or under any REA or comply with the terms and conditions of any REA as hereinabove provided during the term of this Lease.

36.    Headings.

The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

37.    Modifications.

This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought and consented to by the Lender in writing.

38.    Successors, Assigns.

The covenants of this Lease shall run with the Land and bind Landlord and Tenant, their respective heirs, distributees, personal representatives, successors and permitted assigns and all present and subsequent subtenants of any part or all of the Leased Premises, and shall inure to the benefit of Landlord and Tenant and their respective successors and assigns. In the event there is more than one Tenant, the obligation of each shall be joint and several. The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Leased Premises and shall include Lender only if and then only following Lender's acquisition of fee title to the Leased Premises. In the event of any transfer or transfers of the title of the Leased Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed.

39.    Counterparts.

This Lease may be executed in several counterparts, which together shall be deemed one and the same instrument.

40.    Governing Law.

This Lease shall be governed by and construed according to the Laws of the State.

41.    Lender as Third Party Beneficiary.

Lender shall be deemed a third party beneficiary with respect to all provisions of this Lease that purports to confer benefits upon Lender or impose obligations upon Tenant or Landlord in order to protect the interests of Lender.

42.    Exculpation of Trustee.

It is expressly understood and agreed by and between the parties hereto, anything herein to the contrary notwithstanding, that, if the Landlord hereunder executes this Lease in the capacity of a trustee under a Delaware Business Trust, each and all of the representations, warranties, covenants, undertakings and agreements herein made on the part of the Landlord, while in form purporting to be the representations, warranties, covenants, undertakings and agreements of Landlord, are nevertheless each and every one of them made and intended, not as representations, warranties, covenants, undertakings and agreements by Landlord in its individual capacity (as opposed to its capacity as trustee) or for the purpose or with the intention of binding Landlord in its individual capacity (as opposed to its capacity as trustee), but are made and intended for the purpose only of subjecting Landlord's interest in the Leased Premises and any other assets title to which is held by Landlord as trustee under the trust described in the introductory paragraph of this Lease (such interest and assets being hereafter referred to as "Landlord's Interest") to the terms of this Lease and for no other purpose whatsoever, and in case of default hereunder by Landlord, Tenant shall not look to any other assets of Landlord other than Landlord's Interests.

43.    Substitution of Premises.

If, at any time after thirtieth (30th) month of the Primary Term, Original Tenant determines in its good faith judgment that the Leased Premises have become economically obsolete, Original Tenant may offer to substitute for the Leased Premises a parcel of land and improvements thereon owned by Original Tenant (or its affiliate) and containing a retail or office facility then being operated by Original Tenant ("Substitute Premises"). In order to make such an offer, Original Tenant shall deliver to Landlord a written notice (a "Substitution Offer") of its offer (i) to convey to Landlord the Substitute Premises in consideration for the conveyance to Tenant by Landlord of the Leased

Premises and (ii) after such conveyance, to amend this Lease so as to substitute the Substitute Premises for the Leased Premises. Within ten (10) business days of its delivery to Landlord of the Substitution Offer, Original Tenant shall also deliver to Landlord and Lender a Phase I environmental report, an owner's title commitment, a Survey, an MAI appraisal and the plans and specifications for the Substitute Premises and such other information as Landlord or Lender may request (collectively, the "Substitution Deliveries") conforming to the requirements set forth below.

Landlord shall have until the close of business on the sixtieth (60th) day following its receipt of the last of the Substitution Deliveries to accept or reject the Substitution Offer, provided Landlord shall not unreasonably reject or fail to accept the Substitution Offer. If Landlord fails to notify Original Tenant as to its acceptance or rejection of the Substitution Offer, the Substitution Offer shall be deemed to have been rejected. Such offer shall be contingent upon satisfaction of all of the following conditions:

(a) If a Mortgage encumbers the Leased Premises, the Substitution Offer shall be contingent upon Landlord obtaining from Lender the consent of such Lender to the substitution of the Substitute Premises for the Leased Premises as security for the Loan, which consent shall not be unreasonably withheld. Without limitation of the foregoing, Lender's consent may be withheld if Lender does not receive the written confirmation from any rating agency rating any pool of mortgage loans of which the Mortgage is a part that such substitution would not cause a downgrade, withdrawal or qualification of the ratings then assigned to such pool.

(b) Landlord and Lender determine in their sole and absolute discretion that the Substitute Premises are of at least equal value to the Leased Premises and will be of comparable value to the Leased Premises as of the last day of the Term (without regard to any diminution in value by reason of any applicable casualty or Condemnation). Landlord's determination of value shall be based on Landlord's assessment of the comparability of the Substitute Premises to the Leased Premises, taking into account all relevant factors including but not limited to size of market area, demographics, age and physical condition of the Improvements on the Substitute Premises and the location of the Substitute Premises.

(c) Original Tenant furnishes to Landlord a current Phase I environmental report with respect to the Substitute Premises and Landlord is reasonably satisfied that the same was prepared by a competent environmental consultant and that the Substitute Premises, on the basis thereof, are free of Hazardous Materials or violations of the Act or any other Laws pertaining to safety, health or the environment.

(d)    Landlord obtains the opinion of local counsel designated by it that the Lease as amended will be enforceable under the laws of the locality in which the Substitute Premises is located and, if any amendments are, in such attorney's opinion, required or desirable by reason of requirements of local law, Original Tenant agrees to such amendments.

(e)    Original Tenant agrees in writing, at its sole cost and expense, to furnish to Landlord (i) a title insurance policy insuring fee simple title to the Substitute Premises in Landlord (and if applicable, insuring Lender as well as to its Mortgage), free and clear of any and all liens and encumbrances which are not acceptable to Landlord, and containing all endorsements (or the reasonable equivalent thereof) as Landlord then has on the title insurance policy covering the Leased Premises and such additional endorsements as are reasonably required by Lender or Landlord; (ii) a current Survey of the Substitute Premises, prepared in accordance with the same standards as the Survey of the Premises then in Landlord's possession, showing no encroachments or other survey defects which are unacceptable to Landlord; (iii) an opinion of counsel to Tenant, in form reasonably acceptable to Landlord, with respect to the such matters as were opined upon by Tenant's counsel at the time of acquisition of the Leased Premises by Landlord; and (iv) such other matters as Landlord shall reasonably require so as to assure Landlord that the exercise of the Substitution Option will not adversely affect Landlord's investment in the Leased Premises.

(f)    Original Tenant executes an amendment of this Lease reasonably acceptable to Landlord and Lender substituting the Substitute Premises for the Leased Premises and making such conforming changes as Landlord reasonably deems necessary.

(g)    Original Tenant pays to Landlord on the Substitution Closing Date (as defined below); an amount equal to all reasonable attorneys' fees and other reasonable expenses incurred by Landlord and Lender in connection with the effectuation of the Substitution Offer, including but not limited to the travel expenses of Landlord and Lender and their representatives in inspecting the Substitute Premises and mortgage, intangible, documentary and other recording fees and taxes and all transfer and sales taxes. It is hereby agreed that it is the intention of the parties that the exercise of the Substitution Offer by Original Tenant hereunder shall result in no costs or expenses of any kind or nature whatsoever being imposed on Landlord and Lender unless reimbursed in full by Original Tenant, including but not limited to any costs or expenses incurred in evaluating the Substitute Premises, and that in addition such costs and expenses will be promptly reimbursed even if Landlord rejects the Substitute Premises or otherwise fails to consummate the acquisition of the Substitute Premises.

If Landlord accepts the Substitution Offer, the closing shall take place on the later of the third anniversary of the Commencement Date or sixty (60) days after Landlord notifies Original Tenant of its acceptance (such later date being the "Substitution Closing Date") in compliance with the terms and conditions set forth in Exhibit 43 attached hereto. In the event a substitution is effectuated pursuant to this Paragraph 43, Tenant agrees that it shall, within one hundred eighty (180) days, close its facility on the original Leased Premises and not re-open the facility during the Term. Original Tenant agrees on the Substitution Closing Date to deliver to Landlord an irrevocable undertaking, in recordable form, from Original Tenant obligating it to refrain from using, and to cause all Affiliates of Original Tenant to refrain from using, the Leased Premises as a retail store, warehouse or office building for the remainder of the Term as such Term is in effect on the Substitution Closing Date (without regard to any Executory Renewal Terms and without regard to any early termination of the Term as it pertains to the Substitute Premises) and providing for the payment by Tenant to Landlord of (a) liquidated damages in the event of a violation of such covenant in the amount of twenty-five (25%) of the Basic Rent which would have accrued during that portion of the Term during which such covenant is violated and (b) the costs of collection, including reasonable attorneys' fees. The provisions of this grammatical paragraph shall survive the expiration or earlier termination of this Lease.

44.    Event Purchase Offer.

In the event any transaction or series or related transactions involving the substantial sale of substantial assets or substantial distributions of substantial cash, securities or property to Original Tenant's shareholders reduces Original Tenant's Shareholder's Equity below One Hundred Twenty-Five Million Dollars ($125,000,000) (any such event being referred to as a "Financial Event"), Original Tenant shall be conclusively presumed to have made to Landlord an irrevocable offer to purchase the Leased Premises at the applicable price specified in Exhibit 12 attached hereto plus Yield Maintenance and any Additions to Purchase Price (the "Event Purchase Offer") which offer shall be deemed to have been made as of the first to occur of (a) receipt by Landlord and Lender of written notice from Original Tenant stating that a Financial Event has occurred and that Original Tenant is accordingly making an Event Purchase Offer and (b) delivery by Landlord or Lender of a written notice to Original Tenant, that a Financial Event has occurred (the "Event Purchase Offer Date") and shall be deemed to be remade every January 1st, April 1st, July 1st and October 1st which occurs at least thirty five (35) days after the Event Purchase Offer Date until Original Tenant's Shareholder's Equity becomes equal to or greater than One Hundred Twenty-Five Million Dollars ($125,000,000) (each a "Quarterly Purchase Offer Date"). Each such remade Event Purchaser Offer shall be a "Quarterly Purchase Offer." The Event Purchase Offer shall be deemed accepted unless rejected in writing by Landlord and Lender jointly within thirty (30) days after the Event Purchase Offer Date. Each Quarterly Purchase Offer shall be deemed accepted unless rejected by Landlord and Lender in writing within thirty (30) days after the Quarterly Offer Purchase Date. If the Event Purchase Offer or a Quarterly Purchase Offer is accepted or deemed accepted, (a) payment of the purchase price and transfer of title to the Leased

Premises shall occur on a closing date specified by Landlord in a written notice to Tenant which is not less than sixty (60) days nor more than one hundred (100) days after the Event Purchase Offer Date or such Quarterly Purchase Offer Date, as applicable, in compliance with the terms and conditions set forth in Paragraph 12 above (as though the Leased Premises were being sold to Original Tenant thereunder), and (b) this Lease shall continue in full force and effect without any abatement of Rent until such transfer of title, provided that Landlord may by written notice to Tenant defer such closing date to a date not later than the third anniversary of the Commencement Date. Until the closing of such sale, this Lease shall continue in full force and effect without any abatement of Rent.

      45.   <u>Warranties</u>.

      To induce Landlord to enter into this Lease, any transferee to become Landlord hereunder and any Lender to make a loan secured by a Mortgage, Tenant makes the warranties set forth in Exhibit 45 attached hereto.

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

LANDLORD:

MRSLV GURNEE MILLS L.L.C., a Delaware limited liability company

By    MESIROW REALTY SALE-LEASEBACK, INC., an Illinois corporation, its sole Member

By _____
Its _____

TENANT:

VALUE CITY DEPARTMENT STORES, INC., an Ohio corporation

By _____
Title _____

-47-

MRSLV GURNEE MILLS

## EXHIBIT 1

1.  General taxes for the year and subsequent years, which are not yet due and payable. Tax No.: 07-09-301-009.

2.  Terms, conditions and provisions of the document creating the easement described in document recorded as Document 2873087, together with the rights of the adjoining owners in and to the concurrent use of said easement.

3.  Easement for public utilities as disclosed by the plat of subdivision recorded as Document 2938772 on August 28, 1990.

4.  Terms and provisions of the Annexation Ordinance of the Village of Gurnee dated November 14, 1988 and recorded November 21, 1988 as Document 2742674, which ordinance was amended by instrument recorded January 26, 1989 as Document 2761044. (Affects Parcels 1 and 2).

5.  Terms and conditions contained in the Annexation Agreement dated November 14, 1988 and recorded December 13, 1988 as Document 2748797 by and between the Village of Gurnee and Western Development Corporation. (Affects Parcels 1 and 2).

6.  Covenants, conditions and restrictions contained in the plat of subdivision recorded January 26, 1990 as Document 2873087 and as amended by First Amendment recorded as Document 3078170, and as amended by Second Amendment recorded as Document 3078171, and as amended by Third Amendment recorded as Document 3146113. Said covenants, conditions and restrictions relate, among other things, to the following: maintenance fund and promotional fund assessments. (Affects Parcels 1 and 2).

7.  Additional easement areas within 21 feet (measured perpendicularly from the boundary line of each property) of a project road or any road which is dedicated to the public or within ten feet (measured perpendicularly from the boundary of each property) of a common boundary between such property and any other property within the total parcel as provided for in the declaration recorded as Document 2873087. (Affects Parcels 1 and 2).

8.  Building setback lines 25 feet back from the right of way lines of the interior "Ring Road" and entrance magazines as set forth in the annexation agreement recorded as Document 2748797. (Affects Parcel 1).

9.  A 25 foot building line established by plat of subdivision recorded as Document 2938772.

10. Covenants, conditions and restrictions contained in the plat of subdivision recorded July 25, 1990 as Document 2928223 relating to: Easement for access and utilities

serving lots within Blocks A, B, C and M are provided by Gurnee Mills Master Declaration of Easements, Covenants, Conditions and Restrictions dated January 22, 1990 and recorded January 26, 1990 as Document 2873087, as amended from time to time.

11. Covenants, conditions and restrictions contained in the Declaration of Restrictions recorded September 11, 1990 as Document 2943172 relating to promotional fund assessments.

12. Easement for ingress and egress over the land for construction activities, for installation and maintenance of signs as granted in the declaration of restrictions recorded as Document 2943172. (Affects Parcels 1 and 2).

13. An Easement for installation of underground electric facilities.

> In Favor Of: Commonwealth Edison Company
> For: Install underground electric facilities
> Recorded: April 1, 1991
> Document: 3003233
> Affects: In, upon and under a 15-foot wide strip of land within a 55 foot wide utility corridor depicted on Exhibit "A" and "B" in the instrument entitled "Electric Facilities Agreement" dated March 18, 1991 and as contained in Electric Facilities Agreement.
> Recorded: October 31, 1990
> Document: 2958974

14. Easement in favor of Commonwealth Edison Company, and/or their successors in interest, for pole lines, conduits and maintenance purposes granted by Document 3039234, recorded on July 11, 1991, and the terms and conditions thereof. (Affects Parcels 1 and 2).

15. Provisions, conditions, restrictions contained in Planned Unit Development Agreement authorized for Execution by the Village of Gurnee in Ordinance No. 92-18 recorded March 24, 1992 as Document 3131954. Said document should be considered when dealing with the premises in questions. (Affects Parcels 1 and 2).

16. Easement for installation, operation, maintenance, repair and replacement of water main recorded July 1, 1993 as Document 3357606. (Affects Parcels 1 and 2).

17. Easement for installation, operation, maintenance, repair and replacement of the sanitary sewer main recorded July 1, 1993 as Document 3357606. (Affects Parcels 1 and 2).

18. Rights of the owners of the property Southwesterly of the Land, in and to the asphalt pavement parking lot which extends beyond the Southwesterly line of the land, as

disclosed by the Survey prepared by Howard Surveying Co., Inc., dated July 9, 1997, and per Gurnee Mills Master Declaration of Easements, covenants, conditions and restrictions dated January 22, 1990 and recorded January 26, 1990 as Document 2873087, in Lake County, Illinois.

19. Encroachment of the one story masonry and frame commercial building located mainly on the land onto property northeasterly of the land, by a distance of 0.44 feet, as disclosed by the survey prepared by Howard Surveying Co., Inc., dated July 9, 1997.

20. Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of August __, 1997 made by MRSLV Gurnee Mills L.L.C. in favor of Nomura Asset Capital Corporation.

21. Assignment of Leases and Rents dated as of August __, 1997 made by MRSLV Gurnee Mills L.L.C. in favor of Nomura Asset Capital Corporation.

22. UCC-2 Financing Statement made by MRSLV Gurnee Mills L.L.C., as debtor in favor of Nomura Asset Capital Corporation, as secured party.

**EXHIBIT 2**

**Leased Premises**

**LEGAL DESCRIPTION:**

PARCEL 1:

PARCEL 1 IN FIRST RESUBDIVISION OF LOT 1, IN BLOCK "M" OF GURNEE MILLS, A SUBDIVISION RECORDED AS DOCUMENT 2928223, ACCORDING TO THE PLAT THEREOF RECORDED AUGUST 28, 1990 AS DOCUMENT 2938772, IN LAKE COUNTY, ILLINOIS.

PARCEL 2:

EASEMENT FOR INGRESS AND EGRESS AND OTHER EASEMENTS FOR THE BENEFIT OF PARCEL 1 AS CONTAINED IN "GURNEE MILLS MASTER DECLARATION OF EASEMENTS, COVENANTS, CONDITIONS AND RESTRICTIONS" DATED JANUARY 22, 1990 AND RECORDED JANUARY 26, 1990 AS DOCUMENT 2873087, IN LAKE COUNTY, ILLINOIS.

Being the same premises described by a survey performed by Howard Surveying Co., Inc  as                                dated July 9  1997 and attached hereto as Exhibit B.

PARCEL 1:  Parcel 1 in First Resubdivision of Lot 1, in Block "M" of Gurnee Mills, a Subdivision recorded as Document 2928223, according to the Plat thereof recorded August 28, 1990 as Document 2938772, in Lake County, Illinois

## ALTERNATE METES AND BOUNDS LEGAL DESCRIPTION

That part of Lot 1 of Block "M" of GURNEE MILLS, being a Subdivision of parts of Sections 8, 9 and 16, Township 45 North, Range 11, East of the Third Principal Meridian, and recorded on July 25, 1990 as Document No. 2928223, described as follows: Beginning at the point of intersection of the North line of former Commonwealth Edison Company right-of-way being a line 150.00 feet North of and parallel to the South line of Section 9 and the Northwesterly line of Lot 2 in Block "M" of GURNEE MILLS; thence North 44°30'00" East along said Northwesterly line for a distance of 133.58 feet to a point of curvature; thence North along a curved line concave to the Northwest having a radius of 398.50 feet, an arc length of 309.97 feet, and a chord length of 302.21 feet bearing North 22°13'00" East to a point of tangency; thence continuing along the West line of Lot 2 in Block "M" North 00°04'00" West for a distance of 289.76 feet; thence North 90°00'00" West for a distance of 480.19 feet; thence North 45°00'00" West for a distance of 81.58 feet; thence South 45°00'00" West for a distance of 0.50 feet; thence North 45°00'00" West for a distance of 40.00 feet; thence South 45°00'00" West for a distance of 60.00 feet; thence South 45°00'00" East for a distance of 40.00 feet; thence South 45°00'00" West for a distance of 255.50 feet; thence South 45°00'00" East for a distance of 705.65 feet to a point on the North line of former Commonwealth Edison Company right-of-way; thence South 89°51'49" East along said North line for a distance of 54.80 feet to the point of beginning, in the Village of Gurnee, Lake County, Illinois.

PARCEL 2:  Easement for ingress and egress and other easements for the benefit of Parcel 1 as contained in "Gurnee Mills Master Declaration of Easements, Covenants, Conditions and Restrictions" dated January 22, 1990 and recorded January 26, 1990 as Document 2877087, in Lake County, Illinois

## EXHIBIT 3

### Basic Rent

1.    Interim Term.  The Basic Rent for the Interim Term, if any, shall be the monthly Basic Rent for the Primary Term, calculated on a per diem basis.

2.    Primary Term.  The Basic Rent for the Primary Term shall be as follows:

| Annual Basic Rent | Monthly Basic Rent |
|---|---|
| $ 390,770 | $ 32,564.17 |

3.    Renewal Terms.  Basic Rent for each Renewal Term shall be determined as provided herein.  For each Renewal Term, annual Basic Rent shall be equal to the greater of the annual Basic Rent for the final year of the Term ending prior to such Renewal Term, and the Fair Market Rent. "Fair Market Rent" as used herein shall mean an amount of annual rent for the Leased Premises for the subject Renewal Term equivalent to the then-current fair market rate of annual net rentals received in the general market area in which the Leased Premises are located pursuant to lease provisions comparable to this Lease for a similar lease term with respect to buildings having comparable characteristics, including, but not limited to, age, condition and classification, and for tenants with a financial condition similar to the then financial condition of Original Tenant.  The rental rate or other terms of any then existing subleases of the Premises shall not be considered in establishing Fair Market Rent.  The Fair Market Rent for the subject Renewal Term shall be determined mutually by Landlord and Tenant at least eleven (11) months prior to the commencement of the subject Renewal Term, or if no mutual determination is made, by the following procedure.  The parties shall attempt to agree upon an appraiser.  If the parties agree upon an appraiser, the appraiser so selected shall determine the Fair Market Rent within thirty (30) days after selection.  If the parties fail to so agree upon the selection of one such appraiser within ten (10) days after said eleven (11) month-period commences, Tenant and Landlord shall each designate in a written notice to the other, within fifteen (15) business days from the end of such ten (10) day period, one appraiser to determine such Fair Market Rent.  In the event either party fails to so select its own appraiser, the appraiser selected by the other party shall determine Fair Market Rent.  If two appraisers are so selected, each appraiser shall independently determine the Fair Market Rent for the Leased Premises and complete and forward to Landlord and Tenant its separate appraisal reports within thirty (30) days after the expiration of such fifteen (15) business day period.  Any appraisal report not so forwarded within such time period shall be excluded.  If only one such report is timely forwarded, then the appraisal set forth therein shall be the Fair Market Rent.  In the event the two reports are both timely forwarded and the lower appraisal is not less than ninety percent (90%) of the higher appraisal, then the arithmetic

mean of the two appraisals shall be the Fair Market Rent. In the event the lower appraisal is less than ninety percent (90%) of the higher appraisal then, within ten (10) days after the second appraisal is delivered to Landlord and Tenant, the two appraisers shall meet and select a third appraiser. In the event the two appraisers fail to so select a third appraiser, either party may obtain court appointment of such third appraiser. The third appraiser shall independently determine the Fair Market Rent for the Leased Premises and promptly complete and forward its report to Landlord and Tenant. The arithmetic mean of the two appraisals which are closest in amount in terms of absolute dollars shall be the Fair Market Rent. All appraisers shall be members in good standing of the American Institute of Real Estate Appraisers or any organization succeeding thereto and shall have had not less than ten (10) years experience with commercial real estate of the type of the Leased Premises in the location where the Leased Premises are located. Each party shall pay the fees and expenses of the appraiser it selected, and each party shall pay one-half of the fees and expenses of the third appraiser (if any), and the costs, if any, of choosing such third appraiser (if not chosen by agreement of the first two appraisers). If for any reason the Basic Rent for a Renewal Term is not determined pursuant to the foregoing procedures prior to the commencement of such Renewal Term, then Tenant shall temporarily pay Basic Rent for such Renewal Term at the same rate as the Basic Rent for the last year of the Term preceding such Renewal Term, until Basic Rent for such Renewal Term is so determined; and when the Basic Rent is determined as provided above, a payment will be made between Landlord and Tenant within twenty (20) days thereof so that Tenant shall have paid the Basic Rent for the Renewal Term as so determined.

## EXHIBIT 9

**REPAIR OBLIGATIONS**
**Gurnee Mills, Illinois**

Tenant shall complete the following work in accordance with the terms and conditions of Paragraphs 9 and 11 of the Lease in the ordinary course on or before December 31, 1997.

1.    Repair broken concrete block wing wall.

2.    Walls:  Modify old sign connection openings, caulk, and cover open electric box.

3.    Paint rusted rooftop metals with rust inhibitive paint.

4.    Add trapped PVC condensate lines to rooftop HVAC units; direct toward drains.

**EXHIBIT 12-1**
Purchase Price

Property #2651 - Gurnee Mills, Illinois

| Month | Termination Value | Month | Termination Value | Month | Termmination Value |
|---|---|---|---|---|---|
| 1 | $ 4,586,626 | 46 | $ 4,436,417 | 91 | 4,244,702 |
| 2 | $ 4,590,764 | 47 | $ 4,432,546 | 92 | 4,240,018 |
| 3 | $ 4,587,587 | 48 | $ 4,428,658 | 93 | 4,235,315 |
| 4 | $ 4,584,395 | 49 | $ 4,424,752 | 94 | 4,230,593 |
| 5 | $ 4,581,188 | 50 | $ 4,420,830 | 95 | 4,225,852 |
| 6 | $ 4,577,967 | 51 | $ 4,416,890 | 96 | 4,221,091 |
| 7 | $ 4,574,731 | 52 | $ 4,412,934 | 97 | 4,216,311 |
| 8 | $ 4,571,480 | 53 | $ 4,408,960 | 98 | 4,211,512 |
| 9 | $ 4,568,215 | 54 | $ 4,404,969 | 99 | 4,206,693 |
| 10 | $ 4,564,934 | 55 | $ 4,400,960 | 100 | 4,201,855 |
| 11 | $ 4,561,638 | 56 | $ 4,396,934 | 101 | 4,196,997 |
| 12 | $ 4,558,327 | 57 | $ 4,392,891 | 102 | 4,192,120 |
| 13 | $ 4,555,001 | 58 | $ 4,388,830 | 103 | 4,187,224 |
| 14 | $ 4,551,660 | 59 | $ 4,384,752 | 104 | 4,182,307 |
| 15 | $ 4,548,304 | 60 | $ 4,380,656 | 105 | 4,177,371 |
| 16 | $ 4,544,932 | 61 | $ 4,376,543 | 106 | 4,172,416 |
| 17 | $ 4,541,545 | 62 | $ 4,372,412 | 107 | 4,167,440 |
| 18 | $ 4,538,143 | 63 | $ 4,368,263 | 108 | 4,162,445 |
| 19 | $ 4,534,725 | 64 | $ 4,364,096 | 109 | 4,157,430 |
| 20 | $ 4,531,292 | 65 | $ 4,359,912 | 110 | 4,152,395 |
| 21 | $ 4,527,843 | 66 | $ 4,355,710 | 111 | 4,147,341 |
| 22 | $ 4,524,378 | 67 | $ 4,351,489 | 112 | 4,142,266 |
| 23 | $ 4,520,898 | 68 | $ 4,347,251 | 113 | 4,137,172 |
| 24 | $ 4,517,403 | 69 | $ 4,342,995 | 114 | 4,132,057 |
| 25 | $ 4,513,891 | 70 | $ 4,338,721 | 115 | 4,126,923 |
| 26 | $ 4,510,364 | 71 | $ 4,334,428 | 116 | 4,121,768 |
| 27 | $ 4,506,821 | 72 | $ 4,330,118 | 117 | 4,116,593 |
| 28 | $ 4,503,261 | 73 | $ 4,325,789 | 118 | 4,111,398 |
| 29 | $ 4,499,686 | 74 | $ 4,321,442 | 119 | 4,106,183 |
| 30 | $ 4,496,095 | 75 | $ 4,317,077 | 120 | 4,100,948 |
| 31 | $ 4,492,488 | 76 | $ 4,312,693 | 121 | 4,095,693 |
| 32 | $ 4,488,865 | 77 | $ 4,308,291 | 122 | 4,090,417 |
| 33 | $ 4,485,226 | 78 | $ 4,303,870 | 123 | 4,085,121 |
| 34 | $ 4,481,570 | 79 | $ 4,299,431 | 124 | 4,079,805 |
| 35 | $ 4,477,898 | 80 | $ 4,294,974 | 125 | 4,074,468 |
| 36 | $ 4,474,210 | 81 | $ 4,290,497 | 126 | 4,069,111 |
| 37 | $ 4,470,505 | 82 | $ 4,286,003 | 127 | 4,063,734 |
| 38 | $ 4,466,784 | 83 | $ 4,281,489 | 128 | 4,058,336 |
| 39 | $ 4,463,046 | 84 | $ 4,276,957 | 129 | 4,052,918 |
| 40 | $ 4,459,292 | 85 | $ 4,272,406 | 130 | 4,047,479 |
| 41 | $ 4,455,522 | 86 | $ 4,267,836 | 131 | 4,042,019 |
| 42 | $ 4,451,734 | 87 | $ 4,263,247 | 132 | 4,036,539 |
| 43 | $ 4,447,930 | 88 | $ 4,258,639 | 133 | 4,031,039 |
| 44 | $ 4,444,109 | 89 | $ 4,254,013 | 134 | 4,025,518 |
| 45 | $ 4,440,272 | 90 | $ 4,249,367 | 135 | 4,019,976 |

For purposes of this Exhibit, "Month 1" shall be the first full calendar month of the Primary Term  The price to be paid shall be the price applicable to the date upon which Tenant is obligated to close the purchase of the Premises

## EXHIBIT 12-1 (CONT'D)
### Purchase Price

### Property #2651 - Gurnee Mills, Illinois

| Month | Termination Value | Month | Termination Value | Month | Termmination Value |
|-------|-------------------|-------|-------------------|-------|--------------------|
| 136 | $ 4,014,413 | 181 | $ 3,742,447 | 226 | $ 3,428,446 |
| 137 | $ 4,008,830 | 182 | $ 3,735,920 | 227 | $ 3,421,014 |
| 138 | $ 4,003,226 | 183 | $ 3,729,372 | 228 | $ 3,413,563 |
| 139 | $ 3,997,602 | 184 | $ 3,722,803 | 229 | $ 3,406,094 |
| 140 | $ 3,991,956 | 185 | $ 3,716,213 | 230 | $ 3,398,606 |
| 141 | $ 3,986,290 | 186 | $ 3,709,602 | 231 | $ 3,391,100 |
| 142 | $ 3,980,603 | 187 | $ 3,702,970 | 232 | $ 3,383,576 |
| 143 | $ 3,974,895 | 188 | $ 3,696,317 | 233 | $ 3,376,033 |
| 144 | $ 3,969,167 | 189 | $ 3,689,644 | 234 | $ 3,368,473 |
| 145 | $ 3,963,417 | 190 | $ 3,682,950 | 235 | $ 3,360,894 |
| 146 | $ 3,957,647 | 191 | $ 3,676,235 | 236 | $ 3,353,298 |
| 147 | $ 3,951,855 | 192 | $ 3,669,499 | 237 | $ 3,345,684 |
| 148 | $ 3,946,043 | 193 | $ 3,662,743 | 238 | $ 3,338,052 |
| 149 | $ 3,940,210 | 194 | $ 3,655,966 | 239 | $ 3,330,402 |
| 150 | $ 3,934,356 | 195 | $ 3,649,168 | 240 | $ 3,322,736 |
| 151 | $ 3,928,481 | 196 | $ 3,642,349 | | |
| 152 | $ 3,922,585 | 197 | $ 3,635,511 | | |
| 153 | $ 3,916,668 | 198 | $ 3,628,651 | | |
| 154 | $ 3,910,730 | 199 | $ 3,621,771 | | |
| 155 | $ 3,904,771 | 200 | $ 3,614,871 | | |
| 156 | $ 3,898,791 | 201 | $ 3,607,950 | | |
| 157 | $ 3,892,790 | 202 | $ 3,601,009 | | |
| 158 | $ 3,886,768 | 203 | $ 3,594,047 | | |
| 159 | $ 3,880,725 | 204 | $ 3,587,065 | | |
| 160 | $ 3,874,661 | 205 | $ 3,580,063 | | |
| 161 | $ 3,868,576 | 206 | $ 3,573,041 | | |
| 162 | $ 3,862,469 | 207 | $ 3,565,998 | | |
| 163 | $ 3,856,342 | 208 | $ 3,558,936 | | |
| 164 | $ 3,850,193 | 209 | $ 3,551,853 | | |
| 165 | $ 3,844,024 | 210 | $ 3,544,751 | | |
| 166 | $ 3,837,833 | 211 | $ 3,537,628 | | |
| 167 | $ 3,831,622 | 212 | $ 3,530,486 | | |
| 168 | $ 3,825,389 | 213 | $ 3,523,324 | | |
| 169 | $ 3,819,135 | 214 | $ 3,516,142 | | |
| 170 | $ 3,812,860 | 215 | $ 3,508,941 | | |
| 171 | $ 3,806,564 | 216 | $ 3,501,720 | | |
| 172 | $ 3,800,247 | 217 | $ 3,494,479 | | |
| 173 | $ 3,793,909 | 218 | $ 3,487,219 | | |
| 174 | $ 3,787,550 | 219 | $ 3,479,939 | | |
| 175 | $ 3,781,170 | 220 | $ 3,472,640 | | |
| 176 | $ 3,774,768 | 221 | $ 3,465,322 | | |
| 177 | $ 3,768,346 | 222 | $ 3,457,985 | | |
| 178 | $ 3,761,903 | 223 | $ 3,450,628 | | |
| 179 | $ 3,755,439 | 224 | $ 3,443,253 | | |
| 180 | $ 3,748,953 | 225 | $ 3,435,859 | | |

For purposes of this Exhibit, "Month 1" shall be the first full calendar month of the Primary Term. The price to be paid shall be the price applicable to the date upon which Tenant is obligated to close the purchase of the Premises

EXHIBIT 12-2

## Determination of Remainder Value and Leasehold Value

If Landlord and Tenant are unable to agree on either or both of Remainder Value and Leasehold Value, either one may at anytime following the commencement of a Condemnation elect, by written notice (the "Exhibit 12 Notice") to determine the contested item or items pursuant to the procedures set forth in this Exhibit 12. The parties shall then attempt to agree upon an appraiser. If the parties agree upon an appraiser, the appraiser so selected shall determine the contested item or items within thirty (30) days after selection. If the parties fail to so agree upon the selection of one such appraiser within ten (10) days after the giving of the Exhibit 12 Notice, Tenant and Landlord shall each designate in a written notice to the other, within fifteen (15) business days from the end of such ten (10) day period, one appraiser to determine the contested item or items. In the event either party fails to so select its own appraiser, the appraiser selected by the other party shall determine the contested item or items. If two appraisers are so selected, each appraiser shall independently determine such items and complete and forward to Landlord and Tenant its separate appraisal reports within thirty (30) days after the expiration of such fifteen (15) business day period. Any appraisal report not so forwarded within such time period shall be excluded. If only one such report is timely forwarded, then the determination of the contested item or items set forth therein shall be binding on the parties. In the event the two reports are both timely forwarded and, as to the contested item or items, the lower appraisal is not less than ninety percent (90%) of the higher appraisal, then the arithmetic mean of the two appraisals shall be the Remainder Value or the Leasehold Value or both, as applicable. In the event the lower appraisal is less than ninety percent (90%) of the higher appraisal as to the contested item or items, then, within ten (10) days after the second appraisal is delivered to Landlord and Tenant, the two appraisers shall meet and select a third appraiser. In the event the two appraisers fail to so select a third appraiser, either party may obtain court appointment of such third appraiser. The third appraiser shall independently determine the contested item or items and promptly complete and forward its report to Landlord and Tenant. The arithmetic mean of the two appraisals of the contested item or items which are closest in amount in terms of absolute dollars shall be the Remainder Value or the Leasehold Value or both, as applicable. All appraisers shall be members in good standing of the American Institute of Real Estate Appraisers or any organization succeeding thereto and shall have had not less than ten (10) years experience with commercial real estate of the type of the Leased Premises in the location where the Leased Premises are located. Each party shall pay the fees and expenses of the appraiser it selected, and each party shall pay one-half of the fees and expenses of the third appraiser (if any), and the costs, if any, of choosing such third appraiser (if not chosen by agreement of the first two appraisers). If for any reason the Remainder Value or Leasehold Value or both are not determined pursuant to the foregoing procedures or otherwise prior to the distribution of Condemnation award, then the balance of the award in excess of the Purchase Price shall be paid to and held by a mutually acceptable escrowee and held in an interest bearing account pending such determination.

MRSLV Gurnee Mills L.L.C.

## EXHIBIT 26

### Environmental Obligations

Tenant shall make inquiry as to the ownership and maintenance responsibilities of on-site electrical transformers.  In the event that it is determined that such transformers are not owned by the relevant utility company and, further, that any are not labeled "non-PCB" or the like, Tenant shall test, within three (3) months from the Commencement Date, such non-labeled transformer(s) and, in conformance with all Environmental Laws, shall remove and replace any oil to ensure that they do not contain PCB materials.

The foregoing notwithstanding, all dates for performance of environmental obligations hereinabove set forth by Tenant shall be extended by the number of days equal to the number of days that Tenant was delayed in performing such environmental obligations due to labor strikes, shortages of material, acts or omissions of third parties, casualties, or other causes or conditions beyond Tenant's control.

Upon Landlord's or Lender's written request, Tenant shall provide evidence to Landlord and Lender of Tenant's compliance with the terms of this Exhibit 26.

**EXHIBIT 43**

**Substitution Closing Requirements**

The following terms shall apply to the substitution of the Substitute Premises for the Leased Premises pursuant to Section 43 of the Lease:

A. The Leased Premises shall be conveyed to Tenant by Landlord in its then existing condition, without warranty of any kind. Landlord need not transfer and convey to Tenant or its designee any better title thereto than existed as of the Commencement Date. Tenant shall accept such title, subject to such liens, encumbrances, charges, exceptions and restrictions on, against or relating to the Premises (including those arising pursuant to the terms of this Lease), all matters arising by reason of the acts of Tenant (and Tenant's sublessees and assignees) and all Legal Requirements, but free of any mortgages, liens, encumbrances, charges, exceptions and restrictions which have been granted by Landlord, except for those granted at the request of and with the consent of Tenant.

B. On the Substitution Closing Date, Landlord shall deliver to Tenant at Tenant's expense:

1. A quitclaim deed conveying title to the Leased Premises, together with such instruments as shall be necessary to transfer to Tenant or its designee any other property then required to be transferred by Landlord pursuant to this Lease.

2. An affidavit stating that there is no foreign ownership of Landlord as described in § 1445(b) of the Internal Revenue Code.

3. Applicable transfer declarations.

4. An ALTA title policy insuring title to the Substitute Premises in Landlord, subject to such liens, encumbrances, charges, exceptions and restrictions on, against or relating to the Substitute Premises (including those arising pursuant to the terms of this Lease) permitted hereunder, all matters arising by reason of the acts of Tenant (and Tenant's sublessees and assignees) and all Legal Requirements.

C. On the Substitution Closing Date, Tenant shall deliver to Landlord at Tenant's expense:

1.    A general warranty deed conveying title to the Substitute Premises, together with such instruments as shall be necessary to transfer to Landlord any other property then required to be transferred by Tenant pursuant to this Lease.

2.    An affidavit stating that there is no foreign ownership of Tenant as described in § 1445(b) of the Internal Revenue Code.

3.    Applicable transfer declarations.

4.    An ALTA title policy insuring title to the Leased Premises in Tenant, subject to such liens, encumbrances, charges, exceptions and restrictions on, against or relating to the Leased Premises (including those arising pursuant to the terms of this Lease) permitted hereunder, all matters arising by reason of the acts of Landlord and otherwise in accordance with the provisions of Paragraph 43 of the Lease.

5.    Opinion letter of counsel to Tenant in accordance with the provisions of Paragraph 43 of the Lease.

6.    An amendment of this Lease in accordance with the provision of Paragraph 43 of the Lease.

## EXHIBIT 45

### Tenant's Warranties

Tenant represents and warrants to Landlord the following matters, each as of the date hereof except as specifically provided otherwise in this Exhibit 45:

(a)    Tenant is a corporation existing and in good standing under the laws of the jurisdiction of its incorporation, and has the corporate power and authority, without the consent of any party, and all necessary licenses and permits to enter into and perform its obligations under this Lease.

(b)    This Lease has been duly authorized, executed and delivered by Tenant and constitutes the valid and binding obligations of Tenant enforceable against Tenant in accordance with its terms, subject to bankruptcy, insolvency or similar laws affecting creditors' and landlord's rights generally, and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law).

(c)    The execution and delivery of this Lease and compliance by Tenant with all of its provisions will not (i) contravene any law or any order of any court or governmental authority or agency applicable to or binding on Tenant or (ii) contravene the provisions of, or constitutes a default under, its certificate or articles of incorporation or by-laws or any indenture, mortgage, contract or other agreement or instrument to which Tenant is a party or by which it or any of its property may be bound or affected or result in the creation of any lien or encumbrance upon the property of Tenant.

(d)    There are no proceedings pending or, to the knowledge of Tenant, threatened and, to the knowledge of Tenant, there is no existing basis for any such proceedings, against or affecting Tenant in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, could reasonably be expected to materially and adversely affect Tenant, the Leased Premises or Landlord's interest in this Lease or materially impair the ability of Tenant to perform its obligations under this Lease. Tenant is not in default with respect to any order of any court or governmental authority or arbitration board or tribunal which default could reasonably be expected to materially adversely affect Tenant, the Leased Premises or Landlord's interest in this Lease or materially impair the ability of Tenant to perform its obligations under this Lease.

(e)    No attachments, execution proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings are pending or, to the best of Tenant's knowledge, threatened against Tenant nor are any of such proceedings contemplated by Tenant.

(f)    The written statements, information and other deliveries furnished to Landlord or any Mortgagee or prospective Mortgagee or equity owner of Landlord or

prospective equity owner of Landlord by Tenant in connection with the acquisition of the Leased Premises by Landlord, to the best of Tenant's knowledge, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or herein not misleading.

(g)    To the best of Tenant's knowledge, the execution and delivery of this Lease and the consummation of the transactions contemplated hereby do not require the consent, approval or authorization of, or filing, registration or qualification with, any governmental authority or any other person or entity, except for such of the foregoing that have been made or obtained.

(h)    Tenant has not received any written notice from any insurance carrier of, nor is Tenant aware of, defects or inadequacies in the Leased Premises which if not corrected would result in termination of insurance coverage or increase in the cost thereof.

(i)    No event which would constitute a default or an Event of Default under this Lease has occurred and is continuing. Tenant is not in violation in any material respect of any term of any charter instrument, by-law or other material agreement or instrument to which it is a party or by which it may be bound. Tenant is in compliance with all laws, ordinances, governmental rules and regulations to which it is subject, failure to comply with which would materially adversely affect Tenant or impair the ability of Tenant to perform its obligations under this Lease, and Tenant has obtained all licenses, permits, franchises and other governmental authorizations material to the leasing and operation of the Leased Premises.

(j)    To the best of Tenant's knowledge, all tax returns and reports required by law have been filed by Tenant have been duly filed or are subject to existing extensions, and no material taxes, assessments, contributions, fees or other governmental charges upon it or any of its assets or income which are due and payable thereon are delinquent, except to the extent that such taxes, assessments, contributions, fees or charges are being contested in good faith and by proper proceedings and against which appropriate reserves are being maintained. There are no unpaid or outstanding real estate or other taxes or assessments on or against the Leased Premises, or any part thereof, except only general real estate taxes not yet due or payable. Copies of the general real estate tax bills for the year ended December 31, 1996 with respect to the Leased Premises and all subsequent assessment notices have been delivered to Landlord. Said bills cover the whole of the Leased Premises and do not cover or apply to any other property. To the best of Tenant's knowledge, other than the Permitted Encumbrances, there are no standby fees or special assessments against the Leased Premises and there is no pending or contemplated action pursuant to which any standby fee or special assessment may be levied against the Leased Premises.

(k)    To the best of Tenant's knowledge, (i) the Leased Premises have been constructed in a good and workmanlike manner in conformity with good construction and engineering practice at the time of construction, (ii) the Leased Premises conform in all

material respects to the description thereof contained in this Lease and (iii) such construction has been in accordance with all Legal Requirements. To the best of Tenant's knowledge, there are no material defects in the Improvements, the structural elements thereof, the mechanical systems (including without limitation all heating, ventilating, air-conditioning, plumbing, electrical, elevator, security, utility and sprinkler systems) therein, or the roofs, and all of the foregoing are in good operating condition. The mechanical systems in the Improvements are independent systems and do not depend on any other property or source of power or materials for operation except customary utility services.

(l)    To the best of Tenant's knowledge, all water, sewer, gas, electric, telephone, drainage and other utility equipment, facilities and services required by law or necessary for the operation of the Leased Premises as they are now being operated are installed and connected pursuant to valid permits, are adequate to service the Leased Premises and are in good operating condition, and all fees and other charges therefor have been paid in full, including, but not limited to, tap-in and connection fees for public water and sanitary sewerage facilities. To the best of Tenant's knowledge no fact or condition exists which would result in the termination, reduction or impairment of the furnishing of service to the Leased Premises of water, sewer, gas, electric, telephone, drainage and other such utility services.

(m)    To the best of Tenant's knowledge, the Leased Premises, the facilities servicing the Leased Premises and the use and operation thereof are (except as may disclosed in the Environmental Reports) in compliance in all material respects with and are permitted, conforming structures under all Legal Requirements and there are presently in effect all licenses, permits and other authorizations necessary for the use, occupancy and operation of the Leased Premises as they are presently being operated. To the best of Tenant's knowledge, (i) there are no unrecorded agreements with any municipality or governmental authority regarding zoning, off-site improvements or the nature of improvements on the Leased Premises or the use thereof; (ii) access to and from the Leased Premises (and every part thereof) to and from public roads is sufficient to comply with all presently existing Legal Requirements affecting the Leased Premises and for the present use of the Leased Premises; and (iii) the streets, roads and avenues adjoining the Leased Premises have been dedicated to and accepted for maintenance and public use by the public authority having jurisdiction thereover. To the best of Tenant's knowledge, there are no pending or threatened requests, applications or proceedings to alter or restrict the zoning or other use restrictions applicable to the Leased Premises or any portion thereof, including without limitation proceedings involving eminent domain, building code, environmental or zoning. Tenant has not received any written notice of zoning, building, fire, water, use, health, environmental or other statute, ordinance, code or regulatory violations issued in respect of the Leased Premises. There are no off-site facilities necessary to ensure compliance with Legal Requirements. To the best of Tenant's knowledge, the Leased Premises comply in all material respects with all Legal Requirements.

(n)    To the best of Tenant's knowledge, except as may be shown on the Survey delivered to Landlord, no wetlands now exist or previously existed on the Leased Premises.  To the best of Tenant's knowledge no portion of the Leased Premises have appeared on the National Wetlands Inventory of the United States Fish and Wildlife Service.

(o)    To the best of Tenant's knowledge, except as may be shown on the Survey delivered to Landlord, all storm water flowing from the Leased Premises drain directly into a public way in compliance with all legal requirements.

(p)    To the best of Tenant's knowledge, the soil condition of the Leased Premises is such that it will support all of the Improvements for the foreseeable life thereof without the need for unusual or new sub-surface excavations, fill, footings, caissons or other installations.

(q)    Except as indicated in Schedule 1 attached hereto, Tenant is the only tenant or occupant of the Leased Premises, and to Tenant's knowledge, there are no leases, occupancy agreements or other agreements, understandings or commitments with prospective tenants or other occupants relating to the Leased Premises.

(r)    No brokerage commissions are due or shall become due with respect to any of the Existing Subleases.

It is intended that Landlord and each Indemnified Party may rely on the foregoing representations and warranties, as if such representations and warranties had been made in a separate instrument addressed and delivered to each Indemnified Party, in consummating this Lease or, from time to time, making an investment in Landlord, making any loan to Landlord or to owners of equity interests in Landlord or purchasing any interest in the Leased Premises, any Mortgage or any direct or indirect equity interest in Landlord. Tenant will, upon request of Landlord from time to time, furnish to any prospective Mortgagee, purchaser, investor or other person with a financial interest in the continued or updated accuracy of the foregoing representations and warranties, a certificate bringing the status of same forward (revised as necessary to reflect changes which have occurred to the date of the certificate) to such date or dates requested by Landlord.

FILED: JULY 30, 2008    131 South Dearborn Street
08CV4339                          Suite 2400
JUDGE DER YEGHIAYAN        Chicago, Illinois 60603
MAGISTRATE JUDGE MASON         (312) 460-5000

                                fax (312) 460-7000
(312) 460-5600          JFB       www.seyfarth.com

jrubin@seyfarth.com


June 20, 2008


**<u>VIA FEDERAL EXPRESS</u>**

The Mall at Gurnee Mills, L.L.C.
5425 Wisconsin Avenue
Suite 500
Chevy Chase, MD 20815
Attn:   Gregg Goodman
        Executive Vice President

Gurnee Mills LLC
c/o Simon Property Company
225 West Washington
Indianapolis, IN 46204
Attn:   Gregg Goodman
        Executive Vice President

Ladies and Gentlemen:

As the attorneys for Lucky JJC, Inc., we are responding, formally (in the meantime, we have had discussions with David Sickle of DLA Piper and Jason Chadorchi has had discussions with Gregg Goodman) to your and your attorney's letters of May 27, 2008 and June 19, 2008, respectively.  First, we are aware of and join in the letter of American Signature, Inc. to change the use of the premises to a Value City Furniture store.  We believe that the proposed use will fit well with the existing tenancy of the Mall and see no commercially reasonable reason for you to deny such approval.  Secondly, as to your claim that ceasing to operate triggers a buy-back under Subsection 2.E(i) of the Declaration, we have previously advised you that it is our view that this provision is no longer in force.  Furthermore, the Value City Department Stores ceased operations

The Mall at Gurnee Mills, L.L.C.
Gurnee Mills LLC
June 20, 2008
Page 2

in contemplation of the assignment of its lease to American Signature and the proposed change in use, and we believe that Section 2.E(ii), not 2.E(i), is the operable provision.  Thus, you have until July 28, 2008 to trigger the buy-back provisions in the Declaration.

Very truly yours,

SEYFARTH SHAW LLP


Joel D. Rubin

JDR:mem
cc:    David Sickle
       Ryan Dolan
       Jason Chadorchi

**The Mills**
A Simon Company
5425 Wisconsin Avenue
Suite 500
Chevy Chase, MD  20815

FILED: JULY 30, 2008
08CV4339
JUDGE DER YEGHIAYAN
MAGISTRATE JUDGE MASON

JFB

July 18, 2008

*REGISTERED MAIL (RETURN RECEIPT REQUESTED)*

Lucky JJC Inc.
P.O. Box 6919
Beverly Hills, CA  90212-6919

Attn:    Fereshteh Chadorchi, President

Re:    **Gurnee Mills, Gurnee, Illinois - Value City (former Phar-Mar) Parcel**
       **NOTICE OF INTENT TO REPURCHASE**

Dear Mr. Chadorchi:

Please refer to the Declaration of Restrictions dated as of August 31, 1990 and recorded in Lake County, Illinois as Document No. 2943772 (the "Declaration"). Except as otherwise provided in this letter, capitalized terms are used in this letter with the same meanings that such terms have under the Declaration. As a result of several transfers of the Shopping Center Project and the Property, Gurnee Mills Operating Company LLC ("Mills") is the successor in interest to Gurnee Properties Associates Limited Partnership as the Seller under the Declaration and Lucky JJC Inc. is the successor in interest to PMI Associates as the owner of the Property and the Buyer under the Declaration. We understand that American Signature, Inc. ("ASI"), as assignee of Value City Department Stores LLC, is the tenant of the Property under a Lease Agreement dated August 13, 1997 (the "Lease").

By correspondence dated May 28, 2008, we received notice pursuant to Paragraph 2 of the Declaration that the tenant under the Lease intends to change the use of the Property to a Value City Furniture Store. We subsequently received correspondence dated June 20, 2008 from Joel Rubin, on behalf of Lucky JJC Inc., whereby Lucky JJC Inc. joined in May 28, 2008 notice and confirmed the applicability of Paragraph 2.E(ii) of the Declaration, which gives Seller the option to repurchase the Property in the event Buyer or any occupant of the Property notifies Seller that it wishes to change the use of the Property.

**This letter constitutes notice that Seller intends to exercise (and does hereby exercise) the repurchase option granted under Paragraph 2.E of the Declaration. Lucky JJC Inc. shall have thirty (30) days from the date of this letter to select an appraiser and complete the appraisal contemplated under Paragraph 2F of the Declaration. For purposes of Paragraph 2.G of the Declaration, Mills' estimate of the appraised fair market value is $3,500,000.**

At or prior to the consummation of the repurchase transaction, Lucky JJC Inc. will be required to terminate the Lease and obtain the release of all other liens and encumbrances placed or suffered upon the Property by Buyer and/or Buyer's successors or assigns. If the Lease or any other such lien or encumbrance is not terminated or released from the Property, then it shall be extinguished. Accordingly, ASI should not expend any resources (financial or otherwise) toward the proposed change in use of the Property and we assume that ASI does not intend to proceed with any proposed alterations to the Property pending this repurchase. Please let us know immediately if this is not the case.

CHGO2\40259091.1

We look forward to receiving your appraiser's determination of the fair market value of the Property. Please contact me or have your attorney contact our attorneys if you care to discuss this matter in the meantime.

Sincerely,

Gregg Goodman

cc:    PMI Associates
       20 Federal Plaza West
       Youngstown, Ohio 44501
       Attn: Michael Menurs

       Phar-Mor Inc.
       101 Kappa Drive
       R.I.O.C. Park
       Pittsburgh, PA 15235
       Attn: Director of Real Estate

       Lucky JJC, Inc.
       Illinois Corporation Service Company
       801 Adlai Stevenson Drive
       Springfield, IL 62703

       Jason Chadorchi (Jchadorc@tishmanspeyer.com)
       Joel D. Rubin (jrubin@seyfarth.com)
       Richard Sokolov
       Kevin Chumlea
       David Sickle
       John Chen
       [Schottenstein/ASI]
       [Ryan Dolan]

FILED: JULY 30, 2008      131 South Dearborn Street
08CV4339                       Suite 2400
JUDGE DER YEGHIAYAN      Chicago, Illinois 60603
MAGISTRATE JUDGE MASON     (312) 460-5000

                                   fax (312) 460-7000

(312) 460-5600         JFB                  www.seyfarth.com

jrubin@seyfarth.com

May 12, 2008

David Sickle
DLA Piper
203 N. LaSalle Street
Chicago, Illinois 60601

Dear David:

      As you know, we have been retained as counsel by the Chadorchi Trust in regard to the outlot (the "Property") which it controls in Gurnee Mills Mall (the "Mall") and which is currently occupied by Value City pursuant to a lease. It is our impression from reviewing the documents currently available to our client that the buyback right of the Mall owner contained in the Declaration of Restrictions between Gurnee Properties Associates Limited Partnership and PMI Associates dated August 31, 1990 and recorded in Lake County as Document No. 2943172 (the "Declaration") exercisable when the tenant is not operating is no longer in force.

      This conclusion is based in part on the following: (i) the bondable lease between Value City as tenant and the owner of the Property does not require the tenant to stay open for business, which does not appear to be an appropriate result if the Mall owner has a right to buy back the Property, since the Property would still be subject to the lease and the mortgage being subordinate could be released for less than the amount then due, (ii) the fact that going dark is not a default under the lease and does not trigger the joint put of the owner and lender to the tenant, yet a change in use would, can only be explained by the fact that the buy back on going dark must have been previously terminated; otherwise, the lender which thought it had a bondable lease, would no longer be relying on the credit of the tenant in a going dark situation (but on appraised value) even though the loan would be in more jeopardy than in the case of a change in use, (iii) similarly, why was a modification of the use restrictions obtained by the parties to the lease but not a modification of the going dark provisions, (iv) the exceptions to title which are attached as an exhibit to the lease reference the Declaration as to assessments and signage but not the buyback right, and (v) the title policy issued by the title company as part of the financing did not reference the buyback. As we understand it, DLA Piper and its predecessors have represented the successive Mall owners from the development stage through the present and as result should be in possession of many of the relevant documents. We ask that you review your files and provide us with copies of all correspondence and documents which are relevant to the continued existence of the buyback right. (In the event of litigation by either the lender, which may not recover its loan amount and its prepayment penalty (the Declaration could well prime the lender's mortgage) or the Property owner, most, if not all, of this information would be discoverable.)

Separately, after reviewing the Declaration, we disagree with your client's interpretation of the definition of "Appraised Fair Market Value" of the Property, which is to be determined by appraisal pursuant to Section 2 F. The language of the relevant section states, in part, "the appraisers shall appraise the Property solely on the basis of its use as a single user retail facility and shall consider any encumbrances against the Property in making their appraisals." We understand your client's position to be that the language, "any encumbrances against the Property," includes all the provisions of the Declaration. Our client disagrees for one or more of the following reasons:

1.  The above-referenced quotation makes reference to "a single user retail facility." Such language would not be necessary if "encumbrances" included the Declaration, since such requirement is already specifically stated in Section 2A of the Declaration.

2.  The use restrictions in Section 2 A not only restrict the use to a variety or general merchandise store but also state that the Property and/or the building shall be used only for a single retail use. If the use restrictions were also to apply, Section 2 F should have referred to both restrictions, not just the single tenant requirement.

3.  Under Sections 2 D and E, upon repurchase, the Buyer is to convey to Seller "by Special Warranty Deed, good and marketable title to the Property and all improvements thereon and all appurtenances thereon, free and clear of any liens or any encumbrances placed or suffered thereon by the Buyer, and/or Buyer's successors and assigns." Since the Declaration was placed on the Property by Buyer as well as Seller, Buyer is to convey the Property free and clear of the Declaration and the owner is to receive title unburdened by the Declaration, except as a result of acts of Seller. In this case after the conveyance, the Declaration can be amended solely through acts of Seller and those having an interest in Property as a result of the acts of Seller, and, thus, an obligation to convey free and clear may ignore the Declaration.

4.  The language in Section 2 F is meant to address encumbrances which will not continue to affect the value of the Property post acquisition. The Declaration's restrictions are solely in Seller's control and, thus, Seller can modify them in any way it chooses.

5.  The owner of the Mall has a right to repurchase the Property in the event of a change in use. To allow the owner of the Mall to take advantage of the owner of the Property by being able to repurchase the Property in the event of a change in use based on an appraisal which is limited by the uses under the Declaration and then to change the use for its own advantage is clearly self-dealing and not contemplated by the Declaration.

We understand your client is currently in the process of having its appraisal finalized. It is our understanding that your client may be sharing its appraisal with our client, and from that we can conclude whether your client's appraiser agrees with our client on the approach to analyze the value of the Property. Our client has conveyed its interest in working with your client to reach a favorable conclusion of this matter.

Very truly yours,


Joel D. Rubin

cc:    Jason D. Chadorchi
       Tishman Speyer Properties
       One Bush Street, Suite 450
       San Francisco, California 94104

CH3 1132641.2